IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

- - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                                :
        Plaintiff,              :
                                :
vs.                             :        Case No. 4:21-cr-00103
                                :
CARL MURPHY,                    :        TRIAL TRANSCRIPT
                                :
        Defendant.              :           Volume I
- - - - - - - - - - - - - X

                          Courtroom, First Floor
                          U.S. Courthouse
                          123 East Walnut Street
                          Des Moines, Iowa
                          Monday, August 22, 2022
                          8:21 a.m.

BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Chief Judge,
         and a Jury.

APPEARANCES:

For the Plaintiff:        AMY JENNINGS, ESQ.
                          MALLORY E. WEISER, ESQ.
                          United States Attorney's Office
                          U.S. Courthouse Annex
                          110 East Court Avenue, Suite 286
                          Des Moines, Iowa  50309

For the Defendant:        CHRISTINE BRANSTAD, ESQ.
                          Branstad Law
                          2501 Grand Avenue, Suite D
                          Des Moines, Iowa  50312

                          NICHOLAS A. SARCONE, ESQ.
                          Sarcone Law Firm PLLC
                          501 Southwest Seventh Street, Suite J
                          Des Moines, Iowa  50309

                KELLI M. MULCAHY, CSR, RDR, CRR
                   United States Courthouse
                123 East Walnut Street, Room 115
                   Des Moines, Iowa 50309

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| For the Government: | | | | |
| Jacob Murillo | 52 (Weiser) | 80 (Branstad) | | |
| Mark Fredkove | 87 (Jennings) | 100 (Branstad) | | |
| Malek Holmes | 102 (Weiser) | 175 (Branstad) | | |

E X H I B I T S

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|-----------------------|---------|----------|
| 102 - CD with recording of intercepted call | 67 | 67 |
| 102a - Transcript of Government Exhibit 102 | 68 | 68 |
| 103 - CD with recording of intercepted call | 67 | 67 |
| 103a - Transcript of Government Exhibit 103 | 68 | 68 |
| 104 - CD with recording of intercepted call | 67 | 67 |
| 104a - Transcript of Government Exhibit 104 | 68 | 68 |
| 105 - CD with recording of intercepted call | 67 | 67 |
| 105a - Transcript of Government Exhibit 105 | 68 | 68 |
| 106 - CD with recording of intercepted call | 67 | 67 |
| 106a - Transcript of Government Exhibit 106 | 68 | 68 |
| 107 - CD with recording of intercepted call | 67 | 67 |
| 107a - Transcript of Government Exhibit 107 | 68 | 68 |
| 108 - CD with recording of intercepted call | 67 | 67 |
| 108a - Transcript of Government Exhibit 108 | 68 | 68 |
| 109 - CD with recording of intercepted call | 67 | 67 |
| 109a - Transcript of Government Exhibit 109 | 68 | 68 |
| 110 - CD with recording of intercepted call | 67 | 67 |
| 110a - Transcript of Government Exhibit 110 | 68 | 68 |
| 111 - CD with recording of intercepted call | 67 | 67 |
| 111a - Transcript of Government Exhibit 111 | 68 | 68 |
| 112 - CD with recording of intercepted call | 67 | 67 |
| 112a - Transcript of Government Exhibit 112 | 68 | 68 |
| 113 - CD with recording of intercepted call | 67 | 67 |
| 113a - Transcript of Government Exhibit 113 | 68 | 68 |
| 114 - CD with recording of intercepted call | 67 | 67 |
| 114a - Transcript of Government Exhibit 114 | 68 | 68 |

I N D E X (Cont.)

E X H I B I T S

| GOVERNMENT'S EXHIBITS | OFFERED | RECEIVED |
|---|---|---|
| 115 - CD with recording of intercepted call | 67 | 67 |
| 115a - Transcript of Government Exhibit 115 | 68 | 68 |
| 116 - CD with recording of intercepted call | 67 | 67 |
| 116a - Transcript of Government Exhibit 116 | 68 | 68 |
| 117 - CD with recording of intercepted call | 67 | 67 |
| 117a - Transcript of Government Exhibit 117 | 68 | 68 |
| 118 - CD with recording of intercepted call | 67 | 67 |
| 118a - Transcript of Government Exhibit 118 | 68 | 68 |
| 119 - CD with recording of intercepted call | 67 | 67 |
| 119a - Transcript of Government Exhibit 119 | 68 | 68 |
| 201 - CD with pole camera footage | 73 | 73 |
| 202 - CD with pole camera footage | 73 | 73 |
| 203 - CD with pole camera footage | 73 | 73 |
| 204 - CD with pole camera footage | 73 | 73 |
| 205 - CD with pole camera footage | 73 | 73 |
| 300 - Photograph of Carl Murphy | 53 | 53 |
| 301 - Photograph of Malek Holmes | 59 | 59 |
| 302 - Photograph of Pierre Black | 61 | 61 |
| 303 - Photograph of Earl Clay | 61 | 61 |
| 304 - Photograph of Deshawn Greer | 61 | 61 |
| 305 - Photograph of Desmond Howard | 61 | 61 |
| 306 - Photograph of Michael Byrd | 61 | 61 |
| 307 - Photograph of Azim Abdul-Ahad | 61 | 61 |
| 308 - Photograph of Patrick Staples | 61 | 61 |
| 309 - Photograph of Tabaris Brown | 61 | 61 |
| 310 - Photograph of Terrance Lindsay | 61 | 61 |
| 311 - Photograph of Robert Jeffries | 61 | 61 |
| 312 - Photograph of Gregory Spight | 61 | 61 |
| 313 - Photograph of Tony Martin | 61 | 61 |
| 314 - Photograph of Dandre Cox | 61 | 61 |
| 315 - Photograph of Devante Taylor | 61 | 61 |
| 316 - Photograph of Ronald Harris | 61 | 61 |
| 317 - Judgment - USA v. Murphy | 92 | 92 |
| 318 - Stipulation | 51 | 51 |
| 319 - Stipulation | 51 | 51 |
| 325 - Photo of Murphy House | 70 | 70 |
| 326 - Photo of Murphy House | 70 | 70 |
| 327 - Photo of Murphy House | 70 | 70 |
| 328 - Photo of Murphy House | 70 | 70 |

1          P R O C E E D I N G S

2              (In open court, with the defendant present, out of the

3     presence of the jury panel.)

4              THE COURT:  Okay.  We are here in the matter of United

5     States vs. Carl Murphy.  It's Case No. 4:21-cr-103.  The

6     defendant is personally present and represented by his

7     attorneys, Christine Branstad and Nick Sarcone.  The Government

8     is represented by Amy Jennings and Mallory Weiser.  We are here

9     for purposes of a final pretrial conference for a trial set to

10    begin in about 40 minutes.

11             Let's talk about voir dire.  I think we still have two

12    missing questionnaires.  It might be one.  Did the parties --

13    are you still missing one or two?

14             MS. JENNINGS:  The one I was missing was Mr. McKinney.

15             THE COURT:  Okay.  So Henson came in at some point?

16             MS. BRANSTAD:  Your Honor, I don't have Ms. Henson's

17    questionnaire.

18             MS. JENNINGS:  I don't think we have Ms. Henson.

19             THE COURT:  Okay.  So we're missing Henson and

20    McKinney.  We'll have them fill those out when they appear

21    today, and we'll get them to you as soon as we have them.

22             Any particular jurors that we need to discuss this

23    morning before we bring in the group?

24             MS. JENNINGS:  Thank you, Your Honor.

25             The Government noted a few jurors that might need to be

1  spoken to outside the presence of the jury.  We have several

2  that are domestic abuse victims themselves or a family member is

3  a victim of such abuse.  I have those people as No. 4, McCleary;

4  No. 28, Manuel; No. 17, Monroe; and No. 30, Minger.

5       Although this isn't a case that involves any type of

6  allegations of violence against the defendant, when asking the

7  potential jurors about their satisfaction with the criminal

8  justice system in the outcome of those cases, it might be

9  advisable to do that outside the presence of the jury,

10  especially with respect to Ms. McCleary, who it looks like the

11  husband is in prison for intimidation with a dangerous weapon.

12       THE COURT:  Is that what his charge was?

13       MS. JENNINGS:  From her questionnaire, she reports that

14  he was convicted of domestic abuse against her, domestic

15  violence.

16       THE COURT:  Right.

17       MS. JENNINGS:  When we looked him up on the DOC, it

18  looks like he's in prison for intimidation with a dangerous

19  weapon.  I'm not entirely sure if those are stemming from the

20  same set of facts, but he is currently incarcerated in state

21  prison.

22       THE COURT:  Okay.  Thoughts on that, Mr. Sarcone or

23  Ms. Branstad?

24       MS. BRANSTAD:  Your Honor, I have no objection to

25  speaking with those people individually.  I did notice that

1  those were the same people -- I agree that those are the people

2  who listed themselves as victims of domestic abuse.

3       THE COURT:  Okay.  Any other ones that the Government

4  noticed?

5       MS. JENNINGS:  Yes, Your Honor.  No. 7 on the second

6  list.

7       THE COURT:  Yeah.

8       MS. JENNINGS:  His name is Jason Schmidt.  He says

9  that -- well, he gives a lot of commentary, the most of which is

10  that he is not willing to take an oath.  He also made a

11  statement about a family member or an associate who, quote, was

12  the victim of a, quote, clearly unprovable date rape.

13       Just might be some issues with the no oath, in the

14  Government's viewpoint, that may warrant not having him seated

15  at all.

16       And then No. 1 on the first list, Diane Erickson, the

17  Government notes that she appears to have either been selected

18  for federal grand jury in 2017 or at least been part of that

19  process.

20       THE COURT:  This case wouldn't have been heard by a

21  grand jury back in 2017, correct?

22       MS. JENNINGS:  That's correct, Your Honor.

23       THE COURT:  Okay.  I had noticed that as well.  We'll

24  explore that with her.

25       Ms. Branstad, what's your thought with respect to

1  Mr. Schmidt, who has advised that he won't take an oath?

2          MS. BRANSTAD:  Well, I certainly think he can be asked

3  about that just to determine if that is actually his stance.

4          THE COURT:  Anyone that the defense saw that you think

5  we should talk to outside the presence of everybody else?

6          MS. BRANSTAD:  Well, Your Honor, with regard to Juror

7  No. 1, Diane Erickson, she notes that she has a child with the

8  last name Weiser.  So if the Court speaks with her separately,

9  certainly at that point asking if there is any relation with

10  Ms. Weiser for the prosecution would make sense.

11          THE COURT:  Are you aware of any connection to her?

12          MS. WEISER:  No, Your Honor.

13          THE COURT:  Okay.  She'll be asked if she knows any of

14  the people, including Ms. Weiser.

15          Okay.  Who will be doing voir dire on behalf of the

16  Government?

17          MS. JENNINGS:  I will, Your Honor.

18          THE COURT:  And on behalf of the defendant?

19          MS. BRANSTAD:  I will, Your Honor.

20          THE COURT:  Okay.  Let's talk about the witness lists.

21          Thank you, Ms. Weiser, for sending us the list of all

22  the names that might come up.  That's very helpful.

23          I know Agent -- or I should say Mr. Murillo is from

24  Polk County.

25          What's your official title?  Are you a detective,

1  sergeant --

2          DEPUTY MURILLO:  Deputy.

3          THE COURT:  Deputy.

4          And is it Murillo?  Is that how it's pronounced?

5          DEPUTY MURILLO:  Yes.

6          THE COURT:  Okay.  Fredkove?  Is that how that's

7  pronounced?

8          Malek Holmes is from the Des Moines area, right,

9  originally, or is he from Chicago?

10          MS. WEISER:  He's originally from Chicago.  It's Malek.

11          THE COURT:  Malek.

12          Okay.  What about the rest of these folks?  Black,

13  Pierre Black, is he from here, from there, where is he --

14          MS. WEISER:  Chicago.

15          THE COURT:  Earl Clay?

16          MS. WEISER:  Indiana and Chicago area.

17          THE COURT:  Deshawn Greer?

18          MS. WEISER:  Chicago.

19          THE COURT:  Desmond Howard?

20          MS. WEISER:  Chicago.

21          THE COURT:  Michael Byrd?

22          MS. WEISER:  Chicago.

23          THE COURT:  Azim Abdul-Ahad?

24          MS. WEISER:  Chicago.

25          THE COURT:  Patrick Staples?

1          MS. WEISER:  Chicago.

2          THE COURT:  Is it Tabaris Brown?

3          MS. WEISER:  Tabaris Brown.

4          THE COURT:  Tabaris?

5          MS. WEISER:  Chicago.

6          THE COURT:  Terrance Lindsay?

7          MS. WEISER:  Chicago.

8          THE COURT:  Robert Jeffries?

9          MS. WEISER:  Chicago.

10         THE COURT:  Gregory Spight?

11         MS. WEISER:  Chicago.

12         THE COURT:  Is that how it's pronounced?

13         MS. WEISER:  Yes.

14         THE COURT:  Tony Martin?

15         MS. WEISER:  Chicago.

16         THE COURT:  Dandre Cox?

17         MS. WEISER:  Chicago.

18         THE COURT:  Devante Taylor?

19         MS. WEISER:  Chicago.

20         THE COURT:  Ronald Harris?

21         MS. WEISER:  Chicago.

22         Some of those individuals have lived in the Des Moines

23    area recently, but they are all from Chicago originally and have

24    lived the majority of their lives in Chicago.

25         THE COURT:  Okay.  Which one of those also would have

1  any kind of Des Moines presence in the last few years?

2          MS. WEISER: All of them.

3          THE COURT: Okay. All right.

4          And on the defendant's list, you have Jon Murphy.

5  Where is that person from?

6          MS. BRANSTAD: Chicago, Your Honor.

7          THE COURT: Anthony Smith?

8          MS. BRANSTAD: Chicago.

9          THE COURT: Carmen -- is it Conda?

10         MS. BRANSTAD: Yes, Your Honor. And also from Chicago.

11         THE COURT: Star -- is it Tricey -- Williams?

12         MS. BRANSTAD: Yes, Your Honor.

13         THE COURT: From?

14         MS. BRANSTAD: Also from Chicago.

15         THE COURT: And Kenosha Calvin Murphy?

16         MS. BRANSTAD: Also from Chicago. And none of them

17  have any Des Moines presence.

18         THE COURT: All right. Ms. Branstad, you were going to

19  think over the past week about whether or not the defendant

20  wanted a bifurcated trial on the issue of his prior conviction.

21  Did you make a decision about that?

22         MS. BRANSTAD: Yes, Your Honor.

23         THE COURT: And he does want the bifurcated trial?

24         MS. BRANSTAD: Yes, Your Honor.

25         THE COURT: Okay. Last week the defendant was also

1   going to think about the issue of transcripts.  The Government

2   has proposed using those as substantive evidence as opposed to

3   demonstrative evidence.  What's your decision on that,

4   Ms. Branstad?

5           MS. BRANSTAD:  Your Honor, we will stipulate to use of

6   them as exhibits, but not necessarily to the accuracy of each

7   word.  So I believe they can be submitted to the jury, but if

8   there's a discrepancy, I would ask that the jury be asked to

9   rely on the audio recordings.

10          THE COURT:  Okay.  We'll give them that standard

11  instruction.

12          Let's make our Frye record.

13          Ms. Jennings or Ms. Weiser, would you like to summarize

14  any plea offers that have been made to Mr. Murphy?

15          MS. WEISER:  Yes, Your Honor.  Thank you.

16          On December 12th, 2021, the Government extended a plea

17  agreement to the defendant.  This plea agreement withdrew an 851

18  notice which increased the defendant's mandatory minimum from

19  five years to ten years, so with the withdrawal, it would be a

20  five-year mandatory minimum.  This was rejected by the

21  defendant.

22          On April 19th, 2022, after negotiations with defense

23  counsel, the Government extended a plea agreement pursuant to

24  Rule 11(c)(1)(C) agreeing to a guideline range of 168 to 210

25  months, holding the defendant accountable for 1.2 to 4 kilos of

a mixture and substance containing fentanyl, plus two

enhancement for maintaining a premises, plus two for leader or

manager.  This plea agreement withdrew an 851 notice which would

have increased the defendant's mandatory minimum.  Defendant

rejected this agreement.

On June 16th, 2022, after negotiations with the

defendant, the Government sent two plea agreements, both of the

prior that were just explained, an open-ended one that withdrew

the 851 and the (c)(1)(C) agreement, but Defendant rejected

both.

On July 19th, 2022, the Government superseded on drug

quantity as to this defendant.

On July 21st, 2022, the Government extended a plea

agreement withdrawing the 851 notice, which otherwise increases

the defendant's mandatory minimum from 10 years to 15 years.

Defendant rejected this agreement.

On July 28th, 2022, the same plea agreement, which --

was extended to Defendant, along with a letter detailing an

overview of the defendant's -- excuse me -- the evidence the

Government intends to admit at trial and what the Government

believes Defendant's expected guideline range to be with various

enhancements of 292 to 365 months.  The defendant rejected this

agreement.

The terms of any plea offer, if accepted by the Court,

would have resulted in a much lower sentence than if Defendant

is convicted at trial.

THE COURT:  Ms. Branstad or Mr. Sarcone, any addition to the various plea offers, additional record?

MS. BRANSTAD:  No, Your Honor.

THE COURT:  Mr. Murphy, were you aware of all those various offers?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  And it was your decision to reject those offers and proceed to trial?

THE DEFENDANT:  Yes, ma'am.

THE COURT:  Okay.  Who will be making openings on behalf of the United States?

MS. JENNINGS:  I will, Your Honor.

THE COURT:  Okay.  And on behalf of the Defendant?

MR. SARCONE:  I will, Your Honor.

THE COURT:  Anything else we need to talk about today?

MS. JENNINGS:  Yes, Your Honor.

With respect to the preliminary jury instructions, the Government wanted to make sure that the defendant and the Court were aware that we were requesting that fentanyl be removed from that.

THE COURT:  Yes.  I made that change throughout the instructions.  Mr. Chrismer has a copy of the final ones here. Do you have them here in the courtroom?

So, yeah, the instructions no longer contain any

1    reference to fentanyl.

2           MS. JENNINGS:  Thanks so much.

3           We have some stipulated evidence, as the Court has just

4    discussed with the parties; specifically, the transcripts that

5    we're going to admit, as well as the recordings from the wiretap

6    itself.  The Government would like to ask for permission to move

7    for those into evidence pursuant to the stipulation prior to

8    calling our first witness as opposed to moving for admission

9    during the direct examination itself.

10          THE COURT:  Yeah.  If they're stipulated to, there's no

11   objection to that.

12          MS. JENNINGS:  The Government would like to make the

13   Court and defense counsel aware that we intend to use a

14   demonstrative PowerPoint during the examinations of Investigator

15   Murillo and Malek Holmes that will consist of portions of

16   evidence that have already been admitted at that point.

17          As far as the order of witnesses, the Government is

18   planning to call Investigator Murillo twice.  We will start with

19   Investigator Murillo, then we will call Special Agent Fredkove,

20   then we will call Malek Holmes.  After that we will recall

21   Special Agent -- excuse me -- Investigator Murillo, and then end

22   with Sergeant Carney.

23          Over the weekend, the Government replaced Exhibit 317,

24   which is the defendant's prior federal conviction.  The original

25   Exhibit 317 was just the first page of that judgment that only

1  showed the conviction, the charge for which he was convicted.

2  The new exhibit shows two pages of the judgment; the first page,

3  which was a part of the original exhibit, and then also the

4  second page, which shows that he was sentenced to 120 months of

5  imprisonment.  The Government believes that that is appropriate

6  evidence to be put forth before the jury.

7            THE COURT:  Okay.

8            MS. JENNINGS:  The Government also added one more

9  exhibit, Exhibit 331, which is the BOP's sentence computation

10 for Mr. Murphy showing that he served over eight years on that

11 prior 2011 conviction.  There's a business records declaration

12 along with that exhibit that the Government believes will result

13 in its admission.

14           With respect to voir dire, I do have one question, Your

15 Honor, which I've gotten tripped up on before in front of other

16 judges.  After the Government does its voir dire, would the

17 Court prefer for the Government to move for cause -- move to

18 strike for cause at the end of our voir dire or wait until

19 defense does their voir dire and then both parties will move to

20 strike for cause?

21           THE COURT:  I would ordinarily have both people do

22 their questioning and then ask if you pass for cause or if you

23 have motions, and then we take them up simultaneously, kind of,

24 in the back.

25           MS. JENNINGS:  Thank you, Your Honor.

1          With respect to the motion in limine and the ruling,

2     the Court's ruling, on gang evidence, at this time the

3     Government is limiting quite significantly the amount of gang

4     evidence.

5          The Government would like the Court to be aware that we

6     have been listening to some jail phone calls that suggest that a

7     line of defense may be that the other defendants who are in this

8     case are not gang members, were not real gang members, or that

9     the structure of the gang is not the same as it was back in the

10    day in Chicago.

11         It's the Government's view that if that is a line of

12    defense, we would be recalling Malek Holmes to provide further

13    testimony about the existence of the gang, its structure, to

14    rebut that line of defense based on the theory that the

15    Government had opened the -- excuse me -- that the defendant had

16    opened the door to that type of evidence.

17         THE COURT:  Okay.  The calls you're listening to are

18    presumably not with counsel, so who is he discussing --

19         MS. JENNINGS:  Family members.

20         THE COURT:  Okay.

21         MS. JENNINGS:  Additionally, at this time, the

22    Government does not plan on introducing evidence that the

23    defendant -- or bringing up that the defendant was on supervised

24    release at the time a lot of these offenses occurred; however,

25    in the event that the defendant calls character witnesses to

1  demonstrate or attempt to demonstrate that he's a law-abiding

2  citizen, the Government anticipates presenting evidence that he

3  was on supervised release at the time that these offenses took

4  place and as well as jail calls in which he admits to smoking

5  weed and marijuana while on supervised release in its rebuttal

6  case.

7          THE COURT:  Has a summary been provided to the

8  Government of what the defense witnesses are anticipated to

9  testify about?

10         MS. JENNINGS:  No.  We were just provided their names

11 yesterday and their -- excuse me -- their names on Friday and

12 their dates of birth yesterday.  We don't have any idea of how

13 they relate to the case, what they're going to testify to.  We

14 have no reports.

15         THE COURT:  Doesn't the stipulated discovery order

16 require that?

17         MS. JENNINGS:  It does.

18         THE COURT:  Okay.  What are your witnesses going to be

19 testifying about?

20         MS. BRANSTAD:  Your Honor, essentially, the witnesses

21 will be testifying that Mr. Murphy was at home and that he

22 was --

23         THE COURT:  Okay.  Let's just go one by one.  Who is

24 Jon Murphy?

25         MS. BRANSTAD:  Jon Murphy is an acquaintance and friend

1   of -- or, I'm sorry, Jon Murphy is the brother of Carl Murphy.

2   He would be testifying that Mr. Murphy was generally at home;

3   that he was not out gambling, out running the streets, that he

4   was within his home most of the time.

5           THE COURT:  Did Jon Murphy live with him?

6           MS. BRANSTAD:  No.

7           THE COURT:  Okay.  Anthony Smith?

8           MS. BRANSTAD:  Anthony Smith is a friend who will

9   testify that Carl Murphy encouraged him to and helped him find

10  work, that Carl Murphy could be found at home and working.

11          THE COURT:  Okay.  Did he live with the defendant?

12          MS. BRANSTAD:  He did not.

13          THE COURT:  Carmen Conda?

14          MS. BRANSTAD:  Carmen Conda would have similar

15  testimony to Jon Murphy, that she would regularly go to the home

16  and find Carl Murphy at home and not out in the streets or in

17  the neighborhood where the gang members are.

18          THE COURT:  And what's her connection to the defendant?

19          MS. BRANSTAD:  A family friend.  Has known him for a

20  very long time.

21          THE COURT:  Okay.  Star Tricey Williams?

22          MS. BRANSTAD:  Star Tricey Williams is familiar both

23  with Mr. Murphy and with Malek Holmes.  She could testify,

24  either or both, to Mr. Holmes' reputation for truthfulness or

25  Mr. Murphy's regularity being at the home or in community

1  functions.

2         THE COURT:  How does she know Malek Holmes?

3         MS. BRANSTAD:  Through the community and through a

4  number of people who have connection with Malek Holmes.

5         THE COURT:  Okay.  So she's personally aware, she's

6  personally knowledgeable about him?

7         MS. BRANSTAD:  She's both personally knowledgeable

8  about him and is aware of his reputation within the community.

9         THE COURT:  Based on?

10        MS. BRANSTAD:  On knowing people who know Mr. Holmes as

11 well.

12        THE COURT:  Okay.  Kenosha, what's her connection?

13        MS. BRANSTAD:  That is Mr. Murphy's wife.  She can

14 testify to the layout of the home, the contents of the home,

15 observations, and their lifestyle.

16        THE COURT:  Okay.  Still anticipating that the defense

17 case would take less than a half-day?

18        MS. BRANSTAD:  Yes, Your Honor.

19        THE COURT:  All right.  Ms. Jennings, any other issues?

20        MS. JENNINGS:  The last issue, Your Honor, is that I

21 don't believe this falls within gang evidence, the way that it's

22 going to be raised, but the defendant's nickname was The P,

23 short for The Prince, and that evidence is going to be -- I

24 mean, it is a gang moniker, but it's going to be elicited from

25 Malek Holmes.

1    We anticipate that he'll be saying the defendant was

2  known as The P and that he will either say The P stood for The

3  Prince or The Prince of the Moes.  The Government is going to

4  use the name The P and The Prince in its opening statement.

5    THE COURT:  The Prince of the Moes, M-o --

6    MS. JENNINGS:  M-o-e-s.  I guess we never asked how it

7  was spelled, but that's the Government's understanding.

8    I just wanted to make the Court and defense counsel

9  aware of that.

10    THE COURT:  Okay.  Anything else to discuss for the

11  defendant?

12    MS. BRANSTAD:  Your Honor, may I approach counsel for

13  just one moment?

14    THE COURT:  Yes.

15    (Counsel conferred off the record.)

16    THE COURT:  Go ahead, Ms. Branstad.

17    MS. BRANSTAD:  Your Honor, I would ask that we be

18  allowed the opportunity to look at the demonstrative exhibit

19  prior to examination to determine if there is any objection to

20  that demonstrative being used during examination.

21    THE COURT:  Ms. Jennings?

22    MS. WEISER:  Your Honor, I am the attorney that's going

23  to be using the demonstratives.  They're similar to the

24  Government using Trial Director.  It's just like portions of

25  transcripts that are already in and photos of individuals that

1  are already in.  So it's the same as if I had Ms. Kruse do it at

2  the exact same time, it's just for a more streamlined

3  presentation.

4        THE COURT:  Okay.  All right.  Ms. Branstad, if you see

5  anything that's objectionable, object, and we'll take it up at

6  that time.

7        I don't have copies of the defense exhibits.  Do you

8  have copies of those for me?

9        MS. BRANSTAD:  Your Honor, I believe those were

10 delivered on Friday.

11       THE COURT:  Okay.

12       MS. BRANSTAD:  I don't have additional copies.

13       THE COURT:  Okay.  I'll look for those to see if we can

14 track those down.

15       Two juror issues have arisen during the check-in

16 process this morning.  As to Juror No. 22, Poonam Guragai, he is

17 having some serious difficulties with English.  He brought his

18 child to translate for him.  He's asked for an interpreter to

19 help him.  We're not certain.  We think he is originally from

20 Nepal.  We probably want to speak with him outside the presence

21 of everyone else.  If he's unable to converse in English, then

22 he is not eligible to serve as a juror in this case.

23       The alternate No. 5, Thomas Murphy, his daughter tested

24 positive for COVID.  They live together.  He does not have any

25 symptoms at the moment, but that happened, I think, this

morning.

        Is that right, Kyle?

        THE COURTROOM CLERK:  I'm not sure.

        THE COURT:  So he is here in the hall wearing a mask
and separated from everybody else.

        What are your thoughts with respect to how to handle
that situation, Ms. Jennings?

        MS. JENNINGS:  Is it No. 5 Thomas Murphy or No. 5 Les
Hostetter?

        THE COURT:  No. 5, Thomas Murphy, the alternate.

        MS. JENNINGS:  The Government really defers to the
Court as far as exposure issues at this point in the COVID
pandemic.

        THE COURT:  Okay.  Ms. Branstad?

        MS. BRANSTAD:  Your Honor, I have no objection to
dismissing Mr. Murphy without additional questioning.

        THE COURT:  All right.  Let me try and find out when
she tested positive and whether he has tested negative in the
meantime.  I suspect this is an issue that will raise its head
probably more than once during the course of any trial, and so
we'll want to take a kind of measured approach to that.

        Okay.  Why don't you go ahead, then, take the next ten
minutes to sort of finish prepping for the morning, and then
we'll start bringing in the jurors we need to speak to.

        Have the two missing questionnaires checked in yet,

1  Kyle?

2         THE DEPUTY CLERK:  One has.

3         THE COURT:  So they're preparing, presumably, their

4  questionnaires.

5         All right.  Go ahead and take the next ten minutes, and

6  we'll get started, then, at 9.

7         (Recess at 8:50 a.m. until 9:00 a.m.)

8         THE COURT:  Okay.  We have excused the man who had the

9  COVID exposure.  We've got enough jurors here that I'm not as

10  worried about running out of people, and it's probably better

11  not to expose the rest of the jury.  So we have excused

12  Mr. Murphy.

13         We're going to bring in Juror No. 22 to see if we can

14  assess his language needs.  And Mr. Chrismer has just provided

15  you with the final missing questionnaire, which was for Justin

16  McKinney.  We have not been able to reach Rebecca Henson.  She's

17  not responding, so I anticipate that she won't be here, so we'll

18  be replacing her with James Karns.

19         MS. BRANSTAD:  Your Honor, do you move all the jurors

20  or do you put that person in that place?

21         THE COURT:  They just sit in that place.

22         All right.  Kyle, do you want to go see if you can grab

23  Mr. Guragai, the Nepalese man.

24         (Prospective Juror Guragai entered the courtroom.)

25         THE COURT:  Hi.

1          PROSPECTIVE JUROR GURAGAI:  Hi.

2          THE COURT:  Are you Poonam Guragai?

3          PROSPECTIVE JUROR GURAGAI:  Yes.

4          THE COURT:  Is English your first language?

5          PROSPECTIVE JUROR GURAGAI:  Nepali.

6          THE COURT:  Nepali?  How comfortable are you with

7    English?

8          PROSPECTIVE JUROR GURAGAI:  I understand it a little.

9          THE COURT:  Will you have trouble following the

10   evidence without an interpreter?

11         PROSPECTIVE JUROR GURAGAI:  Yeah.

12         THE COURT:  Okay.  All right.  How is your reading in

13   English?

14         PROSPECTIVE JUROR GURAGAI:  Reading is good, but I

15   don't know how to speak it and, what you say, with a reply.  I

16   don't know.  A little.

17         THE COURT:  Okay.  So you can understand better what

18   you read than you can speak?

19         PROSPECTIVE JUROR GURAGAI:  Yeah.  I speak, it is

20   difficult for me.

21         THE COURT:  Speaking is difficult for you?

22         PROSPECTIVE JUROR GURAGAI:  Yeah.

23         THE COURT:  Are you comfortable serving as a juror if

24   the entire trial is in English?  Would you be able to follow

25   everything if it happens entirely in English?

1          PROSPECTIVE JUROR GURAGAI:  No.

2          THE COURT:  No?  Okay.

3          All right.  Any objection to excusing this juror?

4          MS. BRANSTAD:  No, Your Honor.

5          MS. JENNINGS:  No, Your Honor.

6          THE COURT:  Thank you for coming in.  We really

7    appreciate it.  We're going to wait for a different trial for

8    you.  So you can go on home.  You don't have to stay.  Thank

9    you.

10          PROSPECTIVE JUROR GURAGAI:  Okay.  Thank you.

11          (Prospective Juror Guragai left the courtroom.)

12          THE COURT:  All right.  She will be replaced -- well,

13   let's just talk with Mr. Schmidt first because that's who

14   will -- do you want to grab Jason Schmidt.

15          (Prospective Juror Schmidt entered the courtroom.)

16          THE COURT:  Are you Jason Schmidt?

17          PROSPECTIVE JUROR SCHMIDT:  Yes, I am.

18          THE COURT:  Hi.  On your questionnaire, you had advised

19   that you won't take or you're not comfortable taking an oath of

20   certain types, so we wanted to visit with you about that.  I

21   appreciate you flagging that on your questionnaire.

22          In this case, you would be asked to take an oath to

23   apply the law that I give to you and to make a decision based

24   only on the evidence that was introduced, whether you agree with

25   the law or you don't agree with the law.  Would you be able to

1    take that oath?

2           PROSPECTIVE JUROR SCHMIDT:  No.

3           THE COURT:  Okay.  Anything -- is there any type of

4    case for which you would be able to take an oath?  In other

5    words, is it the type of case that matters or is it the oath

6    that matters for you?

7           PROSPECTIVE JUROR SCHMIDT:  I don't know that I could

8    pick out a type of case --

9           THE COURT:  Okay.

10          PROSPECTIVE JUROR SCHMIDT:  -- without knowing more of

11   the details, so --

12          THE COURT:  So it's a moral belief that you hold?

13          PROSPECTIVE JUROR SCHMIDT:  Yeah.  The environment of

14   the way the laws are created, I can't do that.

15          THE COURT:  Any objection to excusing Mr. Schmidt?

16          MS. JENNINGS:  No objection.

17          MS. BRANSTAD:  No objection, Your Honor.

18          THE COURT:  Mr. Schmidt, you are excused.  Thank you

19   for letting us know about that situation.  You can go ahead and

20   go on home.  Thanks.

21          (Prospective Juror Schmidt left the courtroom.)

22          THE COURT:  All right.  So we will be replacing, then,

23   Ms. Guragai, No. 22, with Alternate Juror No. 6, Mr. McKinney.

24          Kyle, if you can find Diane Erickson, she would be the

25   next person to talk to.

1          (Prospective Juror Erickson entered the courtroom.)

2          PROSPECTIVE JUROR ERICKSON:  Hi.

3          THE COURT:  Hello, Ms. Erickson.  You had indicated on

4   your questionnaire that you, back in 2017, had been part of the

5   grand jury here in the Southern District of Iowa.  Were you

6   selected and served or were you just part of the group that was

7   brought in to --

8          PROSPECTIVE JUROR ERICKSON:  No.  Oh, no.  I was on it

9   for a year.

10         THE COURT:  Welcome back.

11         PROSPECTIVE JUROR ERICKSON:  Well, thank you.

12         THE COURT:  Was there anything about that experience

13  that would make it hard for you to serve in a case where you're

14  not being asked whether there's probable cause if somebody

15  committed a crime but asked whether or not the Government's

16  proved beyond a reasonable doubt that somebody committed a

17  crime?

18         PROSPECTIVE JUROR ERICKSON:  No.

19         THE COURT:  Okay.  You understand the burden of proof

20  is very different from what a grand jury does?

21         PROSPECTIVE JUROR ERICKSON:  Absolutely.

22         THE COURT:  Okay.  All right.  Go ahead and join the

23  group again.  We'll see you shortly.

24         PROSPECTIVE JUROR ERICKSON:  Thank you.

25         THE COURT:  You were No. 1 pulled for this batch, so

1  you'll be leading the group in.

2          PROSPECTIVE JUROR ERICKSON:  Thank you.

3          (Prospective Juror Erickson left the courtroom.)

4          THE COURT:  Kyle, do you want to find Marcy Minger.

5          (Prospective Juror Minger entered the courtroom.)

6          THE COURT:  Good morning, Ms. Minger.

7          PROSPECTIVE JUROR MINGER:  Good morning.

8          THE COURT:  You had indicated on your questionnaire

9  that you had been the victim of a very serious crime back in

10 1994.  This is not a case that has anything to do with that,

11 won't touch upon that, will be no allegations of that.  But is

12 there anything about that experience that would impact your

13 ability to serve in a criminal case involving drugs, for

14 instance?

15         PROSPECTIVE JUROR MINGER:  No.

16         THE COURT:  Okay.  Thank you for that.  I just didn't

17 want to ask you those questions in front of everybody else.

18         So you can go ahead and go back to the rest of the

19 group, okay?

20         PROSPECTIVE JUROR MINGER:  Thank you.

21         (Prospective Juror Minger left the courtroom.)

22         THE COURT:  Do you want to find Ms. McCleary.

23         (Prospective Juror McCleary entered the courtroom.)

24         THE COURT:  Good morning, Ms. McCleary.

25         PROSPECTIVE JUROR McCLEARY:  Hi.

1          THE COURT:  On your questionnaire, you had flagged an

2     issue involving that you had been a victim of domestic violence

3     and that your -- I think it's your ex-husband now is in prison

4     as a result of maybe that incident.

5          Is there anything about that situation for you that

6     would make it hard for you to be fair and impartial in a

7     criminal case that does not involve any allegations of domestic

8     violence?  There's nothing of that -- this is a drug case.

9          Anything about that experience, which I'm sure was

10    fairly traumatic for you -- can you help me understand, maybe,

11    how that might impact you?

12         PROSPECTIVE JUROR McCLEARY:  There was drugs involved.

13         THE COURT:  Okay.  Do you feel like this is the kind of

14    case where you could be fair and impartial or is this one that's

15    just too close to home for you?

16         PROSPECTIVE JUROR McCLEARY:  Too close to home,

17    probably.

18         THE COURT:  I'm going to go ahead and excuse you.

19    Thank you for letting us know about that situation.  I'm sorry

20    you suffered that, and I hope things get better for you, okay?

21         (Prospective Juror McCleary left the courtroom.)

22         THE COURT:  Okay.  We are going to replace Ms. McCleary

23    with Ms. Butler, Jessica Butler.

24         Okay.  Kyle, do you want to see if you can find Alisha

25    Manuel.

1          (Prospective Juror Manuel entered the courtroom.)

2          THE COURT:  Good morning.

3          PROSPECTIVE JUROR MANUEL:  Good morning.

4          THE COURT:  Ms. Manuel, you had indicated on your

5    questionnaire that you had been a victim of domestic violence in

6    the past.  This is not a case that involves any allegations of

7    domestic violence, it's a drug case, but we wanted to talk to

8    you --

9          PROSPECTIVE JUROR MANUEL:  It's a what case?  I'm

10   sorry.

11         THE COURT:  It's just a drug case.

12         PROSPECTIVE JUROR MANUEL:  Oh, okay.

13         THE COURT:  Is there anything about that experience for

14   you that would make it hard for you to be fair and impartial in

15   any kind of criminal case, a drug case, for instance?

16         PROSPECTIVE JUROR MANUEL:  No.

17         THE COURT:  Okay.  Anything about how that was handled

18   by the police, anything like that, that would impact you?

19         PROSPECTIVE JUROR MANUEL:  No.

20         THE COURT:  Okay.  Thank you.

21         PROSPECTIVE JUROR MANUEL:  Thank you.

22         THE COURT:  Yes.

23         (Prospective Juror Manuel left the courtroom.)

24         THE COURT:  Zanna Monroe is the last one.

25         THE DEPUTY CLERK:  What was the name?

1          THE COURT:  Zanna or Zanna Monroe.  It's No. 17 on the

2     chart.

3          THE DEPUTY CLERK:  Thank you.

4          (Prospective Juror Monroe entered the courtroom.)

5          THE COURT:  Hello.

6          PROSPECTIVE JUROR MONROE:  Where do I sit?

7          THE COURT:  You're fine right there, actually.

8          Mr. Monroe, you had indicated on your questionnaire

9     that your father had victimized your mother through domestic

10    violence.  This is not a case about domestic violence, it's a

11    regular drug case, but we wanted to make sure that that wasn't

12    something that might impact your ability to be fair and

13    impartial in a criminal case.

14         Was there anything about that experience that would

15    impact your ability to sit in a drug case?

16         PROSPECTIVE JUROR MONROE:  Not really.

17         THE COURT:  Okay.  Anything about how the police

18    handled that that would impact your decision-making?

19         PROSPECTIVE JUROR MONROE:  (Prospective Juror Monroe

20    shook his head.)

21         THE COURT:  We wanted to talk to you about that without

22    everybody else hearing about that situation, so thank you for

23    coming in.  You can go on back, and we'll call you in in just a

24    few minutes.

25         (Prospective Juror Monroe left the courtroom.)

```
1              THE COURT:  Okay.  Anything else to talk about, then,
2    before we bring in our group?
3              MS. JENNINGS:  No, Your Honor.
4              MS. BRANSTAD:  No, Your Honor.
5              THE COURT:  Okay.  We'll go ahead and bring in our
6    prospective jurors.
7              (In open court, with the defendant present, in the
8    presence of the jury panel.)
9              (A jury was duly impaneled and sworn.)
10             THE DEPUTY CLERK:  Thank you.
11             THE COURT:  Thank you.  You can be seated.
12             We are now going to be creating a new seating chart
13   with the 14 of you.  I know we've been talking with you this
14   morning and we know many of your names, but I'm going to ask you
15   just to give them to us again slowly so we can make sure we are
16   accurate in our newest chart.
17             So I'm going to start in the back.  Could you give us
18   your name?
19             JUROR MEDICK:  Duane Medick.
20             THE COURT:  Okay.
21             JUROR OLESON:  Brian Oleson.
22             JUROR OBERENDER:  Benjamin Oberender.
23             JUROR McKINNEY:  Justin McKinney.
24             JUROR SANDOVAL:  Rebecca Sandoval.
25             JUROR MEIER:  Chelsea Meier.
```

1          JUROR ALT:  Brian Alt.

2          THE COURT:  Get all those?

3          Okay.  Front row, we're going to start again, a little

4   bit slower.  Go ahead.

5          JUROR LETH-NISSEN:  Tanner Leth-Nissen.

6          JUROR KLOKIC:  Adnan Klokic.

7          JUROR ERICKSON:  Diane Erickson

8          JUROR MAKUS:  Courtney Makus.

9          JUROR VAN VEEN:  Anna Van Veen

10         JUROR MARR:  Summer Marr.

11         JUROR MINGER:  Marcy Minger.

12         THE COURT:  Get them all?

13         Okay.  Perfect.  Thank you.

14         I want to let you know what's going to happen next.  So

15  in a few minutes, I'm going to go over preliminary jury

16  instructions with you.  Those are just the instructions that

17  will guide you until the end of the case when I give you the

18  final instructions.

19         Then you're going to hear the parties' opening

20  statements.  Each party gets 15 minutes to do their opening

21  statement.

22         Then we will send you to lunch.  We're going to take a

23  little longer lunch today so that you have time to move cars if

24  you need to, contact people to let them know that you'll be

25  staying with us, find lunch if you're not familiar with the

1  downtown area.

2          You will be staying in the jury room throughout the
3  trial if you're not here in the courtroom with us.  It's that
4  door at the back of the room there.  Mr. Chrismer will take you
5  in and out of the courtroom.  There are restrooms back there.
6  There is a refrigerator, a microwave, a coffee pot.

7          You're welcome to bring snacks with you to the
8  courthouse if you want to eat here.  You're welcome to do that.
9  We will take morning and afternoon breaks and a lunch break each
10 day.

11         You are welcome to bring drinks into the courtroom with
12 you, if you'd like, as long as it has a lid on it so if it tips
13 over we can save the carpet.  So if you are somebody who needs
14 or wants morning or afternoon caffeine or you just want a bottle
15 of water to drink, you're welcome to bring those drinks with you
16 into the courtroom.

17         You will be allowed to have your cell phones now that
18 you've been chosen.  You can't have them on in the courtroom,
19 but you can have them with you off or you can leave them in the
20 backroom so that you can use them on breaks or over your lunch
21 hour.  You'll be allowed to do that throughout the trial until
22 you start deliberating, at which point they have to stay out of
23 the room during deliberations.

24         This courthouse is old.  Sometimes it's like an icebox
25 in here, sometimes it's like a sauna.  Sometimes it's relatively

comfortable.  We never quite know what the day is going to bring

us.  So dress in layers.  Please be comfortable.  You're welcome

to dress up if you enjoy dressing up.  You're welcome to dress

down if that's more comfortable for you.  The most important

thing to me is that you're comfortable enough to listen and hear

all the evidence in the case, so whatever that looks like for

you is fine with me.

We're going to go ahead at this point and pass out the

preliminary jury instructions.  You'll each get your own copy,

and then I'll go over those with you.

Okay.  Ladies and gentlemen, I know that you're able to

read.  I am required by law to read these to you, so you're

welcome to listen or follow along.  Whichever is your preference

is fine.

(The jury was duly preliminarily instructed.)

THE COURT:  All right.  Ms. Jennings, would you like to

give opening statements on behalf of the Government?

MS. JENNINGS:  Yes, Your Honor.  Thank you.

May it please the Court.

THE COURT:  Yes.

MS. JENNINGS:  Counsel, Mr. Murphy.

The defendant, Carl Murphy, is a heroin supplier for a

group of drug dealers operating here in Des Moines.  The

evidence will show that the defendant had access to kilogram

quantities of heroin and that he lived in Markham, Illinois, a

1  south Chicago suburb.

2         When heroin dealers here in Des Moines ran out of

3  product, they drove back to Chicago to the defendant's house to

4  pick up bulk quantities of heroin, no less than 100 grams at a

5  time, to bring back here to Des Moines to sell to users in

6  smaller quantities.

7         Now, what the defendant didn't know is that law

8  enforcement here in Des Moines was investigating those heroin

9  dealers here in Des Moines.  And you will hear that those

10  investigators eventually obtained wiretaps on two of those

11  heroin dealers, their phones, here in Des Moines.

12         Sure enough, when law enforcement officers started

13  listening to the phone calls of the heroin dealers here in

14  Des Moines, they heard them talking with the defendant, Carl

15  Murphy, about heroin trafficking.  You are going to hear those

16  phone calls.  You are going to hear the defendant discussing

17  heroin with the heroin dealers from Des Moines.

18         You are also going to see video recordings of the

19  defendant's home in Markham, Illinois, around the time that

20  those phone calls took place, and you're going to see the drug

21  dealers from Des Moines arriving at the defendant's house and

22  parking there, going in for a short period of time, and leaving.

23         Now, let's talk a little bit more about the group of

24  heroin dealers that was here operating in Des Moines in 2019

25  through 2021.  These individuals, a lot of them knew each other.

1   They were young men who all grew up in the same neighborhood in

2   south Chicago.  And you will hear that they moved here

3   specifically to sell heroin because they could make more money

4   selling heroin in Des Moines, because there's less of it, than

5   they could in Chicago.

6           They worked closely together here in Des Moines, and

7   they were responsible for selling small quantities of heroin,

8   about a gram or portions of grams or a couple of grams at a

9   time, to users here in Des Moines.

10          These dealers here in Des Moines, they're about 20 to

11  30 years younger than the defendant, Carl Murphy, in this case.

12  These heroin dealers in Des Moines, they called Carl Murphy

13  The P, which was short for The Prince.

14          Now, The Prince, he didn't leave Chicago.  He didn't

15  have to.  When heroin dealers here in Des Moines ran out of

16  heroin, they took the money that they had made, went back to

17  The P, and replenished their heroin supply.

18          Now, the United States has the burden to prove beyond a

19  reasonable doubt that the defendant is guilty of the crime with

20  which he is charged, which is conspiracy to distribute heroin,

21  more than 1 kilogram of heroin, here in the Southern District of

22  Iowa.  And the Government will establish his guilt beyond a

23  reasonable doubt through testimony and evidence.

24          Let's talk a little bit more about the exhibits that

25  you're going to see in this case.  There are two drug dealers'

phones from Des Moines that were tapped.  The names of those

persons are Malek Holmes and Pierre Black.  As I said, you're

going to hear transcript -- or you're going to listen to phone

calls and read transcripts of their conversations with Carl

Murphy around the time that drug dealers were going to his house

in Chicago.

You are also going to hear Malek Holmes' conversations

with five other separate heroin dealers in Des Moines.  And

Malek Holmes and those five other heroin dealers in

Des Moines -- because, remember, I told you, there's about 15

people selling heroin at that time -- they are all talking about

The P; when we're going to get more heroin from The P, how much

heroin are we going to get, how much is The P charging for a

gram of heroin currently.

Now, these transcripts and these phone calls, you will

hear that the defendant and his co-conspirators don't say, "I

will be arriving at 2 p.m. with $75,000 to purchase

approximately 100 grams of heroin," because that's not how

people talk to each other.  When people are in transactions and

they're familiar with each other and they're dealing drugs which

are illegal, they use other words to refer to drugs.  So these

transcripts are not going to contain the word "heroin."

Let's talk a little bit about witnesses that you'll

hear from in this case.  You're going to hear from Malek Holmes.

Malek Holmes is a heroin distributor here in Des Moines.  He has

pleaded guilty to distributing heroin in Des Moines, conspiracy
to distribute heroin, and he is now cooperating with the
Government.

Malek Holmes is 22 years old.  He was raised in
Chicago, and he will tell you that he moved here in 2019 to join
a group of people who were already here selling heroin and that
he did that so that he could make more money.

He will tell you that when he got here, The P was
already a source of supply for the heroin dealers here in
Des Moines.  He will tell you that he worked with about 15 other
people to sell heroin in Des Moines and that not only did Malek
Holmes go back to Carl Murphy's house to get heroin, but he also
went with several other individuals several times to go get
heroin from Carl Murphy's house.  He will tell you that he got
between 100 grams and 1,000 grams, or 1 kilogram, of heroin from
Carl Murphy's house each time that he went.

He's also going to talk about money because he's made a
lot of money selling heroin, and that money went back to the
defendant, Carl Murphy.  He'll talk about bringing amounts such
as like $75,000 back to the defendant's house in Markham,
Illinois.

Malek Holmes is also going to tell you that there were
other sources of supply of heroin for the conspiracy in
Des Moines because they were selling a lot of heroin and there
were a lot of people here selling heroin.  So they did get

1  heroin from other sources besides Carl Murphy.

2  He's going to talk to you about the trips he took

3  coming back from Chicago to Iowa, and he'll tell you that when

4  they brought -- when they brought heroin back, it was a smaller

5  package.  And you'll hear some expert testimony about what 100

6  grams or 1,000 grams of heroin actually looks like.

7  Holmes will describe to you that the drug dealers had

8  ways to hide this heroin inside the structure of the vehicle

9  that they were driving back in and that they even went so far as

10 to hide the heroin inside their own bodies to prevent law

11 enforcement from finding it.

12 You're going to hear that during this investigation,

13 law enforcement pulled over some of these vehicles with drug

14 dealers coming back from Carl Murphy's house to Des Moines, but

15 that they never were able to find the heroin that they were

16 transporting.

17 You are also going to hear in this case from the case

18 agent, Investigator Murillo.  As I said in jury selection,

19 Investigator Murillo is a member of the Mid-Iowa Narcotics

20 Enforcement Task Force, and he was one of the lead investigators

21 on this case.

22 He's going to tell you that this case started out

23 pretty small, some buys of heroin, small quantities, a portion

24 of a gram or a gram, here in Des Moines; but then that it

25 quickly ballooned as investigators learned that there were

several distributors here in Des Moines who apparently knew each
other and then were working with the source of supply that was
outside the state of Iowa.

He will tell you that it was a difficult investigation
because of some of the techniques used by the drug dealers in
this case, meaning that they used middlemen or other people to
conduct the transactions between the ultimate customer and
themselves; they frequently changed their phone numbers and
changed their phones, which made it difficult for law
enforcement to track; and they had different ways of
transporting drugs which prevented law enforcement from finding
that heroin.

He will tell you that eventually law enforcement got
wiretaps on two of those drug dealers' phones, Malek Holmes and
Pierre Black, and it was only after they got those wiretaps that
they were able to learn that the defendant was the source of
supply in the Chicagoland area.

After that, they put up a camera outside of the
defendant's house and were able to match up some of those phone
calls that were happening between the heroin dealers and
Mr. Murphy and watching those heroin dealers from Des Moines
arrive at the defendant's home in Markham, Illinois.

You're also going to hear that this was a long
investigation from Detective Murillo.  And you'll hear from
Malek Holmes that they were doing this for a year to two years

1   and that those wiretaps and the pole camera, those were only

2   operating for very brief periods within this longer conspiracy

3   so they, of course, did not capture every single transaction or

4   phone conversation that happened between these people.

5           You are also going to hear from, in this case, a

6   special agent with the FBI by the name of Mark Fredkove.  He's

7   going to tell you that he investigated the defendant for selling

8   heroin and crack cocaine around a decade ago, a little bit

9   longer, in the Chicagoland area.  He will tell you that the

10  defendant was ultimately convicted of a federal crack cocaine

11  offense in the Chicagoland area back around 2011.

12          Lastly, you're going to hear from Sergeant Brady Carney

13  with the Des Moines Police Department.  He has been a narcotics

14  investigator here in Des Moines for a long time and has worked

15  on many heroin investigations.  He's going to talk to you about

16  the difference in quantity between suppliers like Carl Murphy --

17  hundreds of grams, kilograms of heroin -- and that sold by the

18  heroin dealers who are actually in Des Moines, smaller

19  quantities like 1 gram, a portion of a gram.

20          He's going to explain to you how heroin conspiracies

21  generate money.  He'll also explain to you that most of the

22  heroin that is sold in Des Moines comes from Chicago and a few

23  other places in the Midwest.

24          The Government is going to establish the defendant's

25  guilty beyond a reasonable doubt.  He is a heroin source of

1  supply for drug dealers operating here in Des Moines.  That's

2  why, at the end of this trial, we are going to come before you

3  and ask you to find the defendant guilty.

4          Thank you.

5          THE COURT:  Thank you, Ms. Jennings.

6          Mr. Sarcone.

7          MR. SARCONE:  Thank you, Your Honor.

8          Please the Court.

9          THE COURT:  Yes.

10          MR. SARCONE:  Counsel.

11          I'm Malek Holmes.  In a day or two, I'm going to take

12  that witness stand and I'm going to testify.  I'm going to tell

13  you about the overwhelming amount of evidence that the federal

14  government collected against me.  I'm going to tell you about

15  the hundreds, if not thousands, of hours of wiretap phone

16  conversations.  I'm going to tell you about GPS surveillance,

17  pole cams.  I'm going to tell you that the FBI, that state and

18  local law enforcement, that the United States Attorney's Office

19  was involved in this investigation.

20          And I pled guilty.  I admitted that I'm a heroin

21  dealer.  But, you know, before I pled guilty, I was told that

22  the Government wanted to talk to me; that if I talked to them, I

23  might just get some time off my sentence; that if I tell them

24  what they want to hear so they can get who they get, it might

25  help me.

1    And so that's why I'm going to be here.  That's why I'm
2  going to take that witness stand.  And if I take that witness
3  stand and I tell you what I told them, I might even get some
4  more time off my sentence.
5    Ladies and gentlemen, my name is Nick Sarcone, and I am
6  Mr. Murphy's attorney, along with Ms. Branstad.  Carl Murphy may
7  be a lot of things.  He may have a past, and he may have a
8  record.  But he's a good, hard-working guy, and his wife will
9  tell you he's no heroin dealer.
10    We're here in the United States Courthouse for the
11  Southern District of Iowa.  The United States Attorney's Office
12  has gotten up and told you what they expect that the evidence
13  will show.  They have a lot of law enforcement witnesses because
14  they did a big investigation because they have a lot of
15  resources, and they used them.
16    Malek knows all too well about the hundreds, if not
17  thousands, of hours of phone taps; about the pole cams, the
18  cameras they mount on utility poles to watch a location; about
19  GPS surveillance that they use.
20    A plethora of audio and video evidence, and yet you are
21  likely to hear in the next few days 19 phone calls, short phone
22  calls for the most part, some of which don't even involve
23  Mr. Murphy.  He's not on either end of the phone call.  And as
24  you listen to those, ask yourself, what do you hear?  Not the
25  word "heroin."

1          And of all the pole cam footage, they're going to put

2    five snippets on.  Ask yourself, what do you see on that

3    footage?  Not heroin.

4          And Ms. Jennings told you that they pulled over a

5    vehicle of these alleged drug dealers coming from Chicago.  And

6    what did they find?  Not heroin.

7          But, you know, the Government is going to call in some

8    law enforcement.  They're going to call in law enforcement whose

9    job is to testify to what's in those phone calls, to interpret

10   them for you, to interpret for you what you don't hear and what

11   you don't see.

12         They're going to call their case agent, Deputy Murillo.

13   Now, he's going to come in and tell you all about this big

14   drug-trafficking organization, or DTO, as they like to call it.

15   Don't get lost in all the mess.  The issue here is whether the

16   Government can prove beyond a reasonable doubt that Carl Murphy,

17   as they say, was part of a conspiracy to distribute heroin, was

18   a source of supply of heroin, was a drug trafficker.

19         Deputy Murillo will probably also testify that -- to

20   the signs of drug trafficking, right?  So there were a lot of

21   search warrants executed in this case, and the signs of drug

22   trafficking from search warrants are things like large amounts

23   of cash, packaging materials, baggies, rubber bands, digital

24   scales to weigh out drugs, okay?  What you will find out is that

25   when they searched Carl Murphy's house, they didn't find

1  anything.

2      And Malek Holmes, as the Government said, is going to

3  testify that they were doing thousands upon thousands upon

4  thousands of dollars worth of business.  No money at Carl's.  He

5  and his wife work.  Heck, they've got a Kohl's card with an

6  unpaid balance.

7      Pay attention to the things and the details that you

8  don't hear and that you don't see.  The reality here is that

9  Carl Murphy was an easy target.  He knew a lot of these guys

10  from Chicago.  He was an easy target for them to point to, and

11  the Government seized all over it.  But the reality is that

12  there was a lack of evidence in this case.

13      When Ms. Branstad or I get up and give a closing

14  argument, we're going to give Carl Murphy to you.  We're going

15  to ask you to take him, and we believe that at that point the

16  evidence will not be sufficient to find him guilty as charged by

17  the United States of America of being in a conspiracy to

18  distribute heroin.  And if they haven't proven that and that

19  alone beyond a reasonable doubt, and we're confident they won't,

20  then you have one verdict to render, which is not guilty.

21      Thank you.

22      THE COURT:  Thank you, Mr. Sarcone.

23      Ladies and gentlemen, we're now going to excuse you for

24  lunch.  If you'll be back in the jury room at 1:15, we'll get

25  started again at that time.  We'll have notepads and pens for

1    you to use if you decide you do want to take notes when we start

2    with the evidence.

3         Any questions I can answer for you?

4         JUROR OLESON:  So we can bring the phones back in when

5    we return?

6         THE COURT:  You can, yes.

7         JUROR MEIER:  Do we leave these here?

8         THE COURT:  You can leave them here on your chair or

9    take them into the room, either one.

10        (In open court, with the defendant present, out of the

11   presence of the jury.)

12        THE COURT:  Okay.  Anything we need to cover?

13        MS. JENNINGS:  Your Honor, based on the defendant's

14   opening statement, the Government anticipates entering in

15   ammunition that was located in his residence during the search

16   warrant.

17        THE COURT:  Okay.  Anything else?

18        Okay.  We'll see everybody back here at 1:15.  Thank

19   you.

20        (Recess at 11:59 a.m. until 1:15 p.m.)

21

22

23

24

25

1    AFTERNOON SESSION (1:15 p.m.)

2         (In open court, with the defendant present, out of the

3    presence of the jury.)

4         THE COURT:  Okay.  Anything we need to discuss?

5         MS. WEISER:  No, Your Honor.

6         THE COURT:  Ms. Branstad, anything we need to discuss?

7         MS. BRANSTAD:  Your Honor, I don't know that we

8    addressed the Government's stated intent to introduce evidence

9    of ammunition.  Your Honor, I'm not sure to what they're

10   referring in the opening that would have opened the door to that

11   particular evidence that would have been unknown, and, Your

12   Honor, I think that that remains irrelevant to this case.

13        THE COURT:  Ms. Jennings or Ms. Weiser, would you like

14   to articulate the relevance of the ammunition to the case or

15   what you believe opened the door to that evidence?

16        MS. JENNINGS:  Yes, Your Honor.  In the opening

17   statement, defense counsel made mention of no indicia of drug

18   trafficking, no packaging, no other materials related to drug

19   trafficking being found at the defendant's residence.

20        Before trial, the Government made clear that we did not

21   intend to present evidence from that consent search whatsoever,

22   which included the ammunition, but we made it clear in our

23   filing at Document 1116 that if the defendant elicits testimony

24   regarding the search of Defendant's residence, the door will be

25   opened to the ammunition coming in.

1          We believe that the defendant had put that in issue by

2     saying that there was no indicia of drug trafficking, and, in

3     fact, ammunition will be an indicia of drug trafficking, and

4     we'll have expert testimony to support that.

5          THE COURT:  Ms. Branstad.

6          MS. BRANSTAD:  Your Honor, an unopened box of

7     ammunition without a gun contained within a safe is a pretty far

8     stretch to say it's indicia of drug trafficking.  And, again,

9     given the statements, I believe that the Government did not make

10    it clear that it was if any mention of the house was made that

11    that would open the door.

12         But even given that statement, at this point, Your

13    Honor, the only statement was as to money, drugs, and packaging,

14    and so this bringing in the unopened package from a safe doesn't

15    meet the relevance.

16         THE COURT:  Okay.  The seizure of ammunition is

17    ordinarily admissible in a drug case because of the tie which I

18    assume the Government would need to establish between guns and

19    drugs, and so I don't believe that the introduction of

20    ammunition would be substantially or would be improperly

21    prejudicial here.

22         I do think that the substantive evidence of that is

23    relevant and that the prejudicial effect doesn't outweigh the

24    probative evidence, so I would allow the introduction of

25    ammunition evidence.

1          Let's go get our jury.

2          (In open court, with the defendant present, in the

3    presence of the jury.)

4          THE COURT:  Ladies and gentlemen, welcome back.

5    Everybody can be seated.

6          Ms. Jennings or Ms. Weiser, you may call your first

7    witness.

8          MS. WEISER:  Your Honor, may the Government read two

9    stipulations into evidence before calling its first witness?

10         THE COURT:  Yes.  Go ahead.

11         MS. WEISER:  Government's Exhibit 318 is a stipulation

12   of evidence.  It is captioned, "United States District Court for

13   the Southern District of Iowa, United States of America vs. Carl

14   Murphy, also known as P, also known as C-Note.

15         "Stipulation Of foundation" -- or "Foundation Of

16   Evidence.

17         "The parties hereby stipulate and agree as follows for

18   the purpose of trial in this case:

19         "As to the following exhibits, the authentication

20   requirements have been met, and these exhibits may be admitted

21   at trial without further foundation.

22         "Government Exhibits 101 et seq. (interceptions)" and

23   "Government Exhibits 201 et seq. (pole camera footage)."

24         Signed by the defendant, the defendant's attorney, and

25   both attorneys for the Government.

1        Government's Exhibit 319 is a stipulation, "Lab Report

2   For Drugs.

3        "In the United States District Court for the Southern

4   District of Iowa, United States of America vs. Carl Murphy, also

5   known as P, also known as C-Note.

6        "The parties hereby stipulate and agree as follows for

7   the purposes of trial in the above case:

8        "As to Government's Exhibits 320-324 (lab reports for

9   drugs), the parties stipulate and agree that the foundational

10  requirements for these exhibits are satisfied and that these

11  exhibits may be admitted as evidence at trial based upon this

12  stipulation.  Defendant waives the right to have the

13  criminalists who analyzed the drugs and prepared the reports

14  testify at trial.  Defendant stipulates that if the criminalists

15  were called to testify, they would testify as put forth in the

16  reports."

17       Signed by the defendant and his attorney and both

18  attorneys for the Government.

19       THE COURT:  Government Exhibits 318 and 319 are

20  admitted.

21                    (Government Exhibit Nos. 318 and 319

22                     were offered and received in evidence.)

23       THE COURT:  Go ahead.

24       MS. WEISER:  Thank you, Your Honor.  The Government

25  calls Jacob Murillo.

1          THE DEPUTY CLERK:  Please raise your right hand.

2          JACOB MURILLO, GOVERNMENT'S WITNESS, SWORN

3          THE DEPUTY CLERK:  Thank you.  Please have a seat.

4                      DIRECT EXAMINATION

5    BY MS. WEISER:

6    Q.  Good afternoon.  Will you please state and spell your name

7    for the record.

8    A.  Jacob Murillo, J-a-c-o-b M-u-r-i-l-l-o.

9    Q.  What do you do for a living?

10   A.  I work for Polk County Sheriff's Office as a deputy, but I'm

11   currently assigned to Mid-Iowa Narcotics Enforcement Task Force

12   as an investigator.

13   Q.  How long have you been a deputy with the Polk County

14   Sheriff's Office?

15   A.  Approximately 7 1/2 years.

16   Q.  And did you state your title as investigator?

17   A.  Yes.

18   Q.  What type of crimes do you investigate at the Mid-Iowa

19   Narcotics Enforcement Task Force?

20   A.  Drug crimes.

21   Q.  We're going to talk about that a little bit more in a

22   moment.  In the course of your work as a drug investigator, have

23   you come to investigate a person known as Carl Murphy?

24   A.  Yes.

25   Q.  Generally, how is it that you came to investigate him?

1   A.  It began with a large investigation with a number of

2   different individuals here in Des Moines selling heroin.

3   Throughout the investigation, we identified the defendant as

4   their drug dealer.

5   Q.  Do you see Carl Murphy in the courtroom today?

6   A.  Yes.

7   Q.  Please describe where he is seated and what he is wearing.

8   A.  He is seated at the defense counsel's table, wearing a blue

9   shirt and a tie.

10  Q.  Will you please -- excuse me.

11          MS. WEISER:  Let the record reflect that the witness

12  has identified the defendant?

13          THE COURT:  It will so reflect.

14  BY MS. WEISER:

15  Q.  Investigator Murillo, please flip in the binder in front of

16  you to Government's Exhibit 300.  What is this an exhibit of?

17  A.  A picture of the defendant.

18  Q.  Is this a fair and accurate photo of the defendant?

19  A.  Yes.

20          MS. WEISER:  Government moves to admit Government's

21  Exhibit 300.

22          MS. BRANSTAD:  No objection.

23          THE COURT:  Government Exhibit 300 is admitted.

24                  (Government Exhibit No. 300 was

25                   offered and received in evidence.)

1        MS. WEISER:  May I publish, Your Honor?

2        THE COURT:  You may.

3   BY MS. WEISER:

4   Q.  Investigator Murillo, does the defendant have any nicknames?

5   A.  He does.

6   Q.  What are they?

7   A.  He goes by C-Note, Big Dawg, and The P.

8   Q.  Returning to your background, what training did you receive

9   when you were hired with the Polk County Sheriff's Office?

10  A.  I'm a graduate of the Iowa Law Enforcement Academy.

11  Q.  Are you a certified peace officer with the State of Iowa?

12  A.  Yes.

13  Q.  Can you tell us a little bit about your educational

14  background?

15  A.  I have an associate's degree in criminal justice.

16  Q.  You mentioned the Mid-Iowa Narcotics Enforcement Task Force

17  earlier.  Does that go by an acronym?

18  A.  Yes.  It's referred to as the MINE Task Force.

19  Q.  Generally, what is the MINE Task Force?

20  A.  We are a multijurisdictional drug enforcement agency.

21  Q.  What do you mean by "multijurisdictional"?

22  A.  We have investigators or officers from a number of different

23  police departments and sheriff's offices within the metro all

24  combined to create the MINE Task Force.

25  Q.  What is the primary geographical area that you investigate?

1    A.   The Des Moines metro.

2    Q.   How long have you been with the MINE Task Force?

3    A.   Since October of 2018.

4    Q.   Have you received any awards during your time with law

5    enforcement?

6    A.   A couple of case-related awards and just some accommodations

7    from the sheriff's office.

8    Q.   Investigator Murillo, do you participate in ongoing

9    drug-related trainings?

10   A.   Yes.

11   Q.   Have you participated in drug-related search warrants?

12   A.   I have.

13   Q.   Can you estimate for us the number of drug-related search

14   warrants you've participated in?

15   A.   It would be hard to estimate, but I'd say easily over a

16   hundred.

17   Q.   Can you estimate the amount of times that you've been

18   running a case on your own?

19   A.   Again, over a hundred.

20   Q.   Have you worked with confidential sources?

21   A.   I have.

22   Q.   Have you debriefed and interviewed drug dealers and drug

23   users?

24   A.   Yes.

25   Q.   Have you conducted physical surveillance?

1    A.   Yes.

2    Q.   Can you explain what physical surveillance means?

3    A.   Physical surveillance would be direct observation, so

4    viewing something with your own eyes, whether that be people,

5    vehicles, some activity taking place at a specific location.

6    Q.   As a part of your duties, have you conducted electronic

7    surveillance?

8    A.   Yes.

9    Q.   What is electronic surveillance?

10   A.   Electronic surveillance can be anything from monitoring

11   GPSes, whether that be on phones and/or vehicles; wiretaps; pole

12   camera footage; and electronic monitoring devices.

13   Q.   In your role with the MINE Task Force, do you drive a marked

14   police vehicle?

15   A.   I do not.

16   Q.   What do you drive?

17   A.   In our day-to-day, we dress in plain clothes, we drive plain

18   vehicles.  We blend in with the general community.

19   Q.   So you don't wear a uniform?

20   A.   Not unless we're doing some sort of proactive enforcement.

21   Q.   Are you one of the case agents for this investigation?

22   A.   Yes.

23   Q.   Can you explain to the jury what it means to be a case

24   agent?

25   A.   As a case agent, I'm one of the lead investigators in this

1  case.  I help dictate the different investigative tools and

2  methods that are used in it and the outcome of the case.

3  Q.  I want to direct your attention to this investigation.  When

4  did this investigation begin?

5  A.  May of 2020.

6  Q.  What drug were you investigating?

7  A.  Heroin.

8  Q.  Did any other law enforcement agencies assist in this

9  investigation?

10  A.  Yes.  The FBI assisted.

11  Q.  At that time, who was your primary target?

12  A.  During that time, our primary target was Malek Holmes.

13  Q.  Did you ever have more than one target during this

14  investigation?

15  A.  Yes.

16  Q.  Why is that?

17  A.  Throughout the investigation, we learned that a number of

18  individuals here in Des Moines were associated and selling

19  heroin together.

20  Q.  Were you ever able to determine who Holmes and the other

21  targets' heroin dealer was?

22  A.  Yes.

23  Q.  And who was that?

24  A.  One of their source of supplies was Carl Murphy.

25  Q.  How did your investigation begin?

1   A.   Our investigation began with controlled buys from Jamisha

2   and Tonie Canada here in Des Moines.

3   Q.   Can you tell us briefly what a controlled buy is?

4   A.   A controlled buy is a narcotics transaction conducted under

5   the direction of law enforcement.

6   Q.   Why do you as an investigator do controlled buys in your

7   investigations?

8   A.   We do controlled buys for a number of different reasons.

9   The main reason is to establish probable cause for search

10  warrants.  During those controlled buys, though, we learn a

11  plethora of different things about our targets; what drugs they

12  sell, the price that they sell, et cetera.

13  Q.   You mentioned the Canada sisters.  Why wasn't that the end

14  of your investigation?

15  A.   We quickly learned that the Canada sisters were essentially

16  middlemen in the investigation.  When I say "middlemen," I mean

17  our informant would arrive at their residence with money, then

18  they would call the drug dealer to come bring the heroin to

19  them, so they never actually held large quantities of heroin.

20  Q.   Were you ever able to determine who the Canadas' heroin

21  dealer was?

22  A.   Yes.  They had a number of them.

23  Q.   And who were some of them?

24  A.   We identified early on Pierre Black and Malek Holmes were

25  two of -- at least two of their drug dealers.

1   Q.  Investigator Murillo, will you please flip to Government's

2   Exhibits 301 -- Government's Exhibit 301.

3           What is Government's Exhibit 301?

4   A.  It's a photograph of Malek Holmes.

5   Q.  Is this a fair and accurate photo of Malek Holmes?

6   A.  Yes.

7           MS. WEISER:  The Government would move to admit

8   Government's Exhibit 301.

9           MS. BRANSTAD:  No objection.

10          THE COURT:  Government Exhibit 301 is admitted.

11                  (Government Exhibit No. 301 was

12                   offered and received in evidence.)

13          MS. WEISER:  May I publish briefly?

14          THE COURT:  You may.

15  BY MS. WEISER:

16  Q.  Investigator Murillo, on the screen in front of us is

17  Government's Exhibit 301.  Is that one of the people you

18  identified as the Canadas' sources?

19  A.  Yes.

20          MS. WEISER:  Can you please take that down, Ms. Kruse.

21  BY MS. WEISER:

22  Q.  Investigator Murillo, I'm sure it's not the same every time,

23  but can you explain how controlled buys from the Canadas worked

24  at the beginning of your investigation?

25  A.  So we would meet with our confidential informant.  He would

1    then arrange the buy over his phone.  During that time, we would

2    search the informant's person and his vehicle to ensure that he

3    did not bring any contraband with him.  We'd then supply our

4    informant with buy money that we provide and an electronic

5    monitoring device.  This electronic monitoring device recorded

6    everything in real time.  Both we could hear everything and see

7    everything, depending on whether he had it in a visible place

8    where he could see everything.

9          We would send our informant to the Canada sisters'

10   residence.  Once he got there with the money, they would contact

11   one of their sources of supply or drug dealers.  Then they would

12   arrive, bring the heroin to the Canada sisters.  They would then

13   give it to our informant all in the same room.  And once the

14   drug dealers would leave, investigators would follow them after

15   that.

16   Q.  Investigator Murillo, please flip through in the binder in

17   front of you Government's Exhibits 302 through 316.

18   A.  I apologize.  I didn't finish your last question.

19   Q.  Oh, sorry.  Go ahead and finish.

20   A.  So after our informant would have the drugs, he would then

21   bring the drugs to us.  We would then search -- after he

22   provided us with the drugs, we would then search his person and

23   his vehicle again just to ensure he didn't have any contraband

24   or anything like that.

25          Sorry.

1    Q.  I'm sorry.  Please flip to Government's Exhibits 302 through

2    316 and look up at me when you're done.

3            Investigator Murillo, what are these exhibits of?

4    A.  They are the individuals we identified here in Des Moines

5    selling heroin.

6    Q.  Are these fair and accurate photos of the people you were

7    investigating?

8    A.  Yes.

9            MS. WEISER:  The Government would move to admit

10   Government's Exhibits 302 through and including 316.

11           MS. BRANSTAD:  No objection.

12           THE COURT:  Government Exhibits 302 through 316 are

13   admitted.

14                       (Government Exhibit Nos. 302 - 316 were

15                        offered and received in evidence.)

16   BY MS. WEISER:

17   Q.  And we'll discuss each of those individuals in a little bit,

18   but, generally, what was each of their involvement in the case?

19   A.  They either sold heroin here in Des Moines or they brought

20   heroin from Chicago here to Des Moines for redistribution.

21   Q.  Were you able to determine the defendant's role within this

22   group that you just explained to us?

23   A.  Yes.

24   Q.  What was that?

25   A.  He was their supplier of heroin.

1  Q.  Can you tell the jury what other tools besides controlled

2  buys that you just described that you used throughout this

3  investigation?

4  A.  Like I stated earlier, we used GPS on both phones and

5  vehicles, we utilized a pole camera, hours of physical

6  surveillance, and wiretaps.

7  Q.  I want to talk about wiretaps for a bit.  You said you did

8  conduct one in this investigation?

9  A.  We did.

10 Q.  What is a wiretap, generally speaking?

11 A.  We were intercepting phone calls and text messages in real

12 time.

13 Q.  Do you have to get authorization from the court to do that?

14 A.  Yes.

15 Q.  Who monitors those phone calls?

16 A.  We did as investigators.

17 Q.  When monitoring, what is it like to get a call?

18 A.  So we all sit in a small room we call the wire room.  It's

19 got several computers, a couple big TVs up on the wall.  And if

20 you're on the computer, you're monitoring the monitor station.

21 You have headphones on, and if a call either comes in or goes

22 out, the system alerts you.  We hear the call in real time, and

23 then we'll either transcribe it -- and we have a team of

24 investigators on the streets doing physical surveillance.  We'll

25 relay to them the investigation.

1    Q.   And that's all -- while the call is happening, you're

2    listening to it?

3    A.   Yes.

4    Q.   What information do you get about the calls when they occur?

5    A.   We get the dates -- date and time and the participants

6    involved in the call.

7    Q.   Is each call assigned a session number per phone?

8    A.   Yes.

9    Q.   What hours were the calls being monitored in this case?

10   A.   They were monitored from approximately 9 a.m. until 11 p.m.,

11   depending on what our active surveillance was.

12   Q.   And what do you mean by depending on your active

13   surveillance?

14   A.   If we had any kind of circumstances that needed more

15   physical surveillance, we would continue to maintain monitoring

16   calls.

17   Q.   Are there limitations about the types of calls and text

18   messages you can review?

19   A.   Yes.  We're not allowed to listen to spousal calls, calls

20   with doctors, calls with clergy, or attorney calls.

21   Q.   Generally, how long were you authorized to intercept

22   telephone calls?

23   A.   Thirty days.

24   Q.   Can that be extended?

25   A.   It can.

1  Q.  And was that done in this case?

2  A.  It was.

3  Q.  How long were investigators utilizing a wiretap to

4  investigate the people we've discussed?

5  A.  Approximately 90 days.

6  Q.  How many phone numbers did investigators have wiretap

7  authorizations for throughout the course of the investigation?

8  A.  Six total.

9  Q.  How many were intercepted for that entire time period?

10 A.  Only two.

11 Q.  Can you explain why only two were done for the entire time

12 period?

13 A.  One telephone number was no longer furthering our

14 investigation.  Two telephone numbers were dropped shortly or

15 immediately after we began intercepting them, meaning -- when I

16 say "dropped," I mean the subscriber user of that telephone got

17 a new number.  And one of them we identified later on in the

18 investigation.

19 Q.  I want to talk about some of those phone numbers.

20 Investigator Murillo, do you recognize the telephone number

21 (515)661-0508?

22 A.  Yes.

23 Q.  Do you recognize the telephone number (515)305-5202?

24 A.  Yes, I do.

25 Q.  Did you obtain authorization to intercept calls and text

1  messages occurring over those phones?

2  A.  Yes.

3  Q.  Who were the primary users of those phones?

4  A.  The primary users we identified on those phones were Malek

5  Holmes, Pierre Black, and Deshawn Greer.

6  Q.  What was the primary nature of the communications on those

7  two telephones?

8  A.  Those two phones we identified as what we refer to as the

9  customer phone or customer phones, and on those phones, it was

10  primarily for heroin customers here in Des Moines or users here

11  in Des Moines to contact those numbers to obtain heroin from

12  whoever was on the other line.

13  Q.  Do you recognize the telephone number (515)334-0682?

14  A.  Yes.

15  Q.  Did you obtain authorization to intercept calls and messages

16  over that phone?

17  A.  Yes.

18  Q.  Who did you identify as the primary user of that phone?

19  A.  Malek Holmes.

20  Q.  What was the primary nature of those communications?

21  A.  That telephone was identified as a more personal phone

22  number.  On that phone number, we intercepted calls of him

23  talking with other associates and talking with his source of

24  supply.

25  Q.  What time period were you intercepting calls and text

1  messages over Malek Holmes' personal phone?

2  A.  From late April until mid-July.

3  Q.  Was that the entirety of the wiretap?

4  A.  Yes.

5  Q.  You said late April to mid-July.  What year was that?

6  A.  2021.

7  Q.  And remind us when your initial investigation began.

8  A.  2020.  May of 2020.

9  Q.  Do you recognize the telephone numbers (773)595-1317 and

10  (773)731-9239?

11  A.  Yes.

12  Q.  Did you obtain authorization to intercept calls over those

13  phone numbers?

14  A.  Yes.

15  Q.  Who did you identify as the primary user of those telephone

16  numbers?

17  A.  Those numbers were -- the user was Pierre Black.

18  Q.  And what was the primary nature of those communications?

19  A.  That was, again, more of a personal number.  Again,

20  identify -- we identified other associates through that number.

21  He contacted his source of supply as well.

22  Q.  What time periods were you intercepting calls and texts over

23  those phone numbers?

24  A.  One of them was from late July until mid -- or late June

25  until mid-July of 2021, and another one was for approximately a

1    week in the end of May.

2    Q.  Does the system you explained listening to the calls through

3    earlier retain audio files for intercepted calls?

4    A.  Yes.

5    Q.  Please look at the discs in the binder in front of you,

6    Government's Exhibits 102 to 119.

7            Investigator Murillo, have you reviewed and initialed

8    those discs?

9    A.  You said to 119?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And do they contain a small portion of interceptions that

13   were recorded and maintained through this investigation?

14   A.  Yes.

15           MS. WEISER:  The Government would move to admit

16   Government's Exhibits 102 to 119.

17           MS. BRANSTAD:  No objection.

18           THE COURT:  Government Exhibits 102 through 119 are

19   admitted.

20                       (Government Exhibit Nos. 102 - 119 were

21                        offered and received in evidence.)

22   BY MS. WEISER:

23   Q.  Investigator Murillo, were transcripts created from those

24   interceptions?

25   A.  Yes.

1  Q.  Would you please flip through Government's Exhibits 102a

2  through 119a briefly.

3          Investigator Murillo, what are these exhibits?

4  A.  These are transcripts of calls we intercepted.

5  Q.  Are they fair and accurate transcriptions of those

6  interceptions?

7  A.  Yes.

8          MS. WEISER:  Government would move to admit Government

9  Exhibits 102a through 119a.

10          MS. BRANSTAD:  No objection subject to instruction to

11  the jury.

12          THE COURT:  Government Exhibits 102a through 119a are

13  admitted.

14                    (Government Exhibit Nos. 102a - 119a were

15                     offered and received in evidence.)

16          THE COURT:  Final instructions will contain information

17  regarding those transcripts.

18          Go ahead, Ms. Weiser.

19          MS. WEISER:  Thank you, Your Honor.

20  BY MS. WEISER:

21  Q.  Investigator Murillo, through interceptions and

22  surveillance, as you just mentioned to the jury, were you able

23  to confirm if Holmes, Black, and others were selling heroin to

24  others besides your confidential sources?

25  A.  Yes.

1    Q.   How often were they selling heroin?

2    A.   Every day.

3    Q.   Through the different types of surveillance that we've

4    talked about, did you confirm where Holmes, Black, and some

5    others lived throughout this investigation?

6    A.   Yes.  They all primarily lived in the Des Moines area.

7    Q.   Through your investigation, did you also confirm where the

8    defendant lived?

9    A.   Yes.

10   Q.   Where was that?

11   A.   He lived at 15731 Kedzie Avenue in Markham, Illinois.

12   Q.   Investigator Murillo, will you please flip through

13   Government's Exhibits 325 through 328 in the binder in front of

14   you.

15        Investigator Murillo, what are these exhibits?

16   A.   These are pictures of the defendant's residence.

17   Q.   Do they fairly and accurately depict the area of 15731

18   Kedzie Avenue in Markham, Illinois?

19   A.   Yes.

20        MS. WEISER:  Government moves to admit Government's

21   Exhibits 325 through and including 328.

22        MS. BRANSTAD:  No objection.

23        THE COURT:  Government Exhibits 325, 326, 327, and 328

24   are admitted.

25

1                    (Government Exhibit Nos. 325 - 328 were

2                          offered and received in evidence.)

3          MS. WEISER:  Your Honor, may I have permission to

4    publish a few of those?

5          THE COURT:  You may.

6          MS. WEISER:  Thank you.

7          Ms. Kruse, will you please publish Government's Exhibit

8    326.

9    BY MS. WEISER:

10   Q.  Investigator Murillo, using this exhibit and the screen in

11   front of you, can you circle the location of the defendant's

12   house?

13   A.  (Witness complied.)

14         MS. WEISER:  And let the record reflect that the

15   witness circled the farthest left residence in Government's

16   Exhibit 326.

17   BY MS. WEISER:

18   Q.  Investigator Murillo, did you conduct physical surveillance

19   of the defendant at his house?

20   A.  No.

21   Q.  And when we mean "physical," can you remind us what that

22   means?

23   A.  Direct observation.  So I never actually observed the

24   defendant's house with my own eyes.

25   Q.  Can you explain why not?

1    A.   The resources here were limited for me to be able to travel

2    to Markham, Illinois, and conduct surveillance on his residence.

3    Q.   Are there any other reasons that you would not be able to

4    conduct physical surveillance?

5    A.   Geographically, this residence is very difficult -- would be

6    very difficult to conduct physical surveillance on, it's on a

7    dead end, without jeopardizing the case.

8    Q.   When you're faced with a situation where it may be difficult

9    to conduct physical surveillance at a location, do you have

10   other means of getting eyes on that location?

11   A.   Yes.  In situations like this, we'd utilize what we call a

12   pole camera.

13   Q.   What's a pole camera?

14   A.   Pole camera is just a camera that we affix to either a

15   telephone pole or a power pole.  A lot of times they're

16   described as power boxes or even streetlights.

17   Q.   Do these pole cameras let you see inside people's houses?

18   A.   No.

19   Q.   Only the exterior?

20   A.   Yes.

21   Q.   Did you use a pole camera in this case to view the

22   defendant's house?

23   A.   We did.

24        MS. WEISER:  Ms. Kruse, please publish Government's

25   Exhibit 328.

1  BY MS. WEISER:

2  Q.  Investigator Murillo, can you explain what we're looking at

3  in Government's Exhibit 328?

4  A.  This is a -- actually a still shot from the pole camera.  It

5  shows the defendant's garage, his front door, and the parking

6  area in front of his house.

7  Q.  Investigator Murillo, do pole cameras transmit 24 hours, 7

8  days a week?

9  A.  Yes.

10 Q.  Is that footage also recorded and maintained by

11 investigative agencies?

12 A.  Yes.

13 Q.  Investigator Murillo, do you see the discs in front of you

14 labeled Government's Exhibits 201 through 205?

15 A.  Yes.

16 Q.  And have you reviewed and initialed those discs?

17 A.  Yes.

18 Q.  Do they contain clips or portions of the pole camera you

19 just explained to us?

20 A.  Yes.

21      MS. WEISER:  The Government moves to admit Government's

22 Exhibits 201 through 205.

23      MS. BRANSTAD:  No objection.

24      THE COURT:  201, 202, 203, 204, and 205 are admitted.

25

1                    (Government Exhibit Nos. 201 - 205 were

2                         offered and received in evidence.)

3    BY MS. WEISER:

4    Q.  Investigator Murillo, I want to back up a little bit, since

5    we've talked about some of the techniques used in this case, and

6    discuss the buys.

7            Did you use confidential sources to buy from Malek

8    Holmes and others?

9    A.  We did.

10   Q.  During the buys, was Malek Holmes or another dealer alone?

11   A.  It depends.  At times they were alone, at times they were

12   with each other.

13   Q.  Did you learn what type of customers Mr. Holmes and others

14   had?

15   A.  Primarily drug users.

16   Q.  Approximately how many controlled buys were performed

17   throughout this investigation?

18   A.  We did over 20.

19   Q.  Is that a lot for one investigation?

20   A.  It is.

21   Q.  Can you explain why you did so many controlled buys in this

22   case?

23   A.  These drug dealers here we're investigating were pretty

24   sophisticated.  A lot of the buys went differently.  When we

25   would attempt to follow them, they would utilize vehicles

1  without license plates, rental vehicles, vehicles that weren't

2  registered to them.  Different people would show up on occasions

3  that we didn't have identified or any way of identifying them.

4          They would use countersurveillance techniques when we

5  tried to follow them.  They even approached us at times asking

6  if we were undercover cops.  And the span of the investigation

7  grew significantly throughout it.

8  Q.  You said that most of the -- excuse me.

9          You said most of the quantities were for drug users; is

10  that correct?

11  A.  Correct.

12  Q.  What quantities were your confidential informants buying?

13  A.  Anywhere from a half of a gram to 3.5 grams, what we refer

14  to as an eight-ball.

15  Q.  Is that different from what you learned the dealers were

16  purchasing from their heroin source?

17  A.  Yes.

18  Q.  How so?

19  A.  They would purchase much larger quantities to bring here and

20  redistribute.

21  Q.  Were you able to estimate how often the dealers were

22  obtaining heroin from the defendant?

23  A.  Approximately every couple of weeks.

24  Q.  And how did those -- excuse me.  How did those dealers get

25  to the defendant?

1  A.  They drove or took the bus.

2  Q.  How did you learn that?

3  A.  Through physical surveillance, GPS location monitoring.

4  Q.  You identified several photos earlier, Government's Exhibits

5  300 through 316; is that correct?

6  A.  Correct.

7       MS. WEISER:  Your Honor, may I briefly publish some of

8  those exhibits?

9       THE COURT:  You may.

10      MS. WEISER:  Thank you, Your Honor.

11 BY MS. WEISER:

12 Q.  So Mr. -- excuse me -- Investigator Murillo, we've discussed

13 Mr. Holmes, so I want to turn your attention to some of the

14 other people that you identified.

15      MS. WEISER:  Ms. Kruse, will you please publish

16 Government's Exhibit 302.

17 BY MS. WEISER:

18 Q.  Investigator Murillo, who is this?

19 A.  Pierre Black.

20 Q.  Does he have any nicknames?

21 A.  He does.  He goes by Peezo, Peezy, or Rico.

22      MS. WEISER:  Ms. Kruse, would you please publish

23 Government's Exhibit 303.

24 BY MS. WEISER:

25 Q.  Investigator Murillo, who is this?

1   A.   This is Earl Clay.  His nickname is BD.

2   Q.   B-D?

3   A.   B as in boy, D as in David.

4        MS. WEISER:  Ms. Kruse, would you please publish

5   Government's Exhibit 304.

6   BY MS. WEISER:

7   Q.   Investigator Murillo, who is this?

8   A.   This is Deshawn Greer.  His nicknames are Jack or Jack

9   Da Jrippa.

10  Q.   Can you spell that for us?

11  A.   J-a-c-k D-a J-r-i-p-p-a.

12  Q.   Thank you.

13       MS. WEISER:  Ms. Kruse, will you please publish

14  Government Exhibit 305.

15  BY MS. WEISER:

16  Q.   Investigator Murillo, who is this?

17  A.   This is Desmond Howard, and his nickname was Blue.

18       MS. WEISER:  Ms. Kruse, would you please publish

19  Government's Exhibit 306.

20  BY MS. WEISER:

21  Q.   Investigator Murillo, who is this?

22  A.   This is Michael Byrd.  His nickname was Big Mike.

23       MS. WEISER:  Ms. Kruse, please publish 307.

24  BY MS. WEISER:

25  Q.   Investigator Murillo, who is this?

1  A.  Azim Abdul-Ahad, and his nickname was Tana.

2  Q.  Can you spell that?

3  A.  T-a-n-a.

4  Q.  Thank you.

5        MS. WEISER:  Ms. Kruse, please publish Government

6  Exhibit 308.

7  BY MS. WEISER:

8  Q.  Investigator Murillo, who is in 308?

9  A.  This is Patrick Staples, and he didn't have a nickname,

10  other than Pat.

11        MS. WEISER:  Ms. Kruse, please publish 309.

12  BY MS. WEISER:

13  Q.  Who is this, Investigator Murillo?

14  A.  This is Tabaris Brown, and his nicknames are TB and G-Money.

15        MS. WEISER:  Ms. Kruse, please publish Government's

16  Exhibit 310.

17  BY MS. WEISER:

18  Q.  Investigator Murillo, who do we see in Government's Exhibit

19  310?

20  A.  This is Terrance Lindsay.  His nicknames are T Streets or

21  Streets.

22        MS. WEISER:  Ms. Kruse, please publish Government's

23  Exhibit 311.

24  BY MS. WEISER:

25  Q.  Investigator Murillo, who do we see in Government's Exhibit

1    311?

2    A.  This is Robert Jeffries.  His nickname was Moo Moo.

3    Q.  Can you spell Moo Moo for us?

4    A.  M-o-o M-o-o.

5         MS. WEISER:  Ms. Kruse, please publish 312.

6    BY MS. WEISER:

7    Q.  Investigator Murillo, who is in Government's Exhibit 312?

8    A.  This is Gregory Spight.  His nickname was LoSo, L-o-S-o.

9    Q.  Thank you.

10        MS. WEISER:  Ms. Kruse, please publish Government's

11   Exhibit 313.

12   BY MS. WEISER:

13   Q.  Who is this, Investigator Murillo?

14   A.  This is Tony Martin, and the only nickname we heard was

15   Tone, T-o-n-e.

16        MS. WEISER:  Ms. Kruse, please publish Government's

17   Exhibit 314.

18   BY MS. WEISER:

19   Q.  Investigator Murillo, who is in Government's Exhibit 314?

20   A.  This is Dandre Cox, and his nicknames were Du-Wop and Dusky.

21        MS. WEISER:  Ms. Kruse, please show us Government's

22   Exhibit 315.

23   BY MS. WEISER:

24   Q.  Investigator Murillo, who is in Government's Exhibit 315?

25   A.  This is Devante Taylor.  His nicknames were Billy Bucks,

1   Bucks, or Smooth.

2          MS. WEISER:  And, Ms. Kruse, please publish

3   Government's Exhibit 316.

4   BY MS. WEISER:

5   Q.  Investigator Murillo, who is in Government's Exhibit 316?

6   A.  This is Ronald Harris, and the only nickname he went by was

7   Ron.

8          MS. WEISER:  You can take that down, Ms. Kruse.  Thank

9   you.

10  BY MS. WEISER:

11  Q.  Investigator Murillo, based on your investigation,

12  surveillance, and the interceptions, what were the roles of

13  these individuals, generally?

14  A.  They either sold heroin here in Des Moines or they brought

15  heroin from Chicago here to Des Moines to be redistributed.

16  Q.  Did you surveil some of these heroin dealers, either

17  physically or electronically?

18  A.  Yes.

19  Q.  Did you intercept telephone calls in which these people were

20  identified as a participant of the phone call?

21  A.  Yes.

22  Q.  Did you intercept calls in which the defendant was

23  identified as a participant?

24  A.  Yes.

25  Q.  How did you identify the defendant as a participant in phone

1   calls?

2   A.   They referred to him as his nickname.   Through phone

3   subscriber information, the phone he was utilizing was

4   registered or subscribed to his wife.

5   Q.   And what phone would you have intercepted the defendant on?

6   A.   Both of the two personal numbers that I spoke about earlier

7   from Malek Holmes and Pierre Black.

8   Q.   You testified about the use of a wiretap nearly a year into

9   this investigation.   What was the ultimate goal of that

10  wiretap?

11  A.   To identify all of the associates involved and then their

12  drug dealers.

13          MS. WEISER:   I have no further questions at this time.

14          THE COURT:   Ms. Branstad.

15                      CROSS-EXAMINATION

16  BY MS. BRANSTAD:

17  Q.   Deputy Fleming -- or Deputy Murillo, Derrick Fleming was

18  also a person that you identified as part of this

19  drug-trafficking organization; is that correct?

20  A.   Yes.

21  Q.   And he also identified as The P, correct?

22  A.   The name I heard for him was Flock P.

23          MS. BRANSTAD:   May I approach?

24          THE COURT:   You may.

25

1    BY MS. BRANSTAD:

2    Q.  Do you remember obtaining a proffer or statements from Malek

3    Holmes?

4    A.   Probably.  A number of them.  Assuming you'll refresh my

5    memory, though.

6    Q.   I'm going to refer first under Tab F to a proffer taken --

7              MS. WEISER:  Objection.

8              THE COURT:  What's the objection?

9              MS. WEISER:  She's eliciting hearsay.

10             THE COURT:  Ms. Branstad?

11             MS. BRANSTAD:  Your Honor, this witness has testified

12   as to what names he's heard for each of a number of people.

13   This is specifically to identify the individual who is known as

14   The P within these proffers.

15             THE COURT:  Deputy Murillo, can you articulate the

16   source of information for the nicknames you had for the other

17   gentlemen?

18             THE WITNESS:  Through a codefendant.

19             THE COURT:  The other men who you identified from the

20   photographs.

21             THE WITNESS:  I'm sorry?

22             THE COURT:  Can you -- you've described how you knew

23   their names.  Was that from listening to wiretaps?  Was it from

24   conducting interviews?  Was it from talking to those gentlemen?

25             THE WITNESS:  Oh, okay.

1        THE COURT:  What's the source of that information?

2        THE WITNESS:  From the question you asked me?

3        THE COURT:  No.  The questions Ms. Weiser asked you.

4        THE WITNESS:  Oh, we heard it from intercepted calls,

5    social media posts, and a lot of them are hip-hop artists.

6        THE COURT:  Okay.  Then you can utilize that same

7    information or other information, if you articulate what it is,

8    in answering Ms. Branstad's questions.

9        Ms. Branstad, can you go ahead and ask your question

10   again.

11   BY MS. BRANSTAD:

12   Q.  Are you aware that Derrick Fleming identifies himself as

13   The P?

14   A.  Like I said, I recall him being referred to as Flock The P.

15   Q.  Well, you said you looked at some of the hip-hop videos.

16   Did you ever look for Derrick Fleming in published hip-hop

17   videos on YouTube?

18   A.  I don't recall.

19   Q.  That would be a source, though, you'd look for for

20   nicknames?

21   A.  A lot of times, they are published on their Facebook pages,

22   which directed me towards them.

23   Q.  Now, you named a number of people here.  Malek Holmes, when

24   arrested, had 200 grams of heroin with him?

25   A.  Approximately.

1  Q.  Desmond Howard had 32 grams of heroin?

2  A.  Approximately.

3  Q.  Carl Murphy did not have heroin on him?

4  A.  He did not.

5  Q.  You associate large sums of cash with drug trafficking; is

6  that correct?

7  A.  Correct.

8  Q.  And Malek Holmes was selling $9,000 worth of heroin a day,

9  up to $17,000 of heroin a day?

10        MS. WEISER:  Objection.

11        THE COURT:  What's the objection?

12        MS. WEISER:  Facts not in evidence.

13        THE COURT:  Sustained.

14        MS. BRANSTAD:  Your Honor, I'm asking if this witness

15  knows if -- that amount.

16        THE COURT:  Go ahead and ask that question, then.

17  BY MS. BRANSTAD:

18  Q.  Was Malek Holmes selling between 9 and 17 thousand dollars

19  worth of heroin a day?

20  A.  He was selling a lot, but I couldn't put an exact number on

21  it.

22  Q.  When arrested, Ronald Harris had $8,400 on him?

23  A.  I would have to refer back to a property sheet.

24  Q.  Does that sound about right?

25  A.  Approximate, sure.

1  Q.  Tabaris Brown was arrested with a large sum of cash?

2  A.  Yes.

3  Q.  Gregory Spight was arrested with $1500 worth of cash?

4  A.  Correct.

5  Q.  Felicia Olson was arrested with a thousand dollars in cash?

6  A.  Correct.

7  Q.  Brandon Reed was arrested with over $5,000?

8  A.  I don't recall, but...

9  Q.  Was Brandon Reed arrested with a large sum of cash?

10  A.  I don't recall.

11  Q.  Carl Murphy had under $50?

12  A.  Approximately.

13  Q.  Pierre Black was not employed; is that correct?

14  A.  From my investigation, no.

15  Q.  Malek Holmes was not employed?

16  A.  No.

17  Q.  Carl Murphy was employed, wasn't he?

18  A.  Correct.

19  Q.  Multiple people in this investigation were arrested with

20  scales; is that correct?

21  A.  Correct.

22  Q.  Carl Murphy did not have scales in his house?

23  A.  He did not.

24  Q.  There were no packaging materials found in his house?

25  A.  None that were found.

1   Q.  Or on his person?

2   A.  No.

3   Q.  As part of your investigation, did you look into the

4   finances for Carl Murphy?

5   A.  I did not.

6   Q.  In your observation of the house of Carl Murphy, did you

7   find any jewelry of note?

8   A.  Not that I'm aware of.

9   Q.  Do you know where Derrick Fleming lives?

10  A.  I know he resides primarily in Chicago.

11  Q.  Do you know how close he lives to where Carl Murphy lives?

12  A.  No.

13  Q.  Derrick Fleming was identified in at least one interview as

14  The Prince of the Moes; is that correct?

15  A.  I don't recall that.

16  Q.  Derrick -- I'm sorry -- Derrick Fleming was identified as

17  The Prince of the Moes in a proffer, wasn't he?

18  A.  I don't recall it.

19          MS. BRANSTAD:  May I approach?

20          THE COURT:  You may.

21          MS. JENNINGS:  Your Honor, may we see what she's

22  showing the witness?

23          THE COURT:  If you could give them a reference cite,

24  please.

25          MS. BRANSTAD:  May I approach counsel?

1          THE COURT:  You may.

2   BY MS. BRANSTAD:

3   Q.  Would looking at one of the proffers you took help refresh

4   your memory?

5   A.  Yes.

6   Q.  I'm showing you a highlighted and tabbed portion.

7   A.  Okay.

8   Q.  Do you now recall Derrick Fleming being identified as The

9   Prince of the Moes?

10  A.  Yes.

11  Q.  Carl Murphy also only had one phone, correct?

12  A.  From what I was aware of, yes.  We only intercepted one

13  number of his.  I don't know if he had more than one phone or

14  not.

15  Q.  That you observed or that you knew of, there was one phone?

16  A.  One phone that I was aware of.

17  Q.  And he had a vehicle that was registered to him or to his

18  wife?

19  A.  I believe so.

20  Q.  It had license plates?

21  A.  I believe so.

22  Q.  And it was a 17-year-old vehicle; is that correct?

23  A.  I don't recall what year it was.

24  Q.  Were you involved with the stops of the vehicles that

25  were -- you were told had left Carl Murphy's residence with

1  heroin?

2  A.  I was.

3  Q.  And there was some amount of marijuana but no heroin found

4  in those vehicles?

5  A.  Correct.

6  Q.  And you searched those vehicles both utilizing a K-9 and

7  taking apart the vehicles, as much as taking off the inside

8  panels of doors?

9  A.  I -- yes.

10           MS. BRANSTAD:  I have no further questions.

11           THE COURT:  Redirect?

12           MS. WEISER:  One moment, Your Honor.

13           No further questions, Your Honor.

14           THE COURT:  All right.  You may step down.

15                                    (Witness excused.)

16           THE COURT:  Government may call its next witness.

17           MS. JENNINGS:  The Government calls Special Agent Mark

18  Fredkove to the stand.

19           THE DEPUTY CLERK:  Please raise your right hand.

20           MARK FREDKOVE, GOVERNMENT'S WITNESS, SWORN

21           THE DEPUTY CLERK:  Thank you.  Please have a seat.

22                        DIRECT EXAMINATION

23  BY MS. JENNINGS:

24  Q.  Good afternoon.

25  A.  Good afternoon.

1  Q.  Please state your name and spell your last name for the

2  record.

3  A.  Mark Fredkove, F-r-e-d-k-o-v-e.

4  Q.  What is your job?

5  A.  I'm a special agent.

6  Q.  With what investigation agency are you a special agent?

7  A.  With the FBI.

8  Q.  Where are you currently assigned?

9  A.  The Minneapolis field office.

10 Q.  How long have you been an FBI agent?

11 A.  Seventeen years.

12 Q.  How long have you been assigned to the Minnesota --

13 Minneapolis office?

14 A.  About 12 years now.

15 Q.  Prior to being assigned to Minneapolis, where were you

16 stationed?

17 A.  I was at the Chicago field office.

18 Q.  Do you remember approximately what years you were in the

19 Chicago field office?

20 A.  From about 2005 to 2010.

21 Q.  Currently, in Minnesota, do you have any specific

22 assignments?

23 A.  I'm assigned to a criminal squad that investigates drug-

24 trafficking organizations and gangs that violate federal law in

25 drugs and guns.

1  Q.  Have you had that same assignment while you were in

2  Minnesota?

3  A.  Yes.

4  Q.  When you were in Chicago, what was your assignment?

5  A.  It was very similar.  Same type of squad.

6  Q.  Can you briefly describe your educational background for the

7  jury, starting with after you graduated high school?

8  A.  After high school, I attended the University of Minnesota,

9  where I got my bachelor's degree in sociology, and then I

10  attended law school at the University of Minnesota as well.

11  Q.  Did you graduate with your law degree?

12  A.  Yes.

13  Q.  And did you work in the legal field after your graduation

14  from law school?

15  A.  Briefly.

16  Q.  Where did you work?

17  A.  I was a paralegal initially, and then I clerked for a judge

18  after law school.

19  Q.  And what did you decide to do after that?

20  A.  I went into the FBI.

21  Q.  Can you describe the training process that takes place in

22  order to become a special agent?

23  A.  We have about a four-month training at our training facility

24  in Quantico, Virginia.  There we learn about legal,

25  interviewing, interrogations, pretty much how to do a case.  We

1  learn firearms, how to shoot.  We do practical exercises in

2  terms of making arrests and search warrants and those type of

3  things.

4  Q.  During your 17 years as a special agent, have you received

5  any awards for your work?

6  A.  I guess just various small awards for case work.

7  Q.  Are you involved in training other special agents?

8  A.  I've been a training agent for two new agents.

9  Q.  Now, in the course of your work as an FBI agent, have you

10  ever encountered a person by the name of Carl Murphy?

11  A.  I have.

12  Q.  And when, approximately, did you encounter Carl Murphy?

13  A.  In the summer of 2008, we had received information that an

14  individual with the nickname C-Note was distributing heroin in

15  the Stone Terrace area of Chicago, which is approximately 80th

16  and Union Avenue in south side of Chicago.

17  Q.  Were you able to identify who C-Note was?

18  A.  Eventually, ultimately, we were able to identify him.

19  Q.  And who was he?

20  A.  Carl Murphy.

21  Q.  What was the nature of the investigation surrounding C-Note,

22  who is Carl Murphy?

23  A.  Narcotics distribution.

24  Q.  What types of narcotics?

25  A.  Heroin and crack cocaine.

1  Q.  During the investigation, did you ever observe Carl Murphy

2  in person?

3  A.  At the end of the investigation, yes.

4  Q.  Did you actually meet with him face to face?

5  A.  I did.

6  Q.  Do you see Carl Murphy in the courtroom today?

7  A.  I do.

8  Q.  Can you please describe what he's wearing and where he is

9  seated?

10 A.  He's seated at defense table wearing a blue shirt and blue

11 tie.

12         MS. JENNINGS:  Can the record reflect that the witness

13 has identified the defendant as Carl Murphy?

14         THE COURT:  It will so reflect.

15 BY MS. JENNINGS:

16 Q.  You testified that you knew the defendant because you had

17 investigated him for heroin and crack cocaine distribution; is

18 that right?

19 A.  Yes.

20 Q.  Okay.  In the binder in front of you, could you open it and

21 turn to the tab marked 317 and look up when you get there.

22 A.  Okay.

23 Q.  Do you recognize the exhibit at 317?

24 A.  Yes.

25 Q.  And what is it?

1   A.   This is a judgment in a criminal case against Carl Murphy.

2   Q.   How does this judgment relate to your investigation of Carl

3   Murphy?

4   A.   This was the ultimate judgment of our case.

5        MS. WEISER:  The Government moves to admit Government's

6   Exhibit 317.

7        MS. BRANSTAD:  No objection.

8        THE COURT:  Government Exhibit 317 is admitted.

9             (Government Exhibit No. 317 was

10            offered and received in evidence.)

11       MS. JENNINGS:  Thank you, Your Honor.  May the

12  Government display 317?

13       THE COURT:  You may.

14       MS. JENNINGS:  And, Ms. Kruse, could you please enlarge

15  and highlight the top half of the -- perfect -- judgment.

16       Thank you.

17  BY MS. JENNINGS:

18  Q.   So let's walk through this document, Special Agent Fredkove.

19  Starting at the top, where is the court that this judgment was

20  entered?

21  A.   This was the United States District Court in the Northern

22  District of Illinois.

23  Q.   Is that the federal district court where Chicago is located?

24  A.   Yes.

25  Q.   And who is the named defendant?

1  A.  Carl Murphy.

2  Q.  And what is the title of the document at the upper

3  right-hand corner?

4  A.  "Judgment In A Criminal Case."

5  Q.  And what is the significance of a judgment?

6  A.  It's the ultimate conviction that ended up with this case.

7  Q.  And does the judgment also contain the sentence that was

8  imposed as a result of that conviction?

9  A.  It does.

10 Q.  Moving to the next section, underneath --

11         MS. JENNINGS:  If we could still stay there.  That's

12 okay.  Thank you.

13 BY MS. JENNINGS:

14 Q.  Underneath "The Defendant," there is a box checked, right?

15 A.  Yes.

16 Q.  And what does it say?

17 A.  "The defendant pleaded guilty to count(s)" -- which was just

18 Count 3 of the superseding indictment.

19 Q.  And was that count distribution of 50 grams or more of crack

20 cocaine?

21 A.  Yes.

22         MS. JENNINGS:  Thank you, Ms. Kruse.

23         Could we move to the second page of Exhibit 317, and

24 could you highlight the portion underneath "Imprisonment."

25         Thank you.

1  BY MS. JENNINGS:

2  Q.  What was the length of time that the defendant received for

3  his conviction?

4  A.  120 months.

5  Q.  Okay.  Now, you testified that this conviction related to

6  your investigation of the defendant in 2008 and 2009; is that

7  right?

8  A.  That's right.

9  Q.  Do you know approximately how old the defendant, Carl

10 Murphy, was in 2008 and 2009?

11 A.  He was approximately 40 years old.

12 Q.  In what city was the defendant living during this

13 investigation?

14 A.  In Markham, Illinois.

15 Q.  Where is Markham in relation to, like, Chicago proper?

16 A.  It's about 15 miles south of Chicago.

17 Q.  In this investigation, what was your role?

18 A.  I was one of the case agents.

19 Q.  Who was the other case agent -- or what agency were they

20 from, I should ask.

21 A.  We were working with the Chicago Police Department, and

22 their sergeant of their unit would have been the other case

23 agent.

24 Q.  Now, when this investigation began, who was the original

25 agency that was involved with Mr. Murphy?

1   A.   The Chicago Police Department.

2   Q.   And what was their involvement with the defendant?

3   A.   When we ultimately identified Carl Murphy, we were able to

4   find out that the Chicago Police Department had already been --

5   had an investigation into him, including an undercover officer

6   who was buying narcotics from him.

7   Q.   What type of narcotics was the undercover officer buying

8   from the defendant?

9   A.   Heroin.

10  Q.   In the course of your investigation with the Chicago Police

11  Department, how many controlled buys were made from the

12  defendant or arranged by the defendant?

13  A.   Six.

14  Q.   Now, the six that you just testified about, those are

15  separate from the previous controlled buys that the Chicago PD

16  was doing on its own prior to your or the FBI's involvement; is

17  that right?

18  A.   Correct.

19  Q.   What drugs were purchased from the defendant during these

20  six controlled buys?

21  A.   On three of the occasions, we purchased crack cocaine and

22  heroin; on two of the occasions, we just purchased heroin; and

23  on one, we just purchased crack cocaine.

24  Q.   Did you ever purchase marijuana from the defendant?

25  A.   No.

1  Q.  Do you know the date range of these buys?

2  A.  It was November of 2008 through June of 2009.

3  Q.  What were the general locations that these buys took place

4  in?

5  A.  They occurred in the city of Chicago, and I believe one was

6  in Dalton, Illinois, which is just a south suburb.

7  Q.  And what was the approximate range of crack cocaine that the

8  undercovers purchased from the defendant?

9  A.  They purchased, I believe, approximately 55 grams to 230

10  grams.

11  Q.  What was the approximate range of heroin?

12  A.  From 1 gram to 25 grams.

13  Q.  How were the controlled buys arranged from Mr. Murphy?

14  A.  The undercover officers would call Mr. Murphy and arrange

15  for a meet location and time to make the purchase.

16  Q.  Did you participate in some capacity in each of those

17  controlled buys?

18  A.  Yes.

19  Q.  What was your role?

20  A.  As the case agent, I would kind of control when we made

21  these buys.  I would provide audio and video recording equipment

22  for our undercovers, provide them with the purchase money that

23  would ultimately be used to purchase the drugs.

24  Q.  Generally, what would you describe as Murphy's role in the

25  crack cocaine transactions?

1  A.  He was a middleman.

2  Q.  What does that mean?

3  A.  So he ultimately would contact some source of supply for the

4  crack and then would make a transaction to get that crack and

5  then ultimately just provide it to the undercover officer.

6  Q.  Generally, how would you describe Murphy's role in the

7  heroin transactions?

8  A.  Of the -- there was one where he was a middleman again on

9  the larger amount.  On the smaller amounts, he often had it

10  either near him or in the area where he was hanging out.

11  Q.  During the time of your investigation in the Chicagoland

12  area, was it easier to purchase on the streets cocaine, crack

13  cocaine, or heroin?

14  A.  I don't know about easier.  For us, it was slightly cheaper

15  to purchase crack cocaine.

16  Q.  Okay.  What was the price per gram for crack cocaine,

17  approximately, at that time?

18  A.  About $25 a gram.

19  Q.  And what was the price per gram for heroin at that time,

20  approximately?

21  A.  About $100 a gram.

22  Q.  Were all of the controlled buys surveilled by you and other

23  law enforcement officers?

24  A.  Yes.

25  Q.  And I believe you testified that you utilized recording

1  equipment for both video and audio?

2  A.  We did.

3  Q.  We looked at the judgment for Mr. Murphy.  I'd like to ask,

4  what month and year was Mr. Murphy arrested in?

5  A.  He was arrested in November of 2008 -- I'm sorry.  2009.

6  Q.  Okay.  In November of 2009?

7  A.  November of 2009.

8  Q.  All right.  Thank you.

9        When Murphy was arrested, was he advised of his Miranda

10  rights?

11  A.  He was.

12  Q.  And did he waive those rights and agree to speak with law

13  enforcement officers?

14  A.  Yes.

15  Q.  Were you present when he was arrested?

16  A.  Yes.

17  Q.  And were you present when law enforcement officers spoke to

18  the defendant?

19  A.  Yes.

20  Q.  What information did the defendant give you about his

21  participation in crack cocaine selling?

22  A.  He admitted that he was the middleman for the -- for crack

23  cocaine purchases.

24  Q.  What did the defendant tell you about his participation in

25  selling heroin?

1  A.  The same thing.  He admitted to selling the heroin.

2  Q.  Did the defendant admit to all of the heroin buys that he

3  had been surveilled conducting?

4  A.  Can you repeat that?

5  Q.  Was he specific and admit to each of the heroin buys that

6  law enforcement conducted, the controlled buys that they

7  conducted?

8  A.  He -- he admitted to the two that -- part of the joint

9  investigation.

10 Q.  Okay.

11 A.  Yes.

12 Q.  Did he admit to also buying heroin with frequency?

13 A.  He admitted to purchase, 1 to 2 grams of heroin every other

14 day.

15 Q.  You discussed some investigative techniques during this

16 investigation, such as the controlled buys and phone calls used

17 to set up these controlled buys.  Were there any other

18 techniques that your investigators used?

19 A.  We used a court-authorized wiretap.

20 Q.  And whose phone was tapped?

21 A.  Mr. Murphy's.

22 Q.  The phone that was tapped for Mr. Murphy, who was it

23 registered to, that phone?

24 A.  A name of Kenosha Calvin.

25 Q.  Who was the user of that phone whose voice you heard on the

1  intercepts?

2  A.  Mr. Murphy.

3  Q.  In general, what type of evidence did you collect from that

4  wiretap?

5  A.  Conversations discussing distribution of narcotics.

6  Q.  In general, with whom did you hear Murphy speak on this

7  wiretap?

8  A.  With customers and individuals who he -- would supply him

9  with narcotics.

10 Q.  And is my understanding correct that he was living in

11 Chicago and then also conducting those controlled buys in

12 Chicago as well or --

13 A.  I don't --

14 Q.  -- Chicagoland area?

15 A.  Yeah.  He was living in Markham, but he was conducting --

16 some of the buys were done in Chicago.

17        MS. JENNINGS:  No further questions at this time, Your

18 Honor.

19        THE COURT:  Go ahead, Ms. Branstad.

20                        CROSS-EXAMINATION

21 BY MS. BRANSTAD:

22 Q.  Every bit of -- that you just testified to was from 2009; is

23 that correct?

24 A.  That's correct.  And 2008.

25 Q.  And you have no information about Mr. Murphy later than

1  2009, other than his plea of guilty; is that correct?

2  A.  That is correct.

3           MS. BRANSTAD:  I have no further questions.

4           THE COURT:  Any redirect?

5           MS. JENNINGS:  No, Your Honor.

6           THE COURT:  Okay.  Thank you, Special Agent.  You can

7  step down.

8           THE WITNESS:  Thank you, Your Honor.

9                                    (Witness excused.)

10          THE COURT:  The Government may call its next witness.

11          MS. WEISER:  One moment, Your Honor.

12          Your Honor, the Government anticipates its next witness

13  will take the rest of the day.  Would it be appropriate if we

14  took our midafternoon break right now?

15          THE COURT:  We're going to need another break because I

16  don't want the jury to have to go for 2 1/2 hours without a

17  break.  So why don't we go ahead and bring him in, and then

18  we'll get started, and we'll just break mid-testimony.

19          MS. WEISER:  Okay.  Thank you, Your Honor.  The

20  Government calls Malek Holmes.

21          Your Honor, while they're getting the witness, may I

22  hand out transcripts to the jury so we don't interrupt the flow?

23          THE COURT:  Sure.  Go ahead.

24          And you'll want to wait to read those until the witness

25  is with us, okay?

1          THE DEPUTY CLERK:  Please stand and raise your right

2  hand.

3          MALEK HOLMES, GOVERNMENT'S WITNESS, SWORN

4          THE DEPUTY CLERK:  Thank you.  Please have a seat.

5          THE COURT:  Go ahead, Ms. Weiser.

6          MS. WEISER:  Thank you, Your Honor.

7                      DIRECT EXAMINATION

8  BY MS. WEISER:

9  Q.  Will you please state and spell your name for the record.

10  A.  Malek Shawn Holmes, M-a-l-e-k S-h-a-w-n H-o-l-m-e-s.

11  Q.  I can tell you're wearing some type of jail clothing.  Are

12  you currently in jail, Mr. Holmes?

13  A.  Yes.

14  Q.  What city did you live in before you went to jail?

15  A.  Des Moines.

16  Q.  How long had you lived in the Des Moines area?

17  A.  About two years.

18  Q.  Where did you live prior to that?

19  A.  Chicago, Illinois.

20  Q.  Mr. Holmes, do you know someone by the name of Carl Murphy?

21  A.  Yes.

22  Q.  Do you see him here in the courtroom today?

23  A.  Yes.

24  Q.  Will you please describe where he is seated and what he is

25  wearing?

1  A.  In front of me.  He wearing a blue shirt with a tie.

2  Q.  Who is the Carl Murphy -- excuse me.  Who is Carl Murphy to

3  you?

4  A.  Someone I know.

5  Q.  How do you know him?

6  A.  He's my source.

7  Q.  Your source of what?

8  A.  Buying drugs.

9  Q.  And what drug would you be buying from him?

10  A.  Heroin.

11  Q.  Mr. Holmes, were you arrested on July 21st, 2022, in

12  Des Moines?

13  A.  Yes.

14  Q.  Have you been charged in this court with conspiracy to

15  distribute a controlled substance, possession with intent to

16  distribute a controlled substance, and unlawful user in

17  possession of a firearm?

18  A.  Yes.

19  Q.  Did you plead guilty to the conspiracy and a firearm charge?

20  A.  Yes.

21  Q.  I know it might be hard, but can you please flip to

22  Government's Exhibit 329 in the notebook in front of you.

23          Those might be the 200s.  It might be farther back.

24          MS. WEISER:  Your Honor, may I approach?  This would be

25  easier.

1          THE COURT:  Yes.

2     BY MS. WEISER:

3     Q.  Mr. Holmes, I'll just show it to you.

4          MS. WEISER:  Handing the witness what's been marked as

5     Government's Exhibit 329.

6     BY MS. WEISER:

7     Q.  Mr. Holmes, is this your plea agreement?

8     A.  Yes.

9     Q.  In paragraph 1, does it say that you are pleading guilty to

10    conspiracy to distribute a controlled substance and unlawful

11    drug user in possession of a firearm?

12    A.  Yes.

13    Q.  When you pled guilty, did you also agree to cooperate with

14    the Government?

15    A.  Yes.

16    Q.  What do you have to do under your understanding of that

17    cooperation agreement?

18    A.  To tell the truth.

19    Q.  Mr. Holmes, what do you hope to get out of cooperating with

20    the Government?

21    A.  Lesser time.

22    Q.  And who decides whether you actually get a reduction in your

23    sentence?

24    A.  The judge.

25    Q.  And do you understand that you've taken an oath to tell the

1  truth here today?

2  A.  Yes.

3  Q.  Let's get to know you a little bit more, Mr. Holmes.  How

4  old are you?

5  A.  Twenty-two.

6  Q.  Where did you grow up?

7  A.  Chicago, Illinois.

8  Q.  Did you graduate from high school?

9  A.  Yes.

10  Q.  Did you go to college?

11  A.  No.

12  Q.  Prior to your arrest, did you use drugs?

13  A.  Yes.

14  Q.  What drugs would you use?

15  A.  Marijuana and lean, promethazine.

16  Q.  So is "lean" the slang term for promethazine?

17  A.  Yes.

18  Q.  Approximately when did you move to Des Moines?

19  A.  2019.

20  Q.  Do you remember what time of year?

21  A.  The wintertime, December.

22  Q.  Before you were arrested, did you have a job in Des Moines?

23  A.  No.

24  Q.  What did you do for money?

25  A.  I sold heroin.

1  Q.  Did you sell any other drugs for profit?

2  A.  No.

3  Q.  Did you know anyone who lived in Des Moines before you moved

4  here?

5  A.  Yes.

6  Q.  Who was that?

7  A.  Desmond Howard, Pierre Black, and Deshawn Greer.

8          MS. WEISER:  Your Honor, may I freely publish some

9  already admitted exhibits?

10         THE COURT:  You may.

11  BY MS. WEISER:

12  Q.  Mr. Holmes, on the screen in front of you are Government

13  Exhibits 302, 304, and 305.  Who are these people?

14  A.  Pierre Black, Deshawn Greer, and Desmond Howard.

15  Q.  Did they have jobs in Des Moines before you moved here?

16  A.  No.

17  Q.  What did they do for money, if you know?

18  A.  Sold heroin.

19  Q.  When you moved to Des Moines, did you work with them to sell

20  heroin?

21  A.  Yes.

22  Q.  From the end of 2019 until your arrest, who was your primary

23  source for heroin?

24  A.  Carl Murphy.

25  Q.  I want to talk about Carl Murphy a little bit.  How long

1  have you known the defendant?

2  A.  My whole life.

3  Q.  Do you know how old he is?

4  A.  About 50.

5  Q.  Do you remember even meeting him for the first time?

6  A.  No.  It was so long ago.

7  Q.  Where were you living when you met him?

8  A.  In Chicago, Illinois.

9  Q.  What area of Chicago, Illinois, are you from?

10  A.  The south side.

11  Q.  Can you be a little bit more specific?

12  A.  80th and Union.

13  Q.  Does Carl Murphy have any nicknames?

14  A.  Yes.

15  Q.  What are some of them?

16  A.  Big C-Note and The P.

17  Q.  What does "The P" stand for?

18  A.  The Prince.

19  Q.  Do you know anyone else who has a P in their nickname or

20  goes by "The Prince"?

21  A.  Yes.

22  Q.  Who is that?

23  A.  Derrick Fleming.

24  Q.  Mr. Holmes, are you a member of a gang?

25  A.  Yes.

1  Q.  What gang is that?

2  A.  The Black P. Stones.

3  Q.  Is the defendant a member of that gang?

4  A.  Yes.

5  Q.  Are the Black P. Stones based out of Chicago?

6  A.  Yes.

7  Q.  I want to talk very briefly about the nicknames that we

8  both -- that you just described for the defendant and Derrick

9  Fleming.  Are they both called The P?

10  A.  One is called The P and one is called P.

11  Q.  So who is The P?

12  A.  Carl Murphy.

13  Q.  And who is P?

14  A.  Derrick Fleming.

15  Q.  Is there a difference in what that means?

16  A.  No, it's not really a difference.

17  Q.  Does the "P" for Derrick Fleming also stand for Prince?

18  A.  Yes.

19  Q.  And what does the Prince mean?

20  A.  The Prince means like he got some type of rank.

21  Q.  In the gang?

22  A.  Yes.

23  Q.  Mr. Holmes, you testified that Defendant was your primary

24  source of heroin.  Did you also at some other points have other

25  sources?

1  A.  Yes.

2  Q.  Who were they?

3  A.  Hector Gonzalez and Joe Blow.

4  Q.  Do you know their real names?

5  A.  No.

6  Q.  Are they also members of the Black P. Stones?

7  A.  Yes.

8  Q.  We briefly talked on P and The P.  Why are there two

9  princes?

10  A.  One of them is the leader, and one of them is just the

11  prince.

12  Q.  And which one's the leader?

13  A.  Carl Murphy.

14  Q.  If the defendant was your primary source of heroin, why did

15  you also go to Hector Gonzalez and Joe Blow?

16  A.  For better quality.

17  Q.  So if your quality with the defendant was suffering, you

18  would go to other sources?

19  A.  Yes.

20  Q.  Approximately when did you go to Joe Blow and Hector

21  Gonzalez?

22  A.  Like the middle of 2021.

23  Q.  So before 2021, who was your only source?

24  A.  Carl Murphy.

25  Q.  Mr. Holmes, do you know what city the defendant lived in?

1   A.   Yes.

2   Q.   And do you know where that was?

3   A.   Chicago, Illinois.

4   Q.   Was it in Chicago proper?

5   A.   It was like the Markham area.

6   Q.   If you needed to get heroin from him, how did you do that?

7   A.   I either drive or get on the bus.

8   Q.   Mr. Holmes, do you know other people besides the three

9   individuals we talked about earlier -- Mr. Black, Mr. Greer, and

10  Mr. Howard -- that sold heroin in Des Moines?

11  A.   Yes.

12  Q.   Do you know other people that would bring heroin to

13  Des Moines for you or others to sell on their behalf?

14  A.   Yes.

15  Q.   We'll discuss that process a little bit more in a bit, but I

16  want to go through some of those individuals with you.

17           I'm publishing Government's Exhibit 302, who you've

18  identified as Pierre Black.  Mr. Holmes, does he have any

19  nicknames?

20  A.   Yes.

21  Q.   What are they?

22  A.   Peezy and Rico.

23  Q.   What city did you live in when you met Pierre Black?

24  A.   Chicago.

25  Q.   How long have you known him?

1  A.  My whole life.

2  Q.  What city did he live in between 2019 and 2021?

3  A.  Des Moines.

4  Q.  You testified earlier that you worked with him to sell

5  heroin, correct?

6  A.  Yes.

7  Q.  Who was his source of heroin?

8  A.  Carl Murphy.

9  Q.  How do you know Carl Murphy was one of his sources of

10 heroin?

11 A.  Because I went with him to go get the stuff.

12 Q.  When you say "stuff," do you mean heroin?

13 A.  Yes.

14        MS. WEISER:  I'm publishing Government's Exhibit 303.

15 BY MS. WEISER:

16 Q.  Mr. Holmes, who is this?

17 A.  Earl Clay.

18 Q.  Does he have any nicknames?

19 A.  Yes.

20 Q.  What are they?

21 A.  BD.

22 Q.  B-D?

23 A.  Yes.

24 Q.  What city were you in when you met him?

25 A.  Chicago, Illinois.

1  Q.  About how long have you known him?

2  A.  My whole life.

3  Q.  Do you know if he sells heroin?

4  A.  Yes.

5  Q.  Do you know who his sources were?

6  A.  Yes.

7  Q.  Who were they?

8  A.  Carl Murphy and Joe Blow.

9  Q.  How do you know Carl Murphy was one of his sources?

10  A.  Because I went with him.

11  Q.  To get heroin?

12  A.  Yes.

13       MS. WEISER:  I'm publishing Government's Exhibit 304.

14  BY MS. WEISER:

15  Q.  Mr. Holmes, who is this?

16  A.  Deshawn Greer.

17  Q.  Does he have any nicknames?

18  A.  Yes.  Jack.

19  Q.  What city did you live in when you met him?

20  A.  Chicago, Illinois.

21  Q.  Do you know where he lived between 2019 and 2021?

22  A.  Yes.  Des Moines.

23  Q.  Does he sell heroin?

24  A.  Yes.

25  Q.  Who are his sources?

1    A.   Carl Murphy.

2    Q.   And how do you know Carl Murphy was one of his sources?

3    A.   Because I went with him.

4    Q.   To get heroin?

5    A.   Yes.

6              MS. WEISER:   I'm publishing Government Exhibit 305.

7    BY MS. WEISER:

8    Q.   Mr. Holmes, who is this?

9    A.   Desmond Howard.

10   Q.   Does he have any nicknames?

11   A.   Yes.

12   Q.   Do you know what they are?

13   A.   Rudy and Blue.

14   Q.   Rudy, R-u-d-y?

15   A.   Yes.

16   Q.   What city did you live in when you met Mr. Howard?

17   A.   Chicago, Illinois.

18   Q.   What city did he live in between approximately 2019 and

19   2021?

20   A.   Des Moines, Iowa.

21   Q.   Did he sell heroin?

22   A.   Yes.

23   Q.   Do you know who his sources were?

24   A.   Yes.  Carl Murphy.

25   Q.   And how do you know that?

1  A.  Because I went with him to go get the heroin.

2        MS. WEISER:  I'm publishing Government's Exhibit 306.

3  BY MS. WEISER:

4  Q.  Mr. Holmes, who is this?

5  A.  Michael Byrd.

6  Q.  Does he have any nicknames?

7  A.  Yes.  Big Mike.

8  Q.  What city did you live in when you met him?

9  A.  Chicago, Illinois.

10 Q.  Did he sell heroin in Des Moines?

11 A.  Yes.

12 Q.  And who were his sources?

13 A.  Carl Murphy.

14 Q.  And how do you know Carl Murphy was one of his sources?

15 A.  Because I went with him to go grab the heroin.

16       MS. WEISER:  I'm publishing Government's Exhibit 307.

17 BY MS. WEISER:

18 Q.  Mr. Holmes, do you know who this is?

19 A.  Yes.

20 Q.  Do you know his name?

21 A.  Azim.

22 Q.  And does he have any nicknames?

23 A.  Tana and Shorty Red.

24 Q.  What did he -- excuse me.  What city did you live in when

25 you met him?

1  A.  Chicago, Illinois.

2  Q.  Do you know where he lived between 2019 and 2021?

3  A.  Yes.  Des Moines, Iowa.

4  Q.  Did he also sell heroin?

5  A.  Yes.

6  Q.  Who were some of his sources?

7  A.  Carl Murphy.

8  Q.  And how do you know Carl Murphy was one of his sources?

9  A.  Because I went with him to go grab the heroin.

10 Q.  And you've said this for Government's Exhibits 302 through

11 307 now.  When you say you went with them, where did you go?

12 A.  To Carl Murphy house.

13 Q.  To pick up heroin?

14 A.  Yes.

15      MS. WEISER:  I'm publishing Government's Exhibit 308.

16 BY MS. WEISER:

17 Q.  Who is this, Mr. Holmes?

18 A.  Patrick Staples.

19 Q.  What city did you live in when you met him?

20 A.  Chicago, Illinois.

21 Q.  Did he sell heroin in Des Moines?

22 A.  No.

23 Q.  Did he ever bring heroin to Des Moines?

24 A.  Yes.

25 Q.  Do you know who one of his sources was?

1  A.  Carl Murphy.

2  Q.  And how do you know that?

3  A.  Because I sent him to go get the heroin.

4  Q.  From Carl Murphy?

5  A.  Yes.

6  Q.  In his house in Markham, Illinois?

7  A.  Yes.

8       MS. WEISER:  I'm publishing Government's Exhibit 309.

9  BY MS. WEISER:

10 Q.  Mr. Holmes, who is this?

11 A.  Tabaris Brown.

12 Q.  Does he have any nicknames?

13 A.  TB or Sandoval.

14 Q.  What city did you live in when you met him?

15 A.  Chicago, Illinois.

16 Q.  And do you know what city he lived in between 2019 and 2021?

17 A.  Yes.  Des Moines, Iowa.

18 Q.  Do you know if he sold heroin in Des Moines?

19 A.  Yes.

20 Q.  And do you know who his sources are?

21 A.  Yes.

22 Q.  Who?

23 A.  Carl Murphy and Hector Gonzalez.

24 Q.  How do you know Carl Murphy is one of his sources?

25 A.  Because it's my best friend.  We know everything about each

1  other, and I'd go with him to go grab the heroin.

2  Q.  From Carl's house?

3  A.  Yes.

4  Q.  I'm showing you Government's Exhibit 310.  Do you know who

5  this is?

6  A.  Yes.

7  Q.  What's his name?

8  A.  Terrance Lindsay.

9  Q.  Does he have any nicknames?

10 A.  T Streets.

11 Q.  Do you know if he sells heroin?

12 A.  Yes.

13 Q.  Do you know if he sold heroin in Des Moines?

14 A.  Yes.

15 Q.  Do you know who his sources are?

16 A.  Yes.

17 Q.  Who?

18 A.  Carl Murphy.

19 Q.  And how do you know that?

20 A.  Because he used to run with me to sell the heroin.

21 Q.  What do you mean by "run with me"?

22 A.  We was together selling heroin in Des Moines, Iowa.

23 Q.  So you'd talk about how Carl was your source?

24 A.  Yes.

25          MS. WEISER:  I'm publishing Government Exhibit 311.

1    BY MS. WEISER:

2    Q.   Mr. Holmes, who is in Government Exhibit 311?

3    A.   Robert Jeffrey.

4    Q.   Does he have any nicknames?

5    A.   Yes.  Moo Moo.

6    Q.   Moo Moo?

7    A.   Yes.

8    Q.   And what city did you live in when you met him?

9    A.   Chicago, Illinois.

10   Q.   Did he sell heroin?

11   A.   Yes.

12   Q.   Do you know who his sources were?

13   A.   Carl Murphy and Joe Blow.

14   Q.   And how do you know Carl Murphy was one of his sources?

15   A.   Because I went with him to go get the heroin from Carl

16   Murphy.

17          MS. WEISER:  I'm publishing Government's Exhibit 312.

18   BY MS. WEISER:

19   Q.   Mr. Holmes, who is this?

20   A.   Gregory Spight.

21   Q.   Did he have any nicknames?

22   A.   Yes.  LoSo.

23   Q.   What city did you live in when you met him?

24   A.   Chicago, Illinois.

25   Q.   What city did he live in between 2019 and 2021?

1   A.  Des Moines, Iowa.

2   Q.  Did he sell heroin?

3   A.  Yes.

4   Q.  And who were his sources?

5   A.  Carl Murphy and Joe Blow.

6   Q.  And how do you know Carl Murphy was one of his sources?

7   A.  Because I drove him.

8   Q.  To Carl Murphy's house?

9   A.  Yes.

10          MS. WEISER:  I'm publishing Government's Exhibit 313.

11  BY MS. WEISER:

12  Q.  Mr. Holmes, who is this?

13  A.  Tony Martin.

14  Q.  What city were you in when you met him?

15  A.  Chicago, Illinois.

16  Q.  Do you know where he lived between 2019 and 2021?

17  A.  Yes.  Minnesota.

18  Q.  Did he sell heroin or bring heroin to Des Moines?

19  A.  Yes.

20  Q.  Who were his sources?

21  A.  He don't really have a source.

22          MS. WEISER:  I'm publishing Government's Exhibit 314.

23  BY MS. WEISER:

24  Q.  Who is this?

25  A.  It's Dandre Cox.

1  Q.  Does he have any nicknames?

2  A.  Yes.  Dusky or Du-Wop.

3  Q.  What city did you live in when you met him?

4  A.  Chicago, Illinois.

5  Q.  And what city did he live in between 2019 and 2021?

6  A.  Des Moines.

7  Q.  Did he sell heroin?

8  A.  Yes.

9  Q.  And who were his sources?

10 A.  Carl Murphy.

11 Q.  How do you know that?

12 A.  Because another one of my best friends.

13 Q.  And you'd talk about it?

14 A.  Yes.

15        MS. WEISER:  I'm publishing Government's Exhibit 315.

16 BY MS. WEISER:

17 Q.  Mr. Holmes, who is this?

18 A.  Devante Taylor.

19 Q.  Do you know if he has any nicknames?

20 A.  Tay-Tay and Smooth.

21 Q.  And what city did you live in when you met him?

22 A.  Chicago, Illinois.

23 Q.  Do you know where he lived between 2019 and 2021?

24 A.  Des Moines, Iowa.

25 Q.  Did he sell heroin here?

1  A.  Yes.

2  Q.  Do you know who his sources were?

3  A.  Carl Murphy and Hector Gonzalez.

4  Q.  How do you know that Carl Murphy was one of his sources?

5  A.  Because I drove him to go get the heroin.

6  Q.  In Markham, Illinois?

7  A.  Yes.

8         MS. WEISER:  I'm publishing Government Exhibit 316.

9  BY MS. WEISER:

10  Q.  Mr. Holmes, who is this?

11  A.  Ronald Harris.

12  Q.  What city did you live in when you met him?

13  A.  Chicago, Illinois.

14  Q.  Where did he live between 2019 and 2021?

15  A.  He came to Des Moines late.  He wasn't living in Des Moines

16  2019.

17  Q.  So did he move here in 2020?

18  A.  Yes.

19  Q.  Did he sell heroin in Des Moines?

20  A.  Yes.

21  Q.  Who were his sources?

22  A.  Carl Murphy and Joe Blow.

23  Q.  And how do you know Carl Murphy was one of his sources?

24  A.  Because I drove him.

25  Q.  Mr. Holmes, on the screen before you shows Government's

1  Exhibits 301 through 316.  Is this all the people you just

2  identified plus yourself?

3  A.  Yes.

4  Q.  Would you say that you're friends with all these people, to

5  some degree?

6  A.  Yes.

7  Q.  Did you talk to several of these people on a daily basis?

8  A.  Yes.

9  Q.  Did you hang out with any of these people daily?

10  A.  Yes.

11  Q.  All the people in Government's Exhibits 301 to 316, are they

12  members of a gang?

13  A.  Yes.

14  Q.  What gang?

15  A.  Everybody is Black Stone except for two of them.

16  Q.  So everyone except for two of these people are members of

17  the Black P. Stones?

18  A.  Yes.

19  Q.  I want to talk about your heroin dealing in Des Moines a

20  little bit more.  When you moved to Des Moines, did you

21  personally start selling heroin right away?

22  A.  No.

23  Q.  What did you do at first?

24  A.  Drive people around to get the heroin.

25  Q.  Can you explain how that would work?

1  A.  I would wake up in the morning.  Because I have a driver's

2  license, I would drive three people to they serves.

3  Q.  What three people would you drive to their serves?

4  A.  Pierre Black, Deshawn Greer, and Desmond Howard.

5  Q.  Those three in Government's Exhibits 302, 304, and 305?

6  A.  Yes.

7  Q.  What is a serve?

8  A.  A serve is going to go meet a heroin addict and sell them

9  drugs.

10 Q.  So you would drive those three to sell to addicts?

11 A.  Yes.

12 Q.  Did you and these three individuals share product when you

13 moved to Des Moines?

14 A.  Yes.

15 Q.  Did you also share profit?

16 A.  Yes.

17 Q.  Why did you guys sell heroin in Des Moines versus Chicago?

18 A.  Because you make more money in Des Moines.

19 Q.  When you personally -- when did you personally begin --

20 start doing hand-to-hand deals?

21 A.  Like 2020, April.

22 Q.  And when you personally started doing deals, how often were

23 you selling heroin?

24 A.  Every day.

25 Q.  Why did you sell heroin so often?

1  A.   To make money.

2  Q.   And did customers call you every day?

3  A.   Yes.

4  Q.   Approximately how many customers do you think you had

5  between 2019 and 2021?

6  A.   Like 600 customers.

7  Q.   People that would come to you or your group for heroin?

8  A.   Yes.

9  Q.   How would customers get in touch with you in the group?

10 A.   All they had to do was just call the phone.

11 Q.   You're saying "the phone."  What phone?

12 A.   We shared this one phone.

13 Q.   And was that for customers to call you on?

14 A.   Yes.

15 Q.   Were there occasions when you would answer a phone call but

16 someone else would do the drug deal?

17 A.   Yes.

18 Q.   And were there occasions when someone else would answer the

19 call but you would show up for the drug deal?

20 A.   Yes.

21 Q.   Does that include with some of these people on the screen,

22 Government's Exhibits 301, including yourself, and through 316?

23 A.   Yes.

24 Q.   Generally speaking, what quantity of heroin did you sell to

25 users?

1    A.   Halves, grams, and balls.

2    Q.   And do you know how much a ball weighs?

3    A.   3.5 grams.

4    Q.   Were you mainly selling people -- excuse me -- selling

5    heroin to people who actually used the drug?

6    A.   Yes.

7    Q.   Do you recall how much you and your group sold 1 gram of

8    heroin for?

9    A.   $200.

10   Q.   Did that ever vary?

11   A.   Yeah.  Then it dropped down to $150.

12   Q.   And how about how much did you sell 3.5 grams of heroin to a

13   user?

14   A.   $600.  Then we dropped it down to $450.

15   Q.   Why did you eventually drop down the prices of those two

16   quantities?

17   A.   To get more customers.

18   Q.   So if you had a lower price, more people would come to you?

19   A.   Yes.

20   Q.   Where did you meet with customers to do the actual

21   hand-to-hand transfer of drugs and cash?

22   A.   Anywhere.

23   Q.   Would you drive to them?

24   A.   Yes.

25   Q.   And have them meet you as well?

1  A.  Yes.

2  Q.  How were you paid?

3  A.  Cash.

4  Q.  Did you have to share your proceeds?

5  A.  Yes.

6  Q.  With who?

7  A.  Deshawn Greer, Desmond Howard, and Pierre Black.

8  Q.  We talked about your daily sales.  What did you do when your

9  supply was low or you completely ran out of heroin?

10 A.  Go get some more heroin.

11 Q.  And from 2019 until your arrest in July of 2021, who did you

12 guys go to for heroin the most often?

13 A.  Carl Murphy.

14 Q.  When you first began working in Des Moines with Mr. Black,

15 Mr. Howard, and Mr. Greer to sell heroin, who primarily would

16 travel to Chicago to get the heroin from the defendant?

17 A.  All of us.

18 Q.  You'd go together?

19 A.  Yes.

20 Q.  Were there ever times where you would personally not go?

21 A.  Yes.

22 Q.  Then how did you know other people were getting that heroin

23 from the defendant if you personally weren't there?

24 A.  Because we'd talk about it before we go.

25 Q.  You would be with them every day?

1  A.  Yes.

2  Q.  And would you talk about this in person?

3  A.  Yes.

4  Q.  You mentioned having a driver's license earlier; is that

5  correct?

6  A.  Yes.

7  Q.  Would there ever be a time when people on the screen in

8  Government Exhibits 302 to 316 needed more product and you would

9  go with?

10 A.  Yes.

11 Q.  And would you drive there?

12 A.  Yes.

13 Q.  And you testified that the defendant lived in a Chicago

14 suburb.  Where did you physically go to meet the defendant for

15 more heroin?

16 A.  At his house.

17 Q.  And I know it might not have happened the same every single

18 time you went, but can you explain generally how it worked when

19 you would arrive to the defendant's to pick up more heroin?

20 A.  I would have arrive at his house.  We'd either go downstairs

21 to the basement or upstairs.

22 Q.  And then what would happen when you got to the basement or

23 wherever he directed you to go?

24 A.  I would tell him how much more drugs I need.  He would weigh

25 it out in front of me, and I hand him the cash, and I get the

1  heroin and leave.

2         MS. WEISER:  Your Honor, may I approach the witness?

3         THE COURT:  You may.

4         MS. WEISER:  I am showing the witness -- or handing the

5  witness already entered Government Exhibits 325 through 328.

6  BY MS. WEISER:

7  Q.  Mr. Holmes, can you flip through those briefly, please.

8  A.  (Witness complied.)

9  Q.  Mr. Holmes, I'm going to publish on the screen Government's

10 Exhibit 327.  Do you recognize this photo?

11 A.  Yes.

12 Q.  And what is it a photo of?

13 A.  Carl Murphy's house.

14 Q.  I know it might be tough, but can you circle on the screen

15 where you would go inside?

16 A.  (Witness complied.)

17        MS. WEISER:  Let the record reflect the witness has

18 circled the front door of the home in Government's Exhibit 327.

19 BY MS. WEISER:

20 Q.  Mr. Holmes, you testified that you would go inside the house

21 for heroin.  Is that usually how it occurred?

22 A.  Yes.

23 Q.  And was anyone ever with the defendant when you were buying

24 heroin from him?

25 A.  No.

1  Q.  Did you ever speak with anyone else at the house when you

2  went to get the heroin from him?

3  A.  No.

4  Q.  Generally, on average, how long would you stay in the house

5  when picking up heroin from the defendant?

6  A.  Like five to ten minutes.

7  Q.  Did you ever hang out with the defendant beyond picking up

8  heroin?

9  A.  No.

10  Q.  Did you ever watch TV with him?

11  A.  No.

12  Q.  Did you ever eat a meal with him?

13  A.  No.

14  Q.  Why not?

15  A.  Because I was just going there to get the heroin and leave.

16  Q.  Did you talk to the defendant on a daily basis?

17  A.  No.

18  Q.  Why not?

19  A.  Because I only call him when I need him.

20  Q.  And when do you need him?

21  A.  Whenever I'm out of heroin.

22  Q.  Can you estimate how often you or one of the people from

23  that -- the group, Government's Exhibits 302 to 316, would go to

24  the defendant to purchase more heroin between 2019 and your

25  arrest in 2021?

1  A.  Once or twice a week.

2  Q.  And if you sold heroin every day, is it true that you didn't

3  have a Monday-through-Friday job?

4  A.  Correct.

5  Q.  So you would go to see the defendant anytime you ran out of

6  heroin?

7  A.  Yes.

8  Q.  Whether that was a Tuesday or a Sunday or any day of the

9  week?

10  A.  Yes.

11  Q.  How do you know if other people visited the defendant for

12  heroin if you went there?

13  A.  Because we all talk about it.

14  Q.  You'd talk about your product?

15  A.  Yes.

16  Q.  Would someone ever pick up more heroin for you?

17  A.  Yes.

18  Q.  Per average trip, how much heroin would you, Mr. Black,

19  Mr. Greer, or Mr. Howard pick up from the defendant each time

20  you went to see him?

21  A.  At least 100 grams.

22  Q.  Was it always that much?

23  A.  Sometimes more.

24  Q.  Even though you were buying at least 100 grams, do you know

25  how much the defendant charged you per gram?

1  A.  $75 a gram.

2  Q.  Was it always $75 a gram?

3  A.  No.  Then he dropped it down to $60 a gram.

4  Q.  And do you know why the price went down?

5  A.  No.

6  Q.  So it was either -- between 60 and 75 dollars?

7  A.  Yes.

8  Q.  How much were you charged for 100 grams of heroin from the

9  defendant?

10  A.  7500 or 6,000.

11  Q.  Do you know why the price dropped for that large quantity?

12  A.  No.

13  Q.  How did you pay the defendant?

14  A.  Cash.

15  Q.  Can you describe to us what 100 grams of heroin physically

16  looks like?

17  A.  It's like an iPhone, big as an iPhone.

18  Q.  Where would you put the heroin that you bought from the

19  defendant when you left his house?

20  A.  If I grab 100 grams, I would put it in my pocket or in my

21  pants.

22  Q.  What about if you bought 200 grams?

23  A.  I'd still put it in my pants in my pocket.

24  Q.  Was there ever a time you bought 500 grams?

25  A.  Yes.

1  Q.  Where would you put that?

2  A.  In a book bag.

3  Q.  And if you bought more than 500 grams, where would you put

4  that?

5  A.  In a book bag.

6       THE COURT:  We need to take a break at some point.  Is

7  this a good breaking point or are you coming up on one within

8  the next few minutes?

9       MS. WEISER:  I'm very close to a good breaking point.

10       THE COURT:  Okay.  Why don't you go ahead and get us to

11  that point.

12       MS. WEISER:  Thank you.

13  BY MS. WEISER:

14  Q.  Mr. Holmes, why would you not carry the heroin out in your

15  hand out of his house?

16  A.  Because I wouldn't want nobody to see what I'm going to go

17  grab.

18  Q.  Is that because heroin's illegal?

19  A.  Yes.

20  Q.  You testified that you would drive back to Des Moines; is

21  that correct?

22  A.  Yes.

23  Q.  Where did you usually hide the heroin -- excuse me.  Did you

24  hide the heroin in the car?

25  A.  Yes.

1  Q.  And where would you usually hide it?

2  A.  The door panel.

3  Q.  Can you explain what you mean by "the door panel"?

4  A.  When you closing a door, it's like a little part where you

5  can just pop open.

6  Q.  So it's like a natural open space in the door?

7  A.  Yeah.  Like where you can put change or anything like that.

8  Q.  And are you saying you open that or remove that and it goes

9  inside there?

10  A.  Yes.

11  Q.  And then you would put -- you'd close it; is that correct?

12  A.  Yes.

13  Q.  Did you ever hide it on yourself?

14  A.  Yes.

15  Q.  Can you explain that?

16  A.  We had it in our butt.

17  Q.  And why would you hide it there?

18  A.  Because the police can't search that.

19  Q.  When you or someone in your group would return to Des Moines

20  with heroin, where did you first go usually?

21  A.  Pierre Black house.

22  Q.  And what did you do at Pierre Black's house?

23  A.  I bagged it up.

24  Q.  What does bagging it up mean?

25  A.  I weighed it out to get it ready to serve, to sell.

1  Q.  So you'd get the heroin ready to sell.  What do you have to

2  do besides weighing it to get it ready for sale?

3  A.  Have to break it down.

4  Q.  Like make the 100 grams a smaller quantity?

5  A.  Yes.

6  Q.  Did you or anyone you worked with cut or mix the products?

7  A.  Yes.

8  Q.  And what's the point of mixing your heroin with another

9  product?

10  A.  To stretch it.

11  Q.  So there --

12  A.  To make more money.

13  Q.  If other people picked up heroin from the defendant that you

14  were going to get and sell, how was that arranged?

15  A.  I would tell them to go get it, and then we would tell them

16  where to meet us at or we go pick them up at the bus station.

17  Q.  Did you talk to your friends in person about getting heroin

18  from the defendant?

19  A.  Yes.

20  Q.  And were plans often made in person to arrange those trips?

21  A.  Yes.

22  Q.  And would other people call the defendant to arrange picking

23  up heroin as well?

24  A.  Yes.

25          MS. WEISER:  Your Honor, I think we're at a good

1 | stopping point.

2 | THE COURT: Okay. Ladies and gentlemen, let's go ahead

3 | and take a 20-minute break. If you'll be back in the jury room

4 | at 3:20, we'll get started again at that time.

5 | (In open court, with the defendant present, out of the

6 | presence of the jury.)

7 | THE COURT: Okay. Anything we need to talk about?

8 | MS. WEISER: No, Your Honor.

9 | THE COURT: Ms. Branstad?

10 | MS. BRANSTAD: No, Your Honor.

11 | THE COURT: All right. Go ahead and enjoy your break.

12 | We'll see everybody in 20 minutes.

13 | (Recess at 3:03 p.m. until 3:21 p.m.)

14 | THE COURT: Anything we need to talk about before we

15 | bring in our jury?

16 | MS. WEISER: No, Your Honor.

17 | MS. BRANSTAD: No, Your Honor.

18 | THE COURT: Okay.

19 | (In open court, with the defendant present, in the

20 | presence of the jury.)

21 | THE COURT: All right. Everyone can go ahead and be

22 | seated.

23 | Ms. Weiser, you may continue with the direct

24 | examination of Mr. Holmes.

25 | MS. WEISER: Thank you, Your Honor.

1  BY MS. WEISER:

2  Q.  Mr. Holmes, was there ever a time where you didn't have

3  heroin in Des Moines?

4  A.  Say that again.

5  Q.  Were there ever times when you didn't have heroin in

6  Des Moines?

7  A.  When I run out.

8  Q.  If you ran out of product, you wouldn't have any?

9  A.  Yes.

10  Q.  Mr. Holmes, what did you do with the drug proceeds that you

11  got from selling to customers?

12  A.  What do you mean by that?

13  Q.  What did you do with the cash after you sold drugs to

14  people?

15  A.  First we split it amongst each other.

16  Q.  So who would you split your cash among?

17  A.  Deshawn Greer, Desmond Howard, and Pierre Black.

18  Q.  And then what did you do with your cut of the cash?

19  A.  Whatever I wanted to do with it.

20  Q.  What did you like doing with it?

21  A.  I buy weed, clothes, shoes, rentals.

22  Q.  Did you put it in a bank account?

23  A.  No.

24  Q.  Did you ever hide it in your home?

25  A.  No.

1   Q.  Where would you keep it?

2   A.  On me.

3   Q.  You kept it on you?

4   A.  Yes.

5   Q.  Mr. Holmes, you talked about customer telephones earlier

6   that the drug users would call.  Would you ever call anyone in

7   the -- this is not on -- on the slide in front of you on those

8   customer phones?

9   A.  No.

10  Q.  What phone would you talk to these people on?

11  A.  My personal cell phone.

12  Q.  And was that (515)344-0682?

13  A.  Yes.

14  Q.  What phone number did you talk to the defendant on when you

15  needed more heroin?

16  A.  My personal phone.

17  Q.  Did you talk to the people in Government's Exhibits 302 to

18  316 about personal matters?

19  A.  Yes.

20  Q.  Did you also talk to them about your drug dealing?

21  A.  Yes.

22  Q.  When you had talked to other drug dealers in this slide, did

23  you use the term "heroin"?

24  A.  No.

25  Q.  Can you explain why not?

1  A.  Because we just don't talk like that.

2  Q.  It's not normal for you to say "heroin" when you're talking

3  to people?

4  A.  Yes.

5  Q.  If you got 100 grams from the defendant -- 100 grams of

6  heroin from the defendant, how would you say that if you were

7  telling one of the people on the screen?

8  A.  "I finna grab 100 grams from The P."

9  Q.  When you say "100 grams," what are you talking about?

10  A.  100 grams of heroin.

11  Q.  And when you say "The P," what are you talking about?

12  A.  Carl Murphy.

13  Q.  Obviously, you have since come to learn that law enforcement

14  was intercepting your phones, correct?

15  A.  Yes.

16  Q.  And that was from April to July of 2021.  Were you going to

17  Carl Murphy for heroin during that time frame?

18  A.  Yes.

19  Q.  Were you also going to the other sources you mentioned

20  earlier during that time frame?

21  A.  Yes.

22  Q.  Have you been able to review some of the calls before today?

23  A.  Yes.

24  Q.  I'm going to play some of them for you.  And there's a

25  binder of transcripts as well.

1          MS. WEISER:  Your Honor, may I approach to pull that up

2    for him?

3          THE COURT:  You may.

4    BY MS. WEISER:

5    Q.  They're listed as 102a through 119a in the binder in front

6    of you, Mr. Holmes.  They're behind a red sheet of paper.

7          Mr. Holmes, I'm going to play for you Government's

8    Exhibit 102.  You and the jurors can flip to Government's

9    Exhibit 102a in the binders in front of you.

10         Mr. Holmes, do you see at the top of the transcript

11   some information about this phone call?

12   A.  Yes.

13   Q.  What date did this phone call occur on?

14   A.  June 15th, 2021.

15   Q.  And who are you going to be talking to on this phone call?

16   A.  Earl Clay.

17         MS. WEISER:  I'm now going to play Government's Exhibit

18   102.  This phone call -- speaking begins at the 22-second mark.

19         (Government Exhibit 102 was played in open court.)

20   BY MS. WEISER:

21   Q.  Mr. Holmes, do you see on the transcript where Mr. Clay

22   says, "grab y'all shit from"?

23   A.  Yep.

24   Q.  What did you understand him to be talking about?

25   A.  Heroin.

1  Q. What did your response, "Yeah, we grab that shit from Hec"

2  mean?

3  A. That mean I went to Hector Gonzalez that time.

4  Q. Were you talking about what product you had at that time?

5  A. Yes.

6  Q. Were you talking about heroin?

7  A. Yes.

8  Q. Where you say, "He's got the best shit in town," what did

9  you mean by "best shit"?

10 A. He got the best heroin in town.

11 Q. And you followed up with, "and The P got some good ass shit

12 too." Who were you referring to in that statement?

13 A. Carl Murphy.

14 Q. And what did you mean by "good ass shit"?

15 A. He got some good heroin too.

16 Q. On this call, I believe Mr. Clay, and maybe even you, say

17 "pid," p-i-d. Can you tell us what that means?

18 A. Pid is short for period, and we used it as okay.

19 Q. And in this call you also say "on Omar grave." What does

20 that mean?

21 A. That's one of my dead homies.

22 Q. One of your dead homies?

23 A. Yes.

24 Q. And why would you be saying on Omar's grave?

25 A. To let my other friend know that I'm telling the truth.

1    Q.  You're swearing on your friend's grave?

2    A.  Yes.

3    Q.  I'm going to play another call for you, Government Exhibit

4    103.  You can follow along at 103a.

5            (Government Exhibit 103 was played in open court.)

6    BY MS. WEISER:

7    Q.  Mr. Holmes, who was this phone call between that we just

8    listened to?

9    A.  It was me and Pierre Black.

10   Q.  And what date was this on?

11   A.  June 19th, 2021.

12   Q.  On the first page of the transcript, about eight lines down,

13   when Mr. Black says, "all the money you got off all them bags,"

14   what did you understand that to mean?

15   A.  All the money I just made from making my serves.

16   Q.  So money that you'd made from selling heroin?

17   A.  Yes.

18   Q.  Twice in this call, Mr. Black says he's going to grab "more

19   shit" from The P.  Do you see that in here?

20   A.  Yes.

21   Q.  What did you understand him to be saying to you?

22   A.  He's going to go buy some heroin from Carl Murphy.

23   Q.  And the second to last line, the last thing Mr. Black says

24   on the first page of the transcript, he says, "I just bought

25   some more shit from Joe."  What did you understand that to mean?

1  A.  He bought some heroin from Joe Blow.

2  Q.  And later he says he's going to grab "more shit from The P."

3  Can you explain why he would be buying heroin from both Joe Blow

4  and Carl Murphy?

5  A.  Because they both had some good heroin.

6  Q.  So you wanted heroin from both of them because it was good?

7  A.  Yes.

8  Q.  Is that common that you would do -- you'd buy from both

9  Defendant and the other distributors?

10  A.  Yes.

11  Q.  I'm going to play Government's Exhibit 104.  You can flip to

12  the transcript 104a.

13          Mr. Holmes, do you see at the top of the transcript

14  what date this call occurred on?

15  A.  June 25th, 2021.

16  Q.  And who is in this phone call?

17  A.  Me, Earl Clay, and Robert Jeffries.

18  Q.  And is Robert Jeffries Moo Moo?

19  A.  Yes.

20          (Government Exhibit 104 was played in open court.)

21  BY MS. WEISER:

22  Q.  Mr. Holmes, you talked about going to your grandma's crib.

23  What does that mean?

24  A.  It's going to my grandma house.

25  Q.  And did you occasionally make personal visits in Chicago

1  when you would be going to get heroin from the defendant?

2  A.  Yes.

3  Q.  Were there ever times that you went to Chicago strictly to

4  get heroin from the defendant and drive back to Des Moines?

5  A.  Yes.

6  Q.  Generally, what were you and Mr. Clay trying to figure out

7  during that phone call?

8  A.  We was trying to figure out can we get fronted 100 grams.

9  Q.  So this is a bit longer of a call, and there's also some

10  math happening, so I want to break it down a little bit line by

11  line.

12        So you asked Clay how much he was grabbing.  What did

13  you mean?

14  A.  How much heroin was he grabbing.

15  Q.  From who?

16  A.  Carl Murphy.

17  Q.  And he replied, "I'm grabbin' 50."  What did you understand

18  that to mean?

19  A.  50 grams of heroin.

20  Q.  You said, "50.  Everybody grabbin' 50.  We might as well

21  take him that whole nine and try to get 200, on stone."  What

22  did you mean by that?

23  A.  I meant take him 9,000 and tell him to give -- tell him to

24  give us 200 grams and then bring back the rest of the money that

25  we owe him later.

1  Q.  Do you see the part where, two lines down, you said,

2  "everybody split it up and break it down"?

3  A.  Yes.

4  Q.  What did you mean by that?

5  A.  After we get the heroin, we're going to split it amongst

6  each other.

7  Q.  And amongst who?

8  A.  Me, Earl Clay, and Moo Moo, Robert Jeffries.

9  Q.  Clay replied with a lot of information to your statement.

10  What did you understand him to mean by, "It's gonna be seven and

11  we gonna tell his ass to give us 100.  We gonna grab 150 and

12  tell his ass to give us 100 and we'll have 250.  We'll take his

13  ass 75 back"?  Can you explain that for us?

14  A.  Earl Clay meant give Carl Murphy 7,000 and tell him to front

15  us 100 grams.

16  Q.  So when you and Clay are discussing numbers in this call,

17  are you discussing grams of heroin and prices of heroin?

18  A.  Yes.

19  Q.  In fact, does Mr. Clay clarify what he meant by 75?

20  A.  Yes.

21  Q.  He said 7500.  Is that what you interpreted that to mean,

22  dollars?

23  A.  Yes.

24  Q.  Mr. Holmes, do you see where Mr. Jeffries says, "100 grams

25  is 6,000, right?"

1  A.  Yes.

2  Q.  What did you understand Mr. Jeffries to be asking in this

3  statement?

4  A.  Is a hundred grams 6,000.

5  Q.  And three lines below that, Mr. Clay says, "He want 70.  He

6  want 70 a G, bro."  Do you see that?

7  A.  Yes.

8  Q.  What did you understand him to be telling you guys?

9  A.  It's $70 a gram.

10  Q.  So when "a G" is said, it stands for gram?

11  A.  Yes.

12  Q.  Did you and Mr. Clay continue to discuss what you'd be

13  buying and paying the defendant for different quantities

14  throughout this call?

15  A.  Yes.

16  Q.  Are you strictly talking about heroin prices and quantities

17  in this phone call?

18  A.  Yes.

19  Q.  Later in the call, on the second page of the transcript, you

20  asked if Streets had "some shit."  What do you mean by that?

21  A.  Do Streets have some heroin.

22  Q.  Can you remind us who Streets is?

23  A.  Terrance Lindsay.

24  Q.  And later in the call, when talking about Mr. Lindsay, Earl

25  Clay says, "That was weed."  Do you see that part?

1          In the transcript in front of you, the paper one, four

2   lines up from the bottom on the second page, Mr. Clay says,

3   "That was weed.  He was gonna FaceTime us showing us the weed."

4   A.  Yes.

5   Q.  What was he talking about?

6   A.  He talking about T Streets had some marijuana and not --

7   Q.  So Terrance Lindsay --

8   A.  He said T Streets had the marijuana and not the heroin.

9   Q.  Okay.  You asked about heroin, but Mr. Clay clarifies, said

10  that Mr. Lindsay only had heroin at the time?

11  A.  Only had marijuana at the time.

12  Q.  Oh, excuse me.  Marijuana at the time.  Thank you.

13         Earlier in that conversation, Mr. Clay says he had

14  White China.  Do you know what White China is?

15  A.  It's another type of heroin.

16  Q.  Is it a slang term for heroin?

17  A.  Yes.

18  Q.  Why is it called White China?

19  A.  Because it's white like snow.

20  Q.  I'm going to play Government's Exhibit 105.  If you can flip

21  to 105a in the transcript in front of you.

22         Mr. Holmes, do you see that this phone call is on June

23  26th, 2021, at 11:42 a.m.?

24  A.  Yes.

25         (Government Exhibit 105 was played in open court.)

1  BY MS. WEISER:

2  Q.  Mr. Holmes, during this phone call with Mr. Lindsay, you say

3  the term "on stone."  Can you tell us what that means?

4  A.  "On stone" mean I putting it on my gain.

5  Q.  So what do you mean when you're putting it on your gain?

6  A.  I'm just staying on stone.

7  Q.  You started the call by asking if Mr. Lindsay lived 37

8  minutes away.  Do you see that in the first page of the

9  transcript?

10 A.  Yes.

11 Q.  What were you doing when you were making this phone call?

12 A.  Driving.

13 Q.  Were you near or in Chicago?

14 A.  Yes.

15 Q.  And in this call, you both talk about BD.  Did you

16 previously testify that BD is Earl Clay?

17 A.  Yes.

18 Q.  Towards the bottom of the first page of this transcript,

19 Lindsay says, "go to The P and tell him to give you a quarter

20 then."  Do you see that?

21 A.  Yes.

22 Q.  What did you understand him to be saying to you?

23 A.  He wanted me to tell Carl Murphy to front him 25 grams, just

24 to give me 25 grams and bring him the money back later.

25 Q.  When Lindsay then says, "He'll have to come pick the money

1  up from me," who did you think he was talking about?

2  A.  He was talking about Carl Murphy.

3  Q.  Would you personally ever travel all the way to Chicago just

4  to get 25 grams of heroin?

5  A.  No.

6  Q.  Why not?

7  A.  Because that's -- that's only a little bit.

8  Q.  Is it not worth your time to drive there for that little

9  amount?

10 A.  Yes.

11 Q.  Why were you doing this for Terrance Lindsay?

12 A.  Because I think he was on house arrest.

13 Q.  So you were getting it for him because he couldn't leave?

14 A.  Yes.

15 Q.  What were you going to do with the heroin that you got him?

16 A.  I was going to sell it back to Des Moines.

17 Q.  And who were you going to give the proceeds to?

18 A.  Terrance Lindsay.

19 Q.  Would anyone else in the group that you worked closely with

20 drive all the way to Chicago just for 25 grams?

21 A.  No.

22 Q.  And 25 grams, what are you referring to?

23 A.  Heroin.

24 Q.  Do you remember what you did after this phone call with

25 Mr. Lindsay?

1   A.  I went to Carl Murphy.

2   Q.  On the screen in front of you, I'm going to play

3   Government's Exhibit 201.

4           (A portion of Government Exhibit 201 was played in open

5   court.)

6   BY MS. WEISER:

7   Q.  Mr. Holmes, Government's Exhibit 201 is stopped at 10

8   seconds in.  Can you tell us what we just watched on Government

9   Exhibit 201?

10  A.  Me pulling up.

11  Q.  And how do you know that's you?

12  A.  Because that's my car.

13  Q.  And would you drive that to and from Des Moines and Chicago?

14  A.  Yes.

15  Q.  Where did you park?

16  A.  At Carl Murphy house.

17  Q.  And is this approximately 30 minutes after your phone call

18  with Mr. Lindsay talking about going to the defendant's house?

19  A.  Yes.

20          MS. WEISER:  I'm resuming Government Exhibit 201 at the

21  1-minute and 27-second mark.

22          (A portion of Government Exhibit 201 was played in open

23  court.)

24          MS. WEISER:  I stopped Government's Exhibit 201 at

25  about 2 minutes and 15 seconds.

1  BY MS. WEISER:

2  Q.  Mr. Holmes, at 1 minute and 50 seconds, someone got out of

3  the front seat of the gold car.  Can you tell us who that was?

4  A.  It was me and Moo Moo.

5  Q.  And what did you guys do?  What did we just watch in this

6  exhibit?

7  A.  We walked in the front door of Carl Murphy house.

8          MS. WEISER:  I stopped this at 2 minutes and 15

9  seconds, and I'm resuming at 14 minutes and 10 seconds.

10         (A portion of Government Exhibit 201 was played in open

11 court.)

12 BY MS. WEISER:

13 Q.  Mr. Holmes, does it appear to be raining?

14 A.  Yes.

15 Q.  Mr. Holmes, what did we just see you and Mr. Jeffries do?

16 A.  Get back into the car.

17         MS. WEISER:  I stopped Government's Exhibit 201 at 15

18 minutes and 23-second mark.

19 BY MS. WEISER:

20 Q.  Mr. Holmes, what did we see at the end of that clip?

21 A.  Me pulling off.

22 Q.  And were you inside the defendant's house for less than 15

23 minutes?

24 A.  Yes.

25 Q.  What did you do inside his house?

1   A.   Gave him money.

2   Q.   And then what did you do when you left?

3   A.   What do you mean?

4   Q.   Where were you going?

5   A.   I was going somewhere.

6   Q.   Did you get heroin when you went inside?

7   A.   No.

8   Q.   And why not?

9   A.   I guess because he didn't have none right then and there.

10  Q.   But you gave him the cash?

11  A.   Yes.

12          MS. WEISER:  I'm playing -- one moment.

13          I'm resuming -- excuse me.  I'm resuming Government's

14  Exhibit 201, although it mistakenly says Government Exhibit 202

15  on the screen, at the 19-minute and 50-second mark.

16          (A portion of Government Exhibit 201 was played in open

17  court.)

18  BY MS. WEISER:

19  Q.   Mr. Holmes, at about the 21-minute and 14-second mark into

20  the Government's Exhibit 201, we just watched someone exit the

21  defendant's house and enter a red van.  Did you watch that?

22  A.   Yes.

23  Q.   Do you recognize either of those people?

24  A.   Yes.

25  Q.   And who are either of them?

1  A.  It's Carl Murphy.

2       MS. WEISER:  Government's Exhibit 201 is stopped at 22

3  minutes and 15 seconds.

4  BY MS. WEISER:

5  Q.  Mr. Holmes, can you tell us what we just saw the red van do?

6  A.  Pull off.

7  Q.  Did you make any phone calls when you left the defendant's

8  house?

9  A.  Yes.

10 Q.  I'm going to direct your attention to Government's Exhibit

11 105.  It's 105 in your binder in front of you.

12      Mr. Holmes, did you call Terrance Lindsay after you

13 left the defendant's house?

14 A.  Yeah.

15 Q.  Excuse me.  It's 106 and 106a.

16      (Government Exhibit 106 was played in open court.)

17 BY MS. WEISER:

18 Q.  Mr. Holmes, do you see on the transcript what time this

19 phone call began at?

20 A.  12:28.

21 Q.  And what date it was on?

22 A.  June 26th.

23 Q.  Would this have been shortly after you left the defendant's

24 house?

25 A.  Yes.

1  Q.  Can you read us the first thing you said on this call?

2  A.  "Streets, you did not call your motherfucking daddy."

3  Q.  What did you mean by that?

4  A.  You didn't call Carl Murphy.

5  Q.  And why did you refer to Carl Murphy as Terrance Lindsay's

6  dad?

7  A.  Because that's his father.

8  Q.  When you said, "He told me to come back in 15 minutes to

9  come pick up that order," who was "he"?

10 A.  Carl Murphy.

11 Q.  And what did you mean by "that order"?

12 A.  Heroin.

13 Q.  Did you go back to the defendant's house after this phone

14 call?

15 A.  Yes.

16      MS. WEISER:  I'm going to play Government's Exhibit

17 202.

18 BY MS. WEISER:

19 Q.  This video begins at approximately 12:50 p.m.  Is that about

20 20 minutes after you left the defendant's house, Mr. Holmes?

21 A.  Yes.

22      (A portion of Government Exhibit 202 was played in open

23 court.)

24      MS. WEISER:  Government Exhibit 202 is paused at 25

25 seconds in.

1  BY MS. WEISER:

2  Q.  Mr. Holmes, did you see that vehicle arrive?

3  A.  Yes.

4  Q.  And who was that?

5  A.  That's me.

6  Q.  Can you explain where you parked?

7  A.  On the side of his white truck.

8  Q.  So off to the left of what the screen actually captured?

9  A.  Yes.

10  Q.  And did you stay sitting in your vehicle at this point?

11  A.  Yes.

12  Q.  Did you make a call to Earl Clay while you were there?

13  A.  Yes.

14  Q.  May I direct your attention to Government Exhibit 107.  You

15  can follow along in 107a.

16         Mr. Holmes, was this also on June 26th, 2021?

17  A.  Yes.

18  Q.  And was it at 1:00 p.m.?

19  A.  Yes.

20         (Government Exhibit 107 was played in open court.)

21  BY MS. WEISER:

22  Q.  Mr. Holmes, where Clay says, "I will be at The P's house in

23  20 minutes, bro," what did you understand that to mean?

24  A.  He gonna be pulling up in 20 minutes to Carl Murphy's house.

25  Q.  He's going to arrive at Carl Murphy's house?

1  A.  Yes.

2  Q.  Were you sitting outside of Carl Murphy's when you made this

3  phone call?

4  A.  Yes.

5      MS. WEISER:  I'm resuming this Government Exhibit 202

6  at the 17-minute mark.

7      One moment, Your Honor.

8  BY MS. WEISER:

9  Q.  Mr. Holmes, we're experiencing some technical difficulties,

10  so we're going to have to rely on you before we can get this

11  video to play.

12      So while you were sitting outside of the defendant's

13  house, did the defendant arrive in his red van again?

14  A.  Yes.

15  Q.  And what did he do when he arrived?

16  A.  He came and sat in the back of my car.

17  Q.  Why did he do that?

18  A.  To give me the heroin.

19  Q.  So did he come straight from the van to get in your car?

20  A.  Yes.

21  Q.  And where did he get in your car?

22  A.  The back seat, right behind me.

23  Q.  And was Mr. Jeffries in the front seat with you?

24  A.  Yes.

25  Q.  Is this the heroin that you already gave him cash for?

1  A.  Yes.

2  Q.  Do you remember approximately how much you got on June 26th

3  from the defendant?

4  A.  150 grams.

5       MS. WEISER:  I'm going to play Government's Exhibit

6  202, maybe, beginning at 18 minutes -- oh, excuse me -- at the

7  30-minute mark.

8       (A portion of Government Exhibit 202 was played in open

9  court.)

10 BY MS. WEISER:

11 Q.  Mr. Holmes, shortly after this video clip started, did we

12 see someone emerge from the left side of the screen?

13 A.  Yes.

14 Q.  Who was that?

15 A.  Carl Murphy.

16 Q.  And where is he coming from?

17 A.  Outside of my car.

18 Q.  Which is off screen, correct?

19 A.  Yes.

20 Q.  Mr. Holmes, did you leave shortly after this?

21 A.  Yes.

22 Q.  I'm going to direct your attention to another call,

23 Government Exhibit 108.  You can follow along with 108a.

24      Mr. Holmes, can you tell us what time this phone call

25 occurred on June 26th, 2021?

1  A.  1:42.

2  Q.  And who is this one?

3  A.  It's me and Earl Clay.

4       (Government Exhibit 108 was played in open court.)

5  BY MS. WEISER:

6  Q.  Mr. Holmes, what are you and Mr. Clay talking about in this

7  phone call?

8  A.  He asked me where I was at, and I'm asking where is he at.

9  Q.  And where he says, "I'm about to be pulled up to The P crib

10 right now," what did you -- what did you understand that to mean

11 him saying?

12 A.  He about to be pulling up to Carl Murphy house.

13 Q.  And was this shortly after you left Carl Murphy's?

14 A.  Yes.

15 Q.  And was this also the same day as the other calls with Earl

16 Clay where you were talking about where he was?

17 A.  (Witness nodded.)

18       MS. WEISER:  I'm resuming Government's Exhibit 202 at

19 the 54-minute mark.

20       (A portion of Government Exhibit 202 was played in open

21 court.)

22 BY MS. WEISER:

23 Q.  Mr. Holmes, a couple seconds into this clip of Government's

24 Exhibit 202, we saw a vehicle.  Did you see that?

25 A.  Yes.

1  Q.  Whose vehicle was that?

2  A.  Earl Clay.

3  Q.  How do you know that?

4  A.  Because I been with him in that car all the time.

5       MS. WEISER:  I stopped Government's Exhibit 202 at the

6  55-minute and 35-second mark.

7  BY MS. WEISER:

8  Q.  Mr. Holmes, did you see someone emerge from the left side of

9  the screen?

10  A.  Yes.

11  Q.  Is that the area where you were parked before?

12  A.  Yes.

13  Q.  And did that person go inside the defendant's house?

14  A.  Yes.

15  Q.  Who do you believe that person to be?

16  A.  Earl Clay.

17       MS. WEISER:  I am resuming Government's Exhibit 202 at

18  the 57-minute and 25-second mark.

19       (A portion of Government Exhibit 202 was played in open

20  court.)

21       MS. WEISER:  I stopped Government's Exhibit 202 at the

22  58-minute mark.

23  BY MS. WEISER:

24  Q.  Mr. Holmes, based on your earlier calls with Mr. Clay and

25  that footage in Government Exhibit 202, what did you understand

1  Clay to be doing at the defendant's house?

2  A.  Going to be grab some heroin.

3  Q.  He was only in there for about two minutes.  Have you only

4  been inside the defendant's house for two minutes to get heroin?

5  A.  Yes.

6  Q.  I'm going to play another phone call for you, Government

7  Exhibit 109.  You can follow along at 109a.

8        Mr. Holmes, this takes place on June 29th, 2021, the

9  following day after we just watched you go to the defendant's

10  house.  Who is this call between?

11  A.  Me and Carl Murphy.

12        (Government Exhibit 109 was played in open court.)

13  BY MS. WEISER:

14  Q.  Mr. Holmes, a lot was discussed on this call, but what was

15  the main topic?

16  A.  That he gave me some bullshit.

17  Q.  What do you mean by "bullshit"?

18  A.  Some bad heroin.

19  Q.  All right.  Let's go through it a little bit.

20        What did you mean by everybody when they told you they

21  didn't like this shit?

22  A.  Everybody that I was trying to sell some heroin to, they

23  said they don't like it, it's a nasty taste.

24  Q.  So the customers in Des Moines weren't liking it?

25  A.  Yes.

1  Q.  So why did you call Mr. -- the defendant to tell him that?

2  A.  To let him know.

3  Q.  That people weren't liking the product he gave you?

4  A.  Yes.

5  Q.  What did you mean by "giving this shit away for $100 for

6  two"?

7  A.  I mean like I usually sell it for 200 a gram or 150 a gram,

8  but since they didn't like it, I was just basically giving it

9  away, so I was taking a loss.

10 Q.  So you were just trying to sell it so you'd lower the price?

11 A.  Get rid of it.  I was trying to get rid of it real fast.

12 Q.  And when you say in that same statement, "I still got...25

13 of these little fuckers," what are you talking about?

14 A.  Still got 25 halves.

15 Q.  What do you mean by "halves"?

16 A.  0.5s of heroin.

17 Q.  So half-gram quantities that you already had packaged?

18 A.  Yes.

19 Q.  So the heroin you got from the defendant previously -- and I

20 think I misspoke.  That was actually on the 26th.  The heroin

21 you got on the 26th, did you break that down and repackage it

22 for sale like you usually would?

23 A.  Yes.

24 Q.  So you were explaining that you had 25 half-gram quantities

25 still?

1    A.  Yes.

2    Q.  And you'd sold the rest or shared the rest with your group

3    of friends?

4    A.  Yes.

5    Q.  Can you read what the defendant said in response to you?

6    A.  "It's the same as TB and...LoSo."

7    Q.  Can you remind us who TB and LoSo are?

8    A.  Tabaris Brown and Gregory Spight.

9    Q.  And is that the individuals in the photos on the screen --

10   A.  Yes.

11   Q.  -- Government's Exhibit 309 and 312?

12          When you say that you tried to sell your shit on TB's

13   line, what do you mean by that?

14   A.  I was trying to use Tabaris Brown phone and try to get rid

15   of the heroin.

16   Q.  So when you're talking about your line, you're talking about

17   your phone that you had customers?

18   A.  Yes.

19   Q.  Did TB have his own phone line of customers?

20   A.  Yes.

21   Q.  And you said, "TB said they don't like this shit on his line

22   neither."  What did you mean?  What were you telling the

23   defendant?

24   A.  They didn't like the heroin on his line either.

25   Q.  And that's after you were told by the defendant that it was

1  the same product, right?

2  A.  Yes.

3  Q.  About halfway down the transcript, you say something about

4  another flavor.  What did you mean by "flavor"?

5  A.  Heroin.

6  Q.  Why were you calling it a flavor?

7  A.  Because it's different flavors of heroin.

8  Q.  You were strictly talking about heroin, though?

9  A.  Yes.

10 Q.  And towards the end of this call, the defendant said, "by

11 the time you come back, I'll be ready with some good."  What did

12 you understand that to mean?

13 A.  He have some more heroin, way better than the last batch.

14 Q.  So he was -- you thought he was talking about heroin?

15 A.  Yes.

16 Q.  And when he said "good," you thought he meant better heroin?

17 A.  Yes.

18 Q.  When he says, "by the time you come back," what did you

19 understand that to mean?

20 A.  When I get done with the 25 halves.

21 Q.  And go back to Chicago?

22 A.  Yes.

23 Q.  I'm going to play Government's Exhibit 110.  You can follow

24 along in 110a.

25          (Government Exhibit 110 was played in open court.)

1   BY MS. WEISER:

2   Q.  Mr. Holmes, who was this telephone call from -- between?

3   A.  That's me and Azim.

4   Q.  And is that on June 29th, 2021?

5   A.  Yes.

6   Q.  Generally, what are you and Mr. Abdul-Ahad talking about in

7   this phone call?

8   A.  He told me that he needs some money because he in Chicago

9   and I'm in Des Moines.

10  Q.  So what did he want you to do?

11  A.  He didn't want me to do nothing.  I was --

12  Q.  Why -- I'm sorry.

13  A.  I was telling him I can't send him no money because all I

14  got was bullshit and I ain't make no money.  I only sold 5

15  grams.

16  Q.  So did you also discuss the quality of the product that you

17  had at that time?

18  A.  Yes.

19  Q.  Do you see at the bottom of the first page where

20  Mr. Abdul-Ahad says, "Send me some count"?

21  A.  Yes.

22  Q.  What was he talking about or what do you understand him to

23  be talking about?

24  A.  Send him some money.

25  Q.  At the top of the next page, you twice say that you bought

1  60.  Do you see that?

2  A.  Yes.

3  Q.  What did you mean?

4  A.  I bought 60 grams of heroin.

5  Q.  From whom?

6  A.  Carl Murphy.

7  Q.  And is that who you meant when you said "The P"?

8  A.  Yes.

9  Q.  When you replied that you bought 60 grams and only sold 5

10  grams, what did you mean?

11  A.  I bought 60 grams of heroin and I only sold 5 out of the 60.

12  Q.  Whenever you say "grams" in this phone call, what are you

13  talking about?

14  A.  Heroin.

15  Q.  Previously today you testified that you bought around 150

16  grams that time from the defendant, but on this call you say 60.

17  Can you explain that?

18  A.  Because I didn't want Tana to know how much money I had in

19  my pocket so I just told whatever he wanted to hear.

20  Q.  So you didn't want Tana, Mr. Azim Abdul-Ahad, to know how

21  much money you had?

22  A.  Yes.

23  Q.  Can you explain that to us.

24  A.  I didn't want him to be pocket watching.

25  Q.  What does "pocket watching" mean?

1  A.  Know how much money I make off the heroin that I'm selling.

2  Q.  So if he knew you bought more, he'd know you had more cash?

3  A.  Yes.

4  Q.  And since he was asking for money, you told him you had a

5  smaller amount?

6  A.  Yes.

7  Q.  I'm going to play for you another call, Government's Exhibit

8  111.  You can follow along in 111a.

9          (Government Exhibit 111 was played in open court.)

10 BY MS. WEISER:

11 Q.  Mr. Holmes, was this call on July 6, 2021?

12 A.  Yes.

13 Q.  When Mr. Martin asks, "I thought you was going [to The] P

14 and shit," what did you understand that to mean?

15 A.  He thought I was going to Carl Murphy to grab some heroin.

16 Q.  And you replied, "Naw.  I got that shit from Ronald."  What

17 did you mean by that?

18 A.  I bought some heroin from Ronald instead of Carl Murphy.

19 Q.  And why did you get it from Ronald that time; do you

20 remember?

21 A.  Because he was right there.

22 Q.  Was he in Des Moines?

23 A.  Yes.

24 Q.  And later in the call, about four lines up from the bottom

25 of the first page, Mr. Martin is saying, "I was trying to get

1  like 20 of them."  What is he talking about or what did you

2  understand him to be talking about?

3  A.  He was talking about he trying to get 20 grams.

4  Q.  Grams of what?

5  A.  Heroin.

6  Q.  And he knows The P, so that's why he was asking you about

7  the defendant?

8  A.  Yes.

9  Q.  And he knows that you get heroin from the defendant so

10 that's why he asked you that?

11 A.  Yes.

12 Q.  Mr. Holmes, if someone else was bringing you heroin for you

13 or others to share, how would they bring it to Des Moines?

14 A.  What do you mean how would they bring it?

15 Q.  How would it get here physically?

16 A.  They could either drive it to us or bring it on a bus.

17 Q.  Who on this slide, which shows Government's Exhibits 301 to

18 316 -- so who on this slide besides yourself, over the course of

19 the almost two years you were selling heroin in Des Moines,

20 would bring heroin that you would get?

21 A.  Pierre Black, Deshawn Greer, Desmond Howard, and Patrick

22 Staples.

23 Q.  They would bring heroin that you -- for you?

24 A.  Yes.

25 Q.  And who on this slide have you gone to Chicago with for them

1  to get heroin from the defendant?

2  A.  Everybody.

3  Q.  Mr. Holmes, on your way back from Chicago, did you ever get

4  pulled over by law enforcement?

5  A.  Yes.

6  Q.  Did you have heroin in your car?

7  A.  Yes.

8  Q.  Can you, like, give us an estimate of how many times you

9  think you were traffic stopped?

10  A.  More than ten times.

11  Q.  Over those about two years?

12  A.  Yes.

13  Q.  Was your car ever searched?

14  A.  Yes.

15  Q.  Was heroin ever found in your car by law enforcement?

16  A.  No.

17  Q.  Why not?

18  A.  Because I hid it good.

19  Q.  You explained where you hid it earlier.  So times when you

20  got heroin from the defendant and were pulled over and nothing

21  was found by law enforcement, was the heroin in your car,

22  though?

23  A.  Yes.

24         MS. WEISER:  One moment, Your Honor.

25

1  BY MS. WEISER:

2  Q.  Mr. Holmes, do you know if anyone on this slide was stopped

3  by law enforcement when you weren't with them?

4  A.  Yes.

5  Q.  How would you have found out if they were stopped by law

6  enforcement?

7  A.  Because we all talk about it.

8  Q.  So if someone got pulled over, they would have told you

9  afterwards?

10  A.  Yes.

11  Q.  I want to draw your attention to Desmond Howard, Government

12  Exhibit 305.  Are you aware of his police encounter from July of

13  2020?

14  A.  Yes.

15  Q.  Why do you remember that?

16  A.  Because after he got pulled over, I still got the heroin to

17  sell in Des Moines.

18  Q.  Okay.  Was there ever a time where he was stopped or had an

19  encounter with police and you showed up on scene?

20  A.  Yes.

21  Q.  Do you know if police found heroin in his car or on his

22  person that time you showed up on scene?

23  A.  Yes.

24  Q.  And do you know if police missed any heroin?

25  A.  Yes.

1  Q.  About how much did the police miss on that occasion?

2  A.  At least 75 grams of heroin.

3  Q.  And how do you know that police missed 75 grams when they

4  did get 30 grams?

5  A.  Because I got the rest of the grams to sell in Des Moines.

6  Q.  So you physically got the drugs out of the car or someone

7  else did?

8  A.  Yes.

9  Q.  And you mentioned another stop of Mr. Howard where you still

10  got the grams after; is that what you testified?

11  A.  Yes.

12  Q.  Are you talking about heroin?

13  A.  Yes.

14  Q.  And do you know who was with him during that traffic stop?

15  A.  Pierre Black, Patrick Staples, Tabaris Brown, and Dandre

16  Cox.

17  Q.  Do you know if they all had heroin in that car?

18  A.  I don't know if they all had it in their car, but I know

19  it's heroin in the car.

20  Q.  And you know that because you got it afterwards?

21  A.  Yes.

22  Q.  Do you remember about how much heroin you got after that

23  traffic stop?

24  A.  It was at least a hundred grams.

25  Q.  Do you know if Tabaris Brown's ever been stopped by law

1  enforcement on his way back from Chicago?

2  A.  Yes.

3  Q.  Do you know if he had heroin on him?

4  A.  Yes.

5  Q.  Do you know if law enforcement found heroin?

6  A.  No, I don't know if they found heroin.

7  Q.  I want to switch gears a little bit.  Mr. Holmes, we talked

8  a little bit about Derrick Fleming at the beginning of your

9  testimony today.  Do you remember that?

10 A.  Yes.

11 Q.  Does Derrick Fleming live with the defendant?

12 A.  No.

13 Q.  Did he ever live with him when he went there to get heroin?

14 A.  No.

15 Q.  Did you ever go to the defendant's house to get heroin from

16 Derrick Fleming?

17 A.  No.

18 Q.  And we talked about how one is "The P" and the other is "P."

19 Is that what you testified to?

20 A.  Yes.

21 Q.  And if the defendant -- is there anything about the fact

22 that Derrick Fleming is also called The Prince that would change

23 if the defendant were to die?

24 A.  Say that again.

25 Q.  If the defendant were to die, what happens to Derrick

1  Fleming?

2  A.   He becomes the next in charge.

3  Q.   So he would take over the defendant's spot?

4  A.   Yes.

5  Q.   Mr. Holmes, were you ever fronted heroin by the defendant?

6  A.   Yes.

7  Q.   Can you explain what getting fronted means?

8  A.   Get the heroin and pay back the money later on.

9  Q.   And why would you ever be fronted?  Can you explain why that

10  would happen?

11  A.   It's like different things.  You'd get fronted because you

12  trying to get some more money or you can get fronted because you

13  don't have no money to buy the heroin in the first place.

14  Q.   And the defendant would front you on occasion?

15  A.   Yes.

16  Q.   Why would he front you?

17  A.   Why not front me?

18  Q.   Do you think the defendant trusted that you'd always bring

19  him cash back?

20  A.   Yes.

21  Q.   And did you always do that?

22  A.   Yes.

23  Q.   Were there ever times when other people didn't -- excuse me.

24  Were there ever times where other members of your group owed the

25  defendant money?

1    A.   Not that I know of.

2    Q.   And you never owed him money, though?

3    A.   No.

4    Q.   Mr. Holmes, you stated that you got at least 100 grams

5    generally when you would visit the defendant.  Is that what you

6    testified to?

7    A.   Yes.

8    Q.   Did you ever get any other drugs from him?

9    A.   No.

10   Q.   What is the largest quantity that you got from the defendant

11   on one occasion?

12   A.   One kilo.

13   Q.   Is that a thousand grams?

14   A.   Yes.

15   Q.   Approximately how many times did you get 1,000 grams from

16   the defendant?

17   A.   More than once.

18   Q.   So at least twice?

19   A.   Yes.

20   Q.   Can you estimate in total how much heroin you bought from

21   the defendant?

22   A.   A lot.

23   Q.   Is it hard to quantify how much you bought from him?

24   A.   Yes.

25   Q.   Why is it hard to put a number on that?

1  A.  Because I been going to him over two -- past two years.

2  Q.  And you'd go maybe even more than once a week?

3  A.  Yes.

4  Q.  Was there ever a time from when you moved to Des Moines and

5  started driving for people on their deals to when you got

6  arrested that you did not go to the defendant consistently?

7  A.  What do you mean by that?

8  Q.  The whole time you sold heroin, did you consistently go to

9  the defendant?

10  A.  Yes.

11  Q.  For heroin?

12  A.  Yes.

13  Q.  Even if you were getting it from other sources at the same

14  time?

15  A.  Yes.

16  Q.  Can you remind us when you started going to Hector Gonzalez

17  and Joe Blow for heroin too?

18  A.  Like the middle of 2021.

19  Q.  Mr. Holmes, I want to switch gears.  Have you been

20  threatened prior to your testimony today?

21  A.  Yes.

22  Q.  By who?

23  A.  Carl Murphy.

24  Q.  The defendant?

25  A.  Yes.

1  Q.  Approximately when was that?

2  A.  About a month ago.

3  Q.  Can you tell us what he said to you?

4  A.  That he got 2500 on my head if I go to trial.

5  Q.  Okay.  What did you understand 2500 on your head to mean?

6  A.  $2500 placed on me if I come to trial.

7  Q.  And what did you think he meant by if you come to trial?

8  A.  If I come to testify.

9  Q.  So if you come here today, there's $2500 on your head?

10 A.  Yes.

11 Q.  What did you think "on your head" meant?

12 A.  $2500 on my head.

13 Q.  So what is --

14 A.  Something will happen to me.

15 Q.  Happen to you?  Did anything happen to you after he told you

16 this?

17 A.  I got into a couple of fights.

18 Q.  So you were beat up or jumped at the jail?

19 A.  Yes.

20 Q.  When that occurred, did anyone say anything to you?

21 A.  They called me a snitch or a rat.

22 Q.  And is that what people are generally called when they are

23 cooperating with the Government?

24 A.  Yes.

25 Q.  Did he say anything else when he threatened you?

1  A.  Something about my family, my baby mama and my son.

2  Q.  What did he say about your baby mama and your son?

3  A.  Something's going to happen to them.

4  Q.  What did you understand that to mean?

5  A.  If I testify in trial, something gonna happen to them,

6  something bad is gonna happen to them.

7  Q.  Did you interpret that as a threat not to testify against

8  the defendant?

9  A.  Yes.

10       MS. WEISER:  No further questions at this time.

11       THE COURT:  All right.  Ms. Branstad or Mr. Sarcone.

12                   CROSS-EXAMINATION

13  BY MS. BRANSTAD:

14  Q.  Mr. Holmes, you're hoping by testifying that you'll get a

15  very big reduction in your sentence, aren't you?

16  A.  No.

17  Q.  You're just testifying -- well, let me put it this way:  You

18  know that you could get a very large reduction in your sentence,

19  don't you?

20  A.  I don't know.  It's up to the judge.

21  Q.  Well, it takes the Government asking for that reduction

22  also, doesn't it?

23  A.  Correct.

24  Q.  And you don't get that reduction if you say that Carl Murphy

25  sold you marijuana, do you?

1  A.  Can you repeat that?

2  Q.  If you testified that Carl Murphy sold you marijuana instead

3  of heroin, you wouldn't get that reduction, would you?

4  A.  He never sold me marijuana.

5  Q.  Okay.  The reduction is only if you testify that it was

6  heroin, not marijuana, correct?

7  A.  That's not true.

8  Q.  Okay.  Come back to that.

9       You also know that you could get an additional

10 reduction if you say you're threatened, don't you?

11 A.  That's not true.

12 Q.  You're saying that you don't know that you could get a

13 reduction if you're threatened?

14 A.  Yeah.  I don't know.

15 Q.  Your lawyer never told you that there is a potential

16 additional reduction --

17       MS. WEISER:  Objection.

18       MS. BRANSTAD:  I withdraw that question.  Let me

19 rephrase that.

20 BY MS. BRANSTAD:

21 Q.  No one's ever told you, and you are not aware, that there is

22 an additional potential reduction --

23       MS. WEISER:  Objection.

24       THE COURT:  Sustained.

25

1  BY MS. BRANSTAD:

2  Q.  Let's talk about that fight.  Now, you were in a fight where

3  you confronted someone about a dispute over commissary, weren't

4  you?

5  A.  Right.  But he took my commissary because he said I was

6  snitching.

7  Q.  Okay.  So he didn't jump you.  You started a fight after

8  someone took your commissary?

9  A.  No, I didn't start the fight.

10  Q.  So if the report says that you started the fight, you'd say

11  that's incorrect?

12  A.  Yes.

13  Q.  Now, let's talk a little bit about marijuana sales.  You

14  said that you sold heroin, but you also did sell marijuana too,

15  didn't you?

16  A.  I sold heroin in Des Moines, yes.

17  Q.  You also sold marijuana in Des Moines, didn't you?

18  A.  In the beginning, yes.

19  Q.  Now, marijuana can be sold by the gram, right?

20  A.  Yes.

21  Q.  By the ounce?

22  A.  Yes.

23  Q.  Quarter-ounce?

24  A.  Yes.

25  Q.  Eighth-ounce?

1  A.  Yes.

2  Q.  Can be sold by the pound?

3  A.  Yes.

4  Q.  Half-pound?

5  A.  Yes.

6  Q.  And quarter-pound?

7  A.  Yes.

8  Q.  Marijuana comes in flavors too, doesn't it?

9  A.  Yes.

10  Q.  And people sometimes don't like certain flavors of

11  marijuana, right?

12  A.  Yes.

13  Q.  Now, there are a few different people called P.  Out of all

14  the pictures that were up there, the Government didn't show you

15  a picture of Derrick Fleming, did they?

16  A.  No.

17  Q.  Derrick Fleming is someone to whom you answered as part of

18  your gang membership, isn't he?

19  A.  I didn't answer to him, but he's my friend, yeah.

20  Q.  Did you ever say that you did what he said?

21  A.  No.

22  Q.  Did you ever say that everyone did what he said?

23  A.  No.

24          MS. BRANSTAD:  May I approach counsel table?

25          THE COURT:  You may.

1   BY MS. BRANSTAD:

2   Q.  Derrick Fleming identifies as Flock Da P, right?

3   A.  Yes.

4   Q.  And he identifies as Da P?

5   A.  No.

6   Q.  He identifies as P?

7   A.  Yes.

8   Q.  And he is The Prince?

9   A.  Yes.

10  Q.  P is also just a common term that's used for a number of

11  people in today's slang, isn't it?

12  A.  No.

13  Q.  P isn't short for playa?

14  A.  Not the way we use it.

15  Q.  You've heard that, though, haven't you?

16  A.  Yeah, I heard that.

17  Q.  At times Derrick Fleming was providing you with heroin,

18  wasn't he?

19  A.  Say that again.

20  Q.  Derrick Fleming provided you with heroin, didn't he?

21  A.  No.

22  Q.  I'm going to take a little step here and say let's talk a

23  little bit about the people involved here.  All the people the

24  Government showed you, those are all younger people who are

25  closer to your age; is that correct?

1   A.  Yes.  Correct.

2   Q.  And most of you were friends with Carl Murphy's son; is that

3   correct?

4   A.  Yes.

5   Q.  Now, his son was at home and was -- stayed in the home for

6   quite a long time with cancer; is that correct?

7   A.  Yes.

8   Q.  And that involved many of you stopping over to see his son

9   in the home; is that right?

10  A.  No.

11  Q.  You're saying that you never went over to the Murphy home in

12  order to see Carl's son while he was -- after he was diagnosed

13  with cancer and stuck at home?

14  A.  No.

15  Q.  Were you aware that he was in the home for that period of

16  time?

17  A.  No.

18  Q.  You didn't know he was there at all?

19  A.  I never saw him there before.

20  Q.  So during these times when you say you went into the Murphy

21  home and you said that you went in there to purchase heroin, you

22  never saw Carl's son in the home?

23  A.  No.  Never.

24  Q.  And just to go back, you said you were going there one, two

25  times a week for months in a row?

1  A.  Yes.

2  Q.  Starting in 2019 and ending in 2021?

3  A.  Yes.

4  Q.  Now, you also said that you'd go in and you would watch Carl

5  weigh out the product and then give it to you; is that correct?

6  A.  Yes.

7  Q.  Let me talk to you a little bit about the difference between

8  marijuana and heroin.  You need a scale to measure out heroin,

9  don't you?

10  A.  Yes.

11  Q.  Now, with marijuana, you can kind of eyeball it, can't you?

12  A.  Yes.

13  Q.  So if someone is selling heroin, they have to have a scale?

14  A.  Yes.

15  Q.  I'm going to step forward and talk about when you say that

16  you were threatened.  You reported that to the attorneys for the

17  Government, correct?

18  A.  Say that again.

19  Q.  You reported that to the attorneys for the Government,

20  correct?

21  A.  I reported it to my lawyer.

22  Q.  Okay.  You didn't report it to anyone in law enforcement,

23  did you?

24  A.  Who else can I talk to in law enforcement?

25  Q.  Jailers.

1  A.  No.

2  Q.  You didn't report that?

3  A.  No.

4  Q.  There are cameras in every room in the jail, aren't there?

5  A.  There's cameras in the main room of the jail, like the place

6  that we hang out at, and in the rec room.

7  Q.  In every room where you can freely walk, there are cameras,

8  right?

9          MS. WEISER:  Objection; calls for speculation.

10          THE COURT:  Sustained.

11  BY MS. BRANSTAD:

12  Q.  Well, you said there are cameras in the rec room.  Are those

13  cameras visible on the ceiling?

14  A.  You can see the camera, yes.

15  Q.  And can you see those cameras in every room that you can

16  walk into?

17  A.  No.  There's only two cameras when you first get on the pod

18  so the cameras can't see the whole pod.

19  Q.  Those cameras would have been able to pick up where either

20  you or Mr. Murphy were, wouldn't they?

21          MS. WEISER:  Objection; calls for speculation.

22          THE COURT:  Sustained.

23  BY MS. BRANSTAD:

24  Q.  You didn't ask anyone to check to see if there was a

25  recording, did you?

1  A.  I didn't have to.

2  Q.  And just to be clear, this threat that you're saying, you

3  weren't actually in the same room, you were saying you overheard

4  it through a vent; is that right?

5  A.  I heard it through the rec room, not a vent.

6  Q.  Through a divider between different rooms?

7  A.  Yes.

8  Q.  Where you couldn't see the person on the other side?

9  A.  Correct.

10 Q.  And where there were a lot of people around?

11 A.  No.

12 Q.  You're saying you were alone in a room in the jail?

13 A.  Yes.

14 Q.  I'm going to just step back and talk just a little bit more

15 about Derrick Fleming.  Derrick Fleming still lives in Chicago,

16 doesn't he?

17 A.  Yes.

18 Q.  Lives about ten minutes away from Carl Murphy?

19 A.  About 15, 20 minutes.

20 Q.  Do you know what his address is?

21 A.  I don't know his address.  I just know he lives on 81st and

22 Emerald.

23         MS. BRANSTAD:  Your Honor, may we approach?

24         (Sidebar conference in chambers with counsel follows.)

25         THE COURT:  Go ahead.

1      MS. BRANSTAD:  We have a number of pictures that were

2 not previously offered that -- and that we didn't list as

3 exhibits.  Now that there has been so much emphasis on the name

4 "The P," these are a number of social media posts showing that

5 Derrick Fleming had the moniker, at least, "Flock Da P" going

6 back to 2019 and through 2021.  And these are all publicly

7 available on Instagram.

8      THE COURT:  How do you suggest putting them in?

9      MS. BRANSTAD:  I'm simply going to ask Mr. Holmes if he

10 recognizes these and knows these to be --

11      THE COURT:  Did it come from his social media?

12      MS. BRANSTAD:  It did not.

13      THE COURT:  Okay.

14      MS. BRANSTAD:  This was something we found yesterday,

15 just perusing the Internet.

16      I don't need that one.  That one does come from his.

17      THE COURT:  Okay.  All of those say "Flock Da P."

18      MS. BRANSTAD:  Yes.

19      THE COURT:  Okay.

20      MS. WEISER:  I mean, authentication, hearsay.  We

21 object to them being in.  She can show them to Malek Holmes, but

22 he already testified that he was called Flock Da P, so that's

23 pretty well established.

24      THE COURT:  The problem is going to be the hearsay

25 statement.  These aren't his statements.

1        MS. BRANSTAD:  I can just ask if he recognizes these as

2   publicly posted and he's seen them.

3        THE COURT:  That doesn't get past a hearsay exception.

4   Publicly posted doesn't mean that it's not hearsay.

5        MS. BRANSTAD:  True.  But if he -- I mean, I can ask

6   him if he's friends with him and knows that he posts these

7   himself because it's how he represents himself.

8        THE COURT:  There's no dispute that he goes by Flock

9   Da P.

10        MS. WEISER:  Yeah.  He testified to that, I believe.

11        MS. BRANSTAD:  Okay.

12        THE COURT:  All right.

13        MS. BRANSTAD:  Could we break at this point?  It will

14   just make the rest of our cross a lot more organized because

15   I've got to dig into some different things that it would be a

16   lot -- it will be much more efficient if we can break.

17        THE COURT:  We need to use the jury's full day so use

18   the day.

19        MS. BRANSTAD:  Okay.

20        THE COURT:  There is no extra enhancement for saying

21   you've been threatened.  That's an incorrect statement of law,

22   so don't say that again or I'm going to instruct the jury

23   otherwise.

24        MS. BRANSTAD:  Okay.  Okay.

25        (In open court, with the defendant present, in the

 1  presence of the jury.)

 2       THE COURT:  Okay.  Ms. Branstad, you can continue.

 3       MS. BRANSTAD:  Thank you, Your Honor.

 4  BY MS. BRANSTAD:

 5  Q.  You've given a number of statements to law enforcement; is

 6  that correct?

 7  A.  Yes.

 8  Q.  And it was through those discussions that you found out

 9  about Tabaris Brown being stopped, correct?

10  A.  No.

11  Q.  Well, certainly that was discussed during your communication

12  with law enforcement, correct?

13  A.  Yes.

14  Q.  Initially, you told law enforcement that the heroin was

15  located in the door of the car; is that right?

16  A.  Yes.

17  Q.  And then when you were told that the door panel had been

18  removed, then you said, well, it was --

19       MS. WEISER:  Objection.

20       THE COURT:  Are you attempting to impeach him with a

21  prior statement?  Is that what you're trying to do,

22  Ms. Branstad?

23       MS. BRANSTAD:  Your Honor, I'm trying to set out the

24  different -- to some degree, yes, Your Honor.

25       THE COURT:  Okay.  Then you can't testify.  You need to

1  ask him questions, citing his exact statement that he said and

2  how and when he said that.

3  BY MS. BRANSTAD:

4  Q.  I'll ask you generally, have you given different statements

5  to law enforcement about how that stop occurred?

6  A.  No.

7  Q.  Where do you believe the drugs were when that stop occurred?

8          MS. WEISER:  Objection.

9          THE COURT:  What's the objection?

10          MS. WEISER:  Speculation.

11          THE COURT:  Can you reword your question, Ms. Branstad?

12          MS. BRANSTAD:  Your Honor, I believe -- okay.

13  BY MS. BRANSTAD:

14  Q.  Do you know where the drugs were when that stop occurred?

15  A.  No.  Because I wasn't with him.

16  Q.  So with regard to any of the interactions with Tabaris

17  Brown, do you know anything directly or is it all what you're

18  saying you've been told now?

19  A.  Can you repeat that?

20  Q.  Were you with Tabaris Brown during any transactions?

21  A.  Say that again.

22  Q.  Well, were you with Tabaris Brown at any time when he bought

23  or sold drugs?

24  A.  Yes.

25  Q.  When?

1  A.   What do you mean when?

2  Q.   Can you name any of those times?

3  A.   I sold heroin with him every day.  But when he go buy the

4  heroin, sometime I don't have to go with him.  Sometimes he need

5  me to go with him if he driving there and driving back.

6  Q.   What would make the difference as to whether or not he would

7  need you with him?

8  A.   Because it's five hours to drive from Des Moines to Chicago

9  and five hours back.  He can't drive ten hours by hisself so he

10 always needs somebody with him.

11 Q.   Prior to testifying today, did you review pole camera

12 footage and phone calls and different documents?

13 A.   Yes.

14 Q.   Are you aware of any of those that show Tabaris Brown buying

15 drugs from -- of any sort from Carl Murphy?

16 A.   No.

17 Q.   Are you aware of anything that shows Earl Clay?

18 A.   Yes.

19 Q.   And that would be the June 26th that you're talking about,

20 correct?

21 A.   Yes.

22 Q.   Are you aware of anything showing Deshawn Greer?

23       MS. WEISER:  Objection.

24       THE COURT:  What's the objection?

25       MS. WEISER:  Irrelevance -- or, excuse me, relevance.

1          THE COURT:  I don't know that it's a relevancy

2    objection, but I'm not sure how -- what you're asking of this

3    defendant.

4          MS. BRANSTAD:  Your Honor, this client -- this witness

5    testified that he went with each and every one of these people

6    when they went to purchase drugs or when they went to sell

7    drugs, and he specifically said that he took each and every one

8    of them when they went to Carl Murphy's house.

9          THE COURT:  Correct.

10          MS. BRANSTAD:  And I'm asking him if he's aware of

11    anything that backs up that statement.

12          THE COURT:  Legally, there doesn't have to be anything

13    that backs up that statement.  I mean, he's -- his testimony is

14    his testimony.  You're asking him if he's aware of the rest of

15    the Government's evidence that he may or may not have ever seen

16    that may or may not corroborate his testimony?  He's just not

17    the right witness for that.

18          MS. BRANSTAD:  Okay.  Well, then I'll just -- okay.

19          One moment.

20    BY MS. BRANSTAD:

21    Q.  When was the last time that you drove Deshawn Greer to

22    Chicago?

23    A.  2020.

24    Q.  When was the last time that you drove Desmond Howard to

25    Chicago?

1    A.   Before he got locked up.   2020.

2    Q.   When was the last time that you drove Gregory Spight to

3    Chicago?

4    A.   2020.

5    Q.   When was the last time that you drove Earl Clay to Chicago?

6    A.   2021.

7    Q.   When was the last time that you drove Michael Byrd to

8    Chicago?

9    A.   2021.

10   Q.   Do you know when in 2021?

11   A.   No.   I just know it before I got arrested.

12   Q.   Do you know how many times you drove Michael Byrd to

13   Chicago?

14   A.   More than three times.

15   Q.   How many times did you drive Gregory Spight to Chicago?

16           MS. WEISER:   Objection; asked and answered.

17           MS. BRANSTAD:   I asked when.   I'm asking how many

18   times.

19           THE COURT:   Overruled.

20           You can answer.

21   A.   Twice.

22   BY MS. BRANSTAD:

23   Q.   How many times did you drive Desmond Howard to Chicago?

24   A.   A lot of times.

25   Q.   How many times did you drive Azim Abdul-Ahad to Chicago?

1  A.  Like four times.

2  Q.  When was the last time?

3  A.  Before he got arrested.

4  Q.  When was that?

5  A.  2020.

6  Q.  When was the last time that you drove Daeante Neely to

7  Chicago?

8  A.  I never drove him to Chicago.

9  Q.  When was the last time you drove Derrick Fleming to Chicago?

10 A.  2021.

11 Q.  How many times did you drive him to Chicago?

12 A.  Once.

13 Q.  Do you know when that was?

14 A.  To drop him off in Chicago for his son birthday.

15 Q.  When was the last time you drove Patrick Staples to Chicago?

16 A.  Patrick Staples always with us.  So sometimes he go to

17 Chicago by himself on the bus, but the last time I drove Patrick

18 Staples to Chicago was before I got arrested.

19 Q.  And when did you get arrested?

20 A.  July 21st, 2021.

21         THE COURT:  Is this a good breaking point,

22 Ms. Branstad?

23         MS. BRANSTAD:  Yes, Your Honor.

24         THE COURT:  All right.  We're going to go ahead and

25 break for the evening, ladies and gentlemen.  If you'll be back

1  in the jury room at 8:30 tomorrow morning, we'll get started at

2  that time.

3          (In open court, with the defendant present, out of the

4  presence of the jury.)

5          THE COURT:  Okay.  You can be seated.

6          All right.  Let's go through exhibits that were

7  admitted today.  I have Government Exhibits 102 through 319,

8  inclusive of all the "a" exhibits between 102 and 119.  I then

9  have 325 through 328.

10          Kyle, do you have anything different?

11          THE DEPUTY CLERK:  No.

12          THE COURT:  Does that match what you have, Ms. Jennings

13  or Ms. Weiser?

14          MS. JENNINGS:  Yes, Your Honor.  That's correct.  We

15  have the same list as the Court.

16          THE COURT:  Right.  Anything different for Defendant?

17          MS. BRANSTAD:  Your Honor, I may not have heard you

18  mention 300 through 316.

19          THE COURT:  Yes.  All the way through 319.

20          MS. BRANSTAD:  Yes.

21          THE COURT:  Okay.  How is the Government doing on time?

22          MS. WEISER:  Your Honor, we're moving quicker than we

23  anticipated, and the Government believes right now that we'll

24  likely rest early afternoon tomorrow.

25          THE COURT:  Okay.  Then the defendant should be

1  prepared to present his witnesses starting in early afternoon,

2  if he intends to call witnesses.

3  I have emailed the parties draft final jury

4  instructions, draft special verdict instructions, a draft

5  verdict form, and a draft special verdict form.  Please look at

6  those this evening, and we will get together tomorrow morning at

7  8:15 and talk about those.

8  I have not heard Mr. Holmes testify about any prior

9  convictions, so I had that as a proposed instruction on

10 impeachment by prior instruction, but I didn't hear anything

11 about that.

12 I also haven't heard any information about him having a

13 mandatory minimum potentially, so we may need to tweak that

14 instruction unless Ms. Branstad's going to get there during

15 cross-examination of him.

16 I assume, then, we'll want him first thing in the

17 morning to return for cross-examination.

18 Okay.  And then still Deputy Murillo and Sergeant

19 Carney are your last two for the day still?

20 MS. WEISER:  Yes, Your Honor.

21 THE COURT:  Anything we need to talk about tonight for

22 the Government?

23 MS. WEISER:  No, Your Honor.

24 THE COURT:  Ms. Branstad?

25 MS. BRANSTAD:  No, Your Honor.

1        THE COURT:  All right.  I'll see everybody back here at

2   8:15.  We'll get started again at that time.

3        Thank you.

4        (Recess at 5:02 p.m. until 8:17 a.m., Tuesday, August

5   23, 2022.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2              I, Kelli M. Mulcahy, a Certified Shorthand Reporter of

3    the State of Iowa and Federal Official Realtime Court Reporter

4    in and for the United States District Court for the Southern

5    District of Iowa, do hereby certify, pursuant to Title 28,

6    United States Code, Section 753, that the foregoing is a true

7    and correct transcript of the stenographically reported

8    proceedings held in the above-entitled matter and that the

9    transcript page format is in conformance with the regulations of

10   the Judicial Conference of the United States.

11             Dated at Des Moines, Iowa, this 22nd day of September,

12   2022.

13

14                          _____
                            Kelli M. Mulcahy, CSR, RDR, CRR
15                          Federal Official Court Reporter

16

17

18

19

20

21

22

23

24

25